**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
PHOENIX LIGHT SF LIMITED, BLUE HERON          :    Index No. 14-cv-10101-SAS
FUNDING II LTD., BLUE HERON FUNDING V         :    (rel. 14-cv-09366-SAS)
LTD., KLEROS PREFERRED FUNDING V PLC,         :
SILVER ELMS CDO PLC, SILVER ELMS CDO II       :    Hon. Shira A. Scheindlin
LIMITED, C-BASS CBO XIV LTD. and C-BASS       :
CBO XVII LTD.,                                :    **AMENDED COMPLAINT**
                                                          :
                          Plaintiffs,                     :
                                                          :
          -against-                                       :    **DEMAND FOR JURY TRIAL**
                                                          :
HSBC BANK USA, NATIONAL ASSOCIATION           :
                                                          :
                          Defendant.                      :
                                                          :
                                                          :
                                                          :
                                                          :
                                                          :
                                                          :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ...................................................................................................1

PARTIES .......................................................................................................................5

PLAINTIFFS' ACQUISITION OF CERTIFICATES AND STANDING TO SUE ....................7

JURISDICTION AND VENUE ......................................................................................13

FACTUAL ALLEGATIONS ..........................................................................................13

    I.      THE SECURITIZATION PROCESS................................................................13

    II.    HSBC'S DUTIES AND OBLIGATIONS ...........................................................15

          A.     HSBC's Duties Pertaining to the Delivery of Mortgage Files..................17

          B.     HSBC Had a Duty to Provide Notice of Defaults and
                Enforce Repurchase Obligations Triggered by Such Notice ....................23

          C.     HSBC's Duty to Act Prudently to Enforce Repurchase Obligations.........25

          D.     HSBC Had a Duty to Address the Master Servicer's
                and Servicers' Failure to Meet Prudent Servicing Standards ...................26

          E.     HSBC Is Liable for Negligence in Performing Its Duties ........................28

    III.   HSBC BREACHED ITS CONTRACTUAL,
          FIDUCIARY AND STATUTORY DUTIES ........................................................30

          A.     HSBC Was Aware of but Failed to Provide
                Notice of Defaults Relating to the Sponsors' and
                Originators' Pervasive Representation and Warranty Breaches ..........30

               1.     The Originators' and Sponsors' Pervasive
                      Breaches of Representations and Warranties ...............................38

          B.     HSBC Failed to Act Prudently to Enforce Repurchase Obligations..........42

               1.     Events of Default Under the PSAs Relating to
                      Document Delivery Failures in the Covered Trusts ....................43

                2.     Events of Default Under the MHC Trusts ....................................47

       3.     HSBC Received Written Notice of Representation and
Warranty Violations Which Ripened into Events of Default .......48

       4.     Events of Default Concerning False Servicer Certifications .........52

    C.    HSBC Failed to Address the Master
Servicer's and Servicers' Looting of Trust Assets ....................................54

IV.    HSBC SUFFERED FROM CONFLICTS OF INTEREST ..................................55

V.    HSBC'S CONDUCT INJURED PLAINTIFFS ...................................................58

CAUSES OF ACTION ..................................................................................................60

FIRST CAUSE OF ACTION (Violations of the TIA) ...................................................60

SECOND CAUSE OF ACTION (Breach of Contract) ..................................................62

THIRD CAUSE OF ACTION (Breach of Fiduciary Duty) ...........................................63

FOURTH CAUSE OF ACTION (Negligence and Gross Negligence) ........................64

FIFTH CAUSE OF ACTION (Violation of the Streit Act) ...........................................64

SIXTH CAUSE OF ACTION (Breach of the Covenant of Good Faith) ......................66

PRAYER FOR RELIEF ................................................................................................66

Phoenix Light SF Limited, Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, Silver Elms CDO II Limited, C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd., as holders of residential mortgage-backed securities ("RMBS") issued by certain Covered Trusts (defined below) (collectively, "Plaintiffs"), by and through their attorneys, bring this action against Defendant HSBC Bank USA, National Association ("HSBC," "Defendant" or the "Trustee"), and allege as follows:

## NATURE OF ACTION

1.     This action arises out of HSBC's role as trustee for 30 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against HSBC for breach of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act").

2.     The Covered Trusts were created to facilitate RMBS transactions introduced to investors from 2005 to 2007.  Fourteen of the RMBS transactions were sponsored by DB Structured Products, Inc. (the "DB Trusts"), four were sponsored by Merrill Lynch Mortgage Lending Inc. and one was sponsored by Merrill Lynch Mortgage Capital Inc. (together, the "Merrill Lynch Trusts"), three were sponsored by Fremont Investment & Loan (the "Fremont Trusts"), three were sponsored by Nomura Credit & Capital, Inc. (the "Nomura Trusts"), two were sponsored by MHC I, Inc. (the "MHC Trusts"), one was sponsored by PHH Mortgage corporation (the "PHH Trust"), one was sponsored by SG Mortgage Finance Corporation (the "SG Trust") and one was sponsored by SunTrust Mortgage, Inc. (the "SunTrust Trust") (DB, Merrill Lynch, MHC, Fremont, Nomura, PHH, SG and SunTrust are referred to collectively as the "Sponsors").

3.      Plaintiffs purchased, and currently hold, RMBS certificates with an original face value in excess of $454 million issued by the Covered Trusts identified in Exhibit B (the "Certificates").

4.      The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The Certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to HSBC.

5.      The Certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected.  Rather, such investors were dependent upon their trustee representative, HSBC, to police the deal and protect their contractual and other legal rights.

6.      As trustee for the Covered Trusts, HSBC owes Plaintiffs and the other Certificateholders certain contractual and common law duties as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts.  HSBC and the Master Servicer and Servicers were required to provide notice of breaches of representation and warranties provided by the Sponsors and Originators concerning key attributes of the mortgage loans underlying the Covered Trusts, including the origination

guidelines applicable to those loans and adherence to state laws regarding predatory lending. HSBC had a duty to enforce the obligation of the responsible parties (typically the Sponsors, affiliates that served as the depositors (the "Depositors"), or the party who originated the mortgage loans (the "Originators")) and to repurchase loans that breached representation and warranty provisions or were missing required documentation.  And HSBC was required to address defaults by the Servicers and Master Servicer who were required to engage in prudent loan mitigation practices.

7.     HSBC was actively involved in the origination and servicing of mortgage loans and typically had very close business relationships with the Sponsors, Originators and Depositors.  Nevertheless, as trustee, HSBC was obligated to act against the financial interest of the Sponsors when demanded by the circumstances.  HSBC, however, abandoned its obligations to protect the rights of investors.

8.     HSBC's breaches of its contractual, fiduciary and statutory duties gave rise to six distinct legal claims.

9.     <u>Breach of Contract.</u>  HSBC's contractual duties are set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs").[1]  HSBC breached the PSAs by failing to (i) provide notice of representation and warranty violations by the Sponsors and Originators; (ii) provide notice of the Servicers' and Master Servicer's failure to give notice of those same representation and warranty violations; (iii) cause the responsible parties to repurchase or substitute loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the

---

[1] The MHC Trusts were structured using indentures, servicing agreements, trust agreements and mortgage loan purchase agreements ("MLPAs"), which together are the functional equivalent of a PSA.  Unless expressly noted herein, when the term PSA is used it is also referring to the aforementioned governing agreements executed in connection with those securitizations.

PSAs; and (iv) exercise all rights and remedies available to the Trustee under the PSAs upon the occurrence of an Event of Default.

10.     <u>Breach of Fiduciary Duty</u>.  Under common law, after an "Event of Default" an indenture trustee had a duty to act as a prudent person would in the exercise of his own affairs to protect the rights of Certificateholders.  This duty continues until the Event of Default is cured.  HSBC failed to meet its fiduciary duties because it was aware Events of Default had occurred, but failed to take action to force the responsible parties to repurchase loans with representation and warranty violations or missing documentation and address breaches by the Servicers and Master Servicer.

11.     <u>Violations of the TIA</u>.  The TIA requires the trustee to provide Certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of Certificateholders during the period in which the default remains uncured.  HSBC violated these provisions to provide notice of defaults that it was aware of and failing to act prudently to protect the Certificateholders' interests by exercising all rights and remedies available to it under the PSAs.

12.     <u>Violation of the Streit Act</u>.  HSBC violated the Streit Act by failing to "use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" to protect the rights of Certificateholders during the pendency of an "event of default."  The Streit Act applies to the extent a PSA is not "qualified" under the TIA.  Thus, to the extent the TIA is deemed not to apply to any particular "mortgage investments," the Streit Act provides a similar remedy.

13.     <u>Negligence and Gross Negligence</u>.  HSBC had an extra-contractual duty to

perform ministerial acts with due care and to avoid conflicts of interest.  HSBC negligently performed ministerial acts by failing to provide notices of the numerous defaults that it was aware of under the PSAs.  HSBC violated its duty of independence by failing to take action against the Sponsors, Originators, Depositors, Servicers and Master Servicer because HSBC was involved in the same systematic origination and servicing misconduct and would have jeopardized future lucrative engagements if it acted.

14.     Breach of Covenant of Good Faith and Fair Dealing.  HSBC violated the covenant of good faith and fair dealing by failing to give notice of defaults and failing to take action to cause the responsible parties to repurchase loans that violated representation and warranty provisions or were missing required documentation.

15.     By failing to perform its duties, HSBC has caused Plaintiffs to suffer over $340 million of damages.

## PARTIES

16.     Plaintiff Phoenix Light SF Limited ("Phoenix Light") is a private limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Phoenix Light brings this action in its own right as a "CDO Issuer" that holds Certificates that were issued by certain of the Covered Trusts and pursuant to rights assigned to Phoenix Light by the Indenture Trustee to bring claims in the name of Kleros Preferred Funding V PLC and Silver Elms CDO PLC.

17.     Plaintiff Blue Heron Funding II Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding II Ltd. brings this action

in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

18.     Plaintiff Blue Heron Funding V Ltd. is an exempted limited liability company incorporated under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding V Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

19.     Plaintiff C-BASS CBO XIV Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  C-BASS CBO XIV Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

20.     Plaintiff C-BASS CBO XVII Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  C-BASS CBO XVII Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

21.     Plaintiff Kleros Preferred Funding V PLC is a special purpose public limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Kleros Preferred Funding V PLC brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

22.     Plaintiff Silver Elms CDO PLC is a special purpose public limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms CDO PLC brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

23.     Plaintiff Silver Elms CDO II Limited is a special purpose private limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms CDO II Limited brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

24.     Each Plaintiff is a corporate entity with separate legal existence and with a board of directors that controls its operations, akin to a corporation formed under U.S. law.  Each Plaintiff entity was organized for the purpose of investing in RMBS and other securities and has investors holding debt and income securities.

25.     Defendant HSBC is a national banking association organized and existing under the laws of the United States.  HSBC does business throughout the United States and maintains its principal executive office in New York and its main office in Virginia.  It serves as the trustee for the Covered Trusts.

**PLAINTIFFS' ACQUISITION OF CERTIFICATES AND STANDING TO SUE**

26.     Plaintiffs held (and currently hold) the Certificates identified in Exhibit B and suffered damages as a result of HSBC's breaches during the period that Plaintiffs held such certificates.

27.     Plaintiffs acquired ownership to the Certificates in multiple ways.

28.     Each of the Plaintiffs, with the exception of Blue Heron Funding II Ltd. and Blue Heron Funding V Ltd., acquired Certificates pursuant to an asset purchase agreement or similar

agreement with third parties including WestLB AG, Harrier Limited ("Harrier"), and Kestrel Funding P.L.C. ("Kestrel") and have held these Certificates continuously since the date of acquisition identified on Exhibit B.

29.     These asset purchase agreements contain choice of law provisions that incorporate New York law.

30.     Blue Heron Funding II Ltd., Blue Heron V Funding Ltd. and Kleros Preferred Funding V PLC also acquired Certificates through direct purchases made after the CDO closing.  Exhibit B identifies which certificates were acquired through market purchases. Blue Heron Funding II Ltd., Blue Heron Funding V Ltd. and Kleros Preferred Funding V PLC have held these Certificates continuously since the date of acquisition identified in Exhibit B.

31.     Plaintiffs have suffered an injury in fact because they are Certificateholders and were damaged as a result of HSBC's breaches as described herein.  Accordingly, they have standing to sue under Article III of the Constitution of the United States.

32.     Plaintiffs also have contractual standing to pursue the claims set forth herein.

33.     Each of the Plaintiffs other than Phoenix Light (*i.e.*, Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, Silver Elms CDO II Limited, C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd.) entered into Indentures (the "CDO Indentures") with a CDO trustee. The CDO Trustees are: (i) Deutsche Bank Trust Company Americas ("Deutsche Bank") for Kleros Preferred Funding V PLC and Silver Elms CDO PLC; (ii) The Bank of New York Trust Company, National Association ("BNY Trust Co.), in its own right or as successor trustee to JPMorgan Chase Bank, for Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., C-BASS CBO XIV Ltd.

and C-BASS CBO XVII Ltd.; and (iii) Wells Fargo Bank, N.A. ("Wells Fargo Bank") for

Silver Elms CDO II Limited.

34.     The Granting Clause of the CDO Indentures convey to the CDO Trustee a

security interest in the underlying collateral for the benefit of Secured Parties.  For example,

the CDO Indenture for Silver Elms CDO II Limited provides:

> The Issuer herby Grants to the Trustee, for the benefit and
> security of the Secured Parties, all of its right, title and interest
> in, to and under, in each case, whether now owned or existing, or
> hereafter acquired or arising, all accounts, chattel paper,
> commercial tort claims, deposit accounts, documents, general
> intangibles, goods, instruments, investment property and letter-
> of-credit rights, including but not limited to the . . . Collateral
> Debt Securities . . . Such Grants are made to the Trustee to hold
> in trust, to secure the Secured Notes.

The other CDO Indentures contain substantially similar grants.

35.     The "Secured Parties" under each of the CDO Indentures include the senior

noteholders.  Phoenix Light holds more than 50% of the senior notes and, thus, is the

Controlling Party and/or the Majority for, each of (i) Blue Heron Funding II Ltd.; (ii) Blue

Heron Funding V Ltd.; (iii) Kleros Preferred Funding V PLC; (iv) Silver Elms CDO PLC;

(v) Silver Elms CDO II Limited; (vi) C-BASS CBO XIV Ltd.; and (vii) C-BASS CBO XVII

Ltd. under the CDO Indentures.

36.     Because only a security interest was conveyed to the CDO Trustees for the

benefit of the CDO senior noteholders and other Secured Parties, neither the CDO Issuers

nor Phoenix Light were divested of their right to bring claims.

37.     Nevertheless, the CDO Trustees have each assigned any right they have to

bring the claims herein to Plaintiffs to the extent that such an assignment is deemed

necessary.  Phoenix Light directed them to do so on December 12, 2014.  Because these

entities suffer from conflicts of interest by virtue of the fact that they are being sued by Plaintiffs, the CDO Trustees wrongfully refused to act until recently.

38.     On April 16, 2015, Deutsche Bank and Phoenix Light entered into a written assignment agreement whereby Deutsche Bank assigned to Phoenix Light as controlling noteholder "any and all rights that the Trustee may have to pursue and enforce the claims set forth" in this action on behalf of Kleros Preferred Funding V PLC and Silver Elms CDO PLC "including any claims which may be added to the Lawsuits by virtue of an amendment to the Complaints or otherwise."  Accordingly, if Deutsche Bank as CDO Trustee was the only party that could bring claims of, and in the name of, Kleros Preferred Funding V PLC and Silver Elms CDO PLC, Phoenix Light now has such authority.  Alternatively, if Kleros Preferred Funding V PLC and Silver Elms CDO PLC retained the ability to bring claims, they do so in their own right here as they are parties to this action.

39.     On June 19, 2015, BNY Trust Co., Phoenix Light, Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd. (among others) entered into a written assignment agreement whereby BNY Trust Co. assigned to Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd. "all right, title and interest in, to and under, in each case, that the Trustee may have with respect to the claims asserted or which may hereafter be asserted on behalf" of these entities in this action.  Accordingly, to the extent BNY Trust Co. as CDO Trustee obtained the exclusive right to assert claims on behalf of Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd., that right has been assigned back to Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd.  Alternatively, if

Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd. retained the ability to bring claims, they do so in their own right here as they are parties to this action.

40.     On June 26, 2015, Wells Fargo Bank, Phoenix Light and Silver Elms CDO II Limited (among others) entered into a written assignment agreement whereby Wells Fargo assigned to Silver Elms CDO II Limited "all right, title and interest that [Wells Fargo] may have, if any, with respect to the claims asserted by each CDO Issuer or which may hereafter be asserted by each CDO Issuer" in this action.  Accordingly, to the extent that Wells Fargo as CDO Trustee obtained the exclusive right to assert claims on behalf of Silver Elms CDO II Limited, that right has been assigned back to Silver Elms CDO II Limited.  Alternatively, if Silver Elms CDO II Limited retained the ability to bring claims, it does so in its own right here as it is a party to this action.

41.     Phoenix Light is structured differently than the other Plaintiffs and did not enter into an Indenture with a CDO trustee.  Instead, Phoenix Light entered into a Trust Agreement that provided to Deutsche Bank as Phoenix Light's Trustee a security interest in the collateral by pledging in Section 3.2 of the Trust Agreement "all its present and future, actual and contingent claims and rights" with respect to the collateral.  Section 3.5 provides that the "pledges pursuant to Clause 3.2 are granted for the purpose of securing the Trustee Claim."

42.     Section 3.7 of the Phoenix Light Trust Agreement expressly authorizes the Issuer (*i.e.,* Phoenix Light) to take actions with respect to the pledged collateral as that section provides: "The Issuer shall be authorised (*ermächtigt*) to collect or have collected in the ordinary course of business or otherwise exercise or deal with (which terms shall, for the

avoidance of doubt, include the enforcement of any security) the rights pledged under

Clause 3.2."

43.     Phoenix Light also entered into an Amended Security Agreement with

Deutsche Bank as Phoenix Light's Trustee, which applies only to assets acquired from

Harrier and Kestrel, including the RMBS conveyed to Phoenix Light pursuant to the asset

purchase agreements identified on Exhibit B.  Section 2.1 of that agreement provides for a

"Grant of Security Interest" providing "the Issuer hereby Grants to the Trustee, for the

benefit of the Transaction Creditors, all of the Issuer's right, title and interest in and to the"

assets acquired from Harrier and Kestrel.  The term "grant" is defined as not including any

of the "obligations" of the issuer with respect to the collateral, including those obligations

set forth in the Phoenix Light Trust Agreement.  The "obligations" of the Issuer include the

obligation to protect the collateral found in Section 9.8 of the Phoenix Light Trust

Agreement.  This provision expressly contemplates that Phoenix Light will act if there are

breaches of covenants or obligations with respect to the collateral, including by enforcing

rights as it is authorized to do under Section 3.7.  Accordingly, Phoenix Light clearly has

contractual standing to bring claims with respect to the RMBS it holds directly as identified

in Exhibit B.

44.     To the extent Deutsche Bank as Phoenix Light's Trustee obtained any rights

to bring the claims asserted herein, on June 17, 2015, Deutsche Bank assigned "all rights

that [Deutsche Bank] may have to pursue and enforce the claims set forth in" this action

"including any claims which may be added to the [action] by virtue of an amendment to the"

complaints or otherwise.  As a result, to the extent that Deutsche Bank as Phoenix Light's

Trustee obtained the exclusive right to assert claims on behalf of Phoenix Light, that right has

been assigned back to Phoenix Light.

## JURISDICTION AND VENUE

45.     This Court has jurisdiction over the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has jurisdiction over the other claims asserted under 28 U.S.C. § 1367.  This Court also has jurisdiction pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

46.     Venue is proper pursuant to 28 U.S.C. § 139l(b) and 15 U.S.C. § 77v as HSBC resides and transacts business in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

47.     This Court has personal jurisdiction over HSBC because HSBC maintains its principal place of business in New York.  This Court also has personal jurisdiction over HSBC because a substantial part of the administration of the Covered Trusts, out of which the claims asserted herein arise, is performed in New York.  Additionally, the majority of the Covered Trusts are New York trusts, with their governing agreements governed by New York law and, in certain of the PSAs, HSBC expressly consented to this Court's jurisdiction.

## FACTUAL ALLEGATIONS

## I.    THE SECURITIZATION PROCESS

48.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are deducted.

49.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as DB Structured Products, Inc., and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

50.     The depositor then conveys the pool of loans to a trustee, such as HSBC, pursuant to a PSA that establishes various prioritized "tranches" of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, HSBC acted as the trustee in connection with the relevant RMBS transactions.

51.     Pursuant to the PSA for each trust, a "servicer" is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation and managing and selling foreclosed properties.

52.     The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. § 229.1121.  The servicer provides data to the trustee to include in these remittance reports.

53.     Each tranche in a loan securitization has a different level of risk and reward,

and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the "waterfall."

54.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

55.     HSBC earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS. HSBC also received significant benefits from the interest-free deposits maintained in their accounts when the servicing payments were remitted to their accounts.  HSBC maintained accounts for hundreds of trusts and earned enormous sums from the aggregate balances on these accounts.  The RMBS trustee engagements further deepened HSBC's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.     <u>HSBC'S DUTIES AND OBLIGATIONS</u>

56.     HSBC's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs, or, as was the case for the MHC Trusts, an Indenture, and under applicable state and federal law.  These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts.  HSBC entered into PSAs or Indentures with:

(a) For one of the DB Trusts (ACE 2005-AG1): (i) ACE Securities Corporation, as Depositor; (ii) Wells Fargo Bank, N.A. as Master Servicer and Securities Administrator; and (iii) Litton Loan Servicing LP, as Servicer;

(b) For one of the DB Trusts (ACE 2006-ASP1): (i) ACE Securities Corporation, as Depositor; (ii) Wells Fargo Bank, N.A. as Master Servicer and Securities Administrator; and (iii) Saxon Mortgage Services, Inc., as Servicer;

(c) For six of the DB Trusts (ACE 2006-ASP2, ACE 2006-ASP5, ACE 2006-HE1, ACE 2006-HE4, ACE 2007-SL1 and ACE 2007-HE1): (i) ACE Securities Corporation, as Depositor; (ii) Wells Fargo Bank, N.A. as Master Servicer and Securities Administrator; and (iii) Ocwen Loan Servicing, LLC, as Servicer;

(d) For five of the DB Trusts (DBALT 2006-AF1, DBALT 2006-AR3, DBALT 2006-AB4, DBALT 2006-AR6 and DBALT 2007-AR1)[2] and the PHH Trust: (i) Deutsche Alt-A Securities, Inc., as Depositor; and (ii) Wells Fargo Bank, N.A., as the Master Servicer and Securities Administrator;

(e) For two of the Fremont Trusts (FHLT 2006-C and FHLT 2006-D): (i) Fremont Mortgage Securities Corporation, as Depositor; (ii) Fremont Investment & Loan, as Originator and Servicer; and (iii) Wells Fargo Bank, N.A., as Master Servicer and Trust Administrator;

(f) For one of the Fremont Trusts (FHLT 2006-B): (i) Fremont Mortgage Securities Corporation, as Depositor; (ii) Fremont Investment & Loan, as Sponsor, Originator and Servicer; and (iii) Wells Fargo Bank, N.A., as Master Servicer, Trust Administrator and Swap Administrator;

(g) For one of the Merrill Lynch Trusts (MANA 2007-A2): (i) Merrill Lynch Mortgage Investors, Inc., as Depositor; and (ii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(h) For one of the Merrill Lynch Trusts (MANA 2007-OAR2): (i) Merrill Lynch Mortgage Investors, Inc., as Depositor; (ii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and (iii) Wilshire Credit Corporation as Servicer and Company;

(i) For three of the Merrill Lynch Trusts (OWNIT 2005-2, OWNIT 2005-3 and OWNIT 2005-4): (i) Merrill Lynch Mortgage Investors, as Depositor; (ii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and (iii) Litton Loan Servicing LP, as

---

[2] DMSI 2006-PR1 was a non-public offering and the relevant PSA is not a publicly filed document.

Servicer;

(j) For the MHC Trusts: An Indenture with (i) the trust as Issuer; and (ii) Wells Fargo Bank, N.A., as Securities Administrator;

(k) For one of the Nomura Trusts (NAA 2005-AR6): (i) Nomura Asset Acceptance Corporation, as Depositor; (ii) Nomura Credit & Capital, Inc., as Seller; (iii) GMAC Mortgage Corporation, as Servicer; and (iv) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(l) For one of the Nomura Trusts (NAA 2006-AR4): (i) Nomura Asset Acceptance Corporation, as Depositor; (ii) Nomura Credit & Capital, Inc., as Sponsor; (iii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and (iv) GMAC Mortgage, LLC, as Servicer;

(m)For one of the Nomura Trusts (NHELI 2006-FM2): (i) Nomura Home Equity Loan, Inc., as Depositor; (ii) Nomura Credit & Capital, Inc., as Sponsor; (iii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and (iv) Equity One, Inc., as Servicer;

(n) For the SG Trust: (i) Asset Backed Securities Corporation, as Depositor; and (ii) Wells Fargo Bank, N.A., as Servicer, Master Servicer and Securities Administrator; and

(o) For the SunTrust Trust: (i) Bear Stearns Asset Backed Securities I LLC, as Depositor; and (ii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator.

## A.    HSBC's Duties Pertaining to the Delivery of Mortgage Files

57.    Each PSA sets forth a process for conveying the mortgage loans to the

Covered Trusts.  Typically, the Sponsor conveyed the loans to the Depositor for the Covered

Trusts.  Then the Depositor conveyed the mortgage loans to HSBC in its capacity as the

Trustee for the Covered Trusts to hold for the benefit of Certificateholders.  This process is

set forth in Section 2.01 ("Conveyance of Mortgage Loans") of the Merrill Lynch PSA,[3]

---

[3] Quotations to the Merrill Lynch PSA herein are to the PSA executed in connection with the OWNIT 2005-2 securitization.  The other four Merrill Lynch Trusts (OWNIT 2005-3, OWNIT 2005-4, MANA 2007-A2 and MANA 2007-OAR2), as well as the other trusts in this action were issued pursuant to PSAs with substantially similar language and any differences are immaterial to the issues addressed in this Amended Complaint.  The relevant provisions of the governing agreements for each trust are set forth in Exhibit C hereto and are substantially similar.

which provides in relevant part:

> The Depositor, concurrently with the execution and delivery hereof, does hereby sell, transfer, assign, set over and convey to the Trustee without recourse all the right, title and interest of the Depositor in and to the assets of the Trust Fund. . . . The ownership of each Mortgage Note, the Mortgage and the contents of the related Mortgage File is vested in the Trustee on behalf of the Certificateholders. . . . In addition . . . , the Depositor does hereby convey, assign and set over to the Trustee for the benefit of the Certificateholders its rights and interests under the Sale Agreement, including the Depositor's right, title and interest in the representations and warranties contained in the Sale Agreement, the rights in the Transfer Agreement described therein and the benefit of the repurchase obligations and the obligation of the Seller contained in the Sale Agreement to take, at the request of the Depositor or the Trustee, all action on its part which is reasonably necessary to ensure the enforceability of a Mortgage Loan.

58.     The PSAs for the DB,[4] Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts set forth a substantially similar process.  *See* Ex. C § I.

59.     In addition, Section 2.02 of the Merrill Lynch PSA ("Acceptance by the Trustee of the Mortgage Loans") provides that the Trustee is required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all present and future Certificateholders.  It provides:

> Except as set forth in the Exception Report delivered contemporaneously herewith (the "Exception Report"), the Trustee acknowledges receipt of the Mortgage Note for each Mortgage Loan and delivery of a Mortgage File (but does not acknowledge receipt of all documents required to be included in such Mortgage File) with respect to each Mortgage Loan and declares that it holds and will hold such documents and any other documents constituting a part of the Mortgage Files delivered to it in trust for the use and benefit of all present and future Certificateholders.

The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts set forth a

---

[4] Upon information and belief, the DMSI 2006-PR1 PSA contains substantially similar language as the DB PSAs and any differences are immaterial to the issues addressed in this Amended Complaint.

substantially similar process.  *See* Ex. C § II.

60.    Section 2.01 of the Merrill Lynch PSA also specifically sets forth the

operative documents that must be contained in the mortgage file for the mortgage loans.  It

provides:

> [T]he Depositor does hereby deliver to, and deposit with, the Trustee
> or its Custodian, the following documents or instruments with
> respect to each Mortgage Loan. . .
>
> (A) The ***original Mortgage Note endorsed*** in blank or, "Pay to the
> order of HSBC Bank USA, National Association, as trustee, without
> recourse" together with all riders thereto. The Mortgage Note shall
> include all intervening endorsements showing a complete chain of
> the title from the originator to [_____];
>
> (B) Except as provided below and for each Mortgage Loan that is
> not a MERS Loan, the ***original recorded Mortgage with all riders
> thereto, with evidence of recording thereon***, or, if the original
> Mortgage has not yet been returned from the recording office, a copy
> of the original Mortgage certified by the Transferor to be true copy
> of the original of the Mortgage that has been delivered for recording
> in the appropriate recording office of the jurisdiction in which the
> Mortgaged Property is located and in the case of each MERS Loan,
> the original Mortgage, noting the presence of the MIN of the Loan
> and either language indicating that the Mortgage Loan is a MOM
> Loan or if the Mortgage Loan was not a MOM Loan at origination,
> the original Mortgage and the assignment thereof to MERS, with
> evidence of recording indicated thereon, or a copy of the Mortgage
> certified by the public recording office in which such Mortgage has
> been recorded;
>
> (C) In the case of each Mortgage Loan that is not a MERS Loan, the
> ***original Assignment*** of each Mortgage endorsed either in blank or,
> to "HSBC Bank USA, National Association, as trustee";
>
> (D) The ***original policy of title insurance*** (or a preliminary title
> report, commitment or binder if the original title insurance policy
> has not been received from the title insurance company);
>
> (E) ***Originals of any intervening assignments of the Mortgage***,
> ***with evidence of recording thereon*** or, if the original intervening
> assignment has not yet been returned from the recording office, a
> copy of such assignment certified to be a true copy of the original of

the assignment which has been sent for recording in the appropriate jurisdiction in which the Mortgaged Property is located; and

(F) ***Originals of all assumption and modification agreements***, if any.

(Emphasis added.)  The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts set forth a substantially similar process.  *See* Ex. C § III.

61.    Physical possession of these documents by HSBC was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

62.    After a designated period, HSBC, or a Custodian on its behalf, was required to issue a final certification and exception report that identified mortgage files that were missing documentation required under the PSA.  *See* Ex. C § V.  When a Custodian provided this exception report, it was required to provide it to HSBC, the Depositor, the Sponsor and the Servicer or Master Servicer.  *See* Ex. C §§ III, V.

63.    The "Form of Trustee Certification," which was attached to the Merrill Lynch PSA as Exhibit D, provides:

Ladies and Gentlemen:

In accordance with Section 2.02 of the Pooling and Servicing Agreement dated as of March 1, 2005 among Merrill Lynch Mortgage Investors, Inc., as depositor, Wells Fargo Bank, N.A., as master servicer and securities administrator, HSBC Bank USA, National Association, as trustee and Litton Loan Servicing LP, as servicer (the "Pooling and Servicing Agreement"), the undersigned, as custodian, hereby certifies that [, except as set forth in Schedule A hereto,] as to each Mortgage Loan listed in the Mortgage Loan Schedule attached hereto (other than any Mortgage Loan paid in full or listed on the attachment hereto) it has reviewed the Mortgage File and the Mortgage Loan Schedule and has determined that:

(i)  All documents in the Mortgage File required to be delivered to the Trustee pursuant to Section 2.01 of the Pooling and Servicing Agreement are in its possession;

(ii) In connection with each Mortgage Loan or Assignment thereof as to which documentary evidence of recording was not received on the Closing Date, it has received evidence of such recording; and

(iii) Such documents have been reviewed by it and appear regular on their face and relate to such Mortgage Loan.

The custodian has made no independent examination of any documents contained in each Mortgage File beyond confirming (i) that the Mortgage Loan number, the name of the Mortgagor, the street address (excluding zip code), the mortgage interest rate at origination, the gross margin (if applicable), the lifetime rate cap (if applicable), the periodic rate cap (if applicable), the original principal balance, the first payment due date and the original maturity date in each Mortgage File conform to the respective Mortgage Loan number and name listed on the Mortgage Loan Schedule and (ii) the existence in each Mortgage File of each of the documents listed in subparagraphs (i)(A) through (F), inclusive, or (ii)(A) through (K), inclusive, as applicable, of Section 2.01 in the Agreement. The custodian makes no representations or warranties as to the validity, legality, recordability, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage Loan or the collectability, insurability, effectiveness or suitability of any such Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-referenced Pooling and Servicing Agreement.

WELLS FARGO BANK, N.A.,
AS CUSTODIAN ON BEHALF OF HSBC AS TRUSTEE

The PSAs (or Custodial Agreements) for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts contain a substantially similar form of final certification.  *See* Ex. C § IV.

64.     The final certification and document exception report are the two key certifications that HSBC was required to prepare for the Covered Trusts.  In these documents, HSBC certified that (i) there was full and complete loan documentation in

accordance with the requirements of the PSAs for those loans specifically identified on the

mortgage loan schedule; and (ii) HSBC had not obtained complete required documentation

for those loans identified on the document exception report.  If there was a defect with any

mortgage file, then HSBC was obligated to demand that the Sponsor cure the defect leading

to the exception within 90 days or repurchase or substitute the defective loans.  This is set

forth in Section 2.02 of the Merrill Lynch PSA, which provides:

> The Trustee agrees, for the benefit of Certificateholders and the
> NIMs Insurer, to review or cause its Custodian to review each
> Mortgage File delivered to it within 60 days after the Closing Date
> . . . to ascertain and to certify, within 70 days of the Closing Date
> (or the Subsequent Transfer Date with respect to Subsequent
> Mortgage Loans), to the NIMs Insurer, the Depositor, the Master
> Servicer and the Servicer that all documents required by Section
> 2.01 have been executed and received, and that such documents
> relate to the Mortgage Loans identified in Exhibit B that have been
> conveyed to it.

> If the Trustee finds any document or documents constituting a part
> of a Mortgage File to be missing or defective (that is, mutilated,
> damaged, defaced or unexecuted) in any material respect, the
> Trustee shall promptly (and in any event within no more than five
> Business Days) after such finding so notify the NIMs Insurer, the
> Servicer, the Master Servicer, the Seller and the Depositor. In
> addition, the Trustee shall also notify the NIMs Insurer, the Master
> Servicer, the Servicer, the Seller and the Depositor if the original
> Mortgage with evidence of recording thereon with respect to a
> Mortgage Loan is not received within 70 days of the Closing Date
> (or the Subsequent Transfer Date with respect to Subsequent
> Mortgage Loans). . . .

> The Trustee shall request that the Seller correct or cure such
> omission, defect or other irregularity, or substitute a Mortgage Loan
> pursuant to the provisions of Section 2.03, within 90 days from the
> date the Seller was notified of such omission or defect and, if the
> Seller does not correct or cure such omission or defect within such
> period, that the Seller purchase such Mortgage Loan from the Trust
> Fund within 90 days from the date the Trustee notified the Seller of
> such omission, defect or other irregularity at the Purchase Price of
> such Mortgage Loan. . . .  Within 70 days of the Closing Date (or
> the Subsequent Transfer Date with respect to Subsequent Mortgage

> Loans), the Trustee (or its custodian) shall deliver to the NIMs Insurer, the Depositor, the Master Servicer and the Servicer the Trustee's Certification, substantially in the form of Exhibit D attached hereto, evidencing the completeness of the Mortgage Files, with any exceptions noted thereto.

The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts contain substantially similar requirements.  *See* Ex. C § V.

65.     In some of the Covered Trusts, after the passage of a specified period of time, the Trustee could not seek substitution of loans and could merely demand repurchase.  For example, Section 2.03 of the Merrill Lynch PSA provides that substitution is not an available remedy more than two years from closing.  The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts have similar cutoffs.  *See* Ex. C § V.

### B.     HSBC Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice

66.     HSBC had an obligation pursuant to the PSAs to provide notice to all parties of the Sponsors' or Originators' breaches of representations and warranties under the PSAs or MLPAs.  For example, Section 2.03 of the Merrill Lynch PSA provides:

> Upon discovery by any of the Depositor, the Master Servicer, the Securities Administrator, the Servicer, the NIMs Insurer or the Trustee of a breach of any of such representations and warranties that adversely and materially affects the value of the related Mortgage Loan, Prepayment Charges or the interests of the Certificateholders, the party discovering such breach shall give prompt written notice to the other parties. Within 90 days of the discovery of such breach of any representation or warranty, the Transferor or the Seller, as applicable, shall either (a) cure such breach in all material respects, (b) repurchase such Mortgage Loan or any property acquired in respect thereof from the Trustee at the Purchase Price or (c) within the two year period following the Closing Date, substitute a Replacement Mortgage Loan for the affected Mortgage Loan. In the event of discovery of a breach of any representation and warranty of the Transferor or the Seller, the Trustee shall enforce its rights under the Transfer Agreement or the

23

Sale Agreement for the benefit of Certificateholders and the NIMs Insurer.

The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts contain substantially similar provisions.  *See* Ex. C § V.  HSBC has a common law duty to perform theses ministerial acts with due care.

67.     In addition, the PSAs require that HSBC provide notice of breaches of covenants made by the Servicers or the Master Servicer.  For example, Section 7.01 of the Merrill Lynch PSA provides that most breaches by the Servicer ripen into an Event of Default if left unremedied for 60 days after "written notice of such failure shall have been given to the Servicer by . . . the Trustee."  *See* Ex. C § VIII; *see also* Ex. C § V.  This provision clearly contemplates that the Trustee "shall" provide notice of Servicer breaches upon becoming aware of such breaches, which makes sense as the Trustee was the party required to police the deal for investors.  The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts contain substantially similar provisions.  *See* Ex. C § VIII; *see also* Ex. C § V.

68.     The PSAs have additional provisions requiring the Trustee to provide notice to all parties of breaches of representations and warranties made by the Servicers or Master Servicer.  For example, Section 2.03(c) of the Merrill Lynch PSA provides that:  "Upon discovery by any of the Depositor, the Master Servicer, the Securities Administrator, the Servicer, the NIMS Insurer or the Trustee of a breach of any of such representations and warranties that adversely and materially affects the value of the related Mortgage Loan . . . or the interests of the Certificateholders, the party discovering such breach shall give prompt written notice to the other parties."  The PSAs for the Nomura and SunTrust Trusts contain substantially similar provisions.  *See* Ex. C § V.

24

69.     In addition, after the occurrence of an Event of Default or a substantial breach of the PSA by the Trustee, the Trustee assumes the same duties as a common law trustee which includes, among other things, providing beneficiaries notice of all defaults under the operative trust documents, which include the PSAs here.

70.     Congress also enacted the TIA to ensure, among other things, that investors in certificates, bonds and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. § 77bbb.

71.     Under Section 315(b) of the TIA, HSBC was required to give Certificateholders notice of a default under the PSAs within 90 days of learning of such default.  15 U.S.C. § 77ooo(b).

72.     As set forth in Section III hereof, HSBC failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law and the TIA.

**C.      HSBC's Duty to Act Prudently to Enforce Repurchase Obligations**

73.     Under the PSAs and applicable law, HSBC owed a fiduciary duty to Certificateholders upon the occurrence of an Event of Default.  HSBC's post-default fiduciary duties are described in Section 8.01 of the Merrill Lynch PSA, which provides in relevant part, "[i]n case an Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."  The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts impose substantially similar obligations on HSBC.  *See* Ex. C § VI.

74.     The duty to act prudently to protect the interests of Certificateholders is a continuing duty that remains in effect until the Event of Default is cured.

75.     In addition, Section 315(c) of the TIA provides that upon the occurrence of a default the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).

76.     The Streit Act provides that upon the occurrence of an "event of default," an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

77.     Upon the occurrence of an Event of Default, a prudent trustee would have exercised all of its rights under the PSAs to ensure that loans that defaulted were eligible for repurchase or substitution due to representation and warranty violations or because they were missing required documentation were put back to the responsible parties.  A prudent trustee would have also taken steps to remedy servicing breaches that increased the loss severities dramatically on the underlying mortgage loans.

78.     As set forth below in Section III, HSBC failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

**D.     HSBC Had a Duty to Address the Master Servicer's and Servicers' Failure to Meet Prudent Servicing Standards**

79.     Each PSA requires the Master Servicer or Servicers to service the loans underlying the Covered Trusts prudently.

80.     For example, the Merrill Lynch PSA provides:  "For and on behalf of the

Certificateholders, the Servicer shall service and administer the Mortgage Loans, including without limitation, any powers of attorney, in accordance with Accepted Servicing Practices." Merrill Lynch PSA § 3.01.  "Accepted Servicing Practices" is defined in the Merrill Lynch PSA as "the mortgage servicing practices of prudent mortgage lending institutions that service for their own account mortgage loans of the same type as the Mortgages Loans in the jurisdictions in which the related Mortgaged Properties . . . are located."  Merrill Lynch PSA Article 1.  The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts contain substantially similar requirements.  *See* Ex. C § VII.

81.     The DB, Merrill Lynch, MHC, Nomura, PHH, SG and SunTrust PSAs provide that failure to meet prudent servicing standards is an Event of Default if left uncured for a designated period of time after notice of the default.  *See* Ex. C § VIII.

82.     For example, Section 7.01 of the Merrill Lynch PSA provides that an Event of Default is triggered by:

> [a]ny failure by the Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in this Agreement or any representation or warranty shall prove to be untrue, which failure or breach shall continue unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Servicer by the Master Servicer, the Securities Administrator, the Trustee or the Depositor, or to the Master Servicer, the Securities Administrator, the Trustee and the Depositor by the NIMs Insurer or the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates.

*See* Ex. C § VIII.

83.     Additionally, the Fremont PSA provides that the failure to follow prudent servicing standards is an Event of Default 30 days after a Servicing Officer becomes aware of such breach, without regard to whether notice was provided.  *See* Ex. C § VIII.

84.     Upon a Master Servicer or Servicer default or Event of Default, HSBC (or in the case of the Merrill Lynch PSA, the Master Servicer) was obligated to act.  As discussed above in Section II(B), HSBC had a duty to provide notice when it became aware of breaches of the PSAs by the Servicers or the Master Servicer.  If the defaults were not cured within the grace period, or if the Trustee failed to give notice, the Trustee was required to take action to address the defaults.  For example, the DB PSA provides that that once a Master Servicer Event of Default occurred, HSBC had the authority and obligation to "terminate all of the rights and obligations of the Master Servicer. . . under this Agreement," DB PSA § 7.01, and "[o]n and after the time the Master Servicer receives a notice of termination, the Trustee shall be the successor in all respects to the Master Servicer . . . under this Agreement and the transactions set forth or provided for herein, and all the responsibilities, duties and liabilities relating thereto and arising thereafter shall be assumed by the Trustee." DB PSA § 7.02.  The PSAs for the Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts impose substantially similar obligations on HSBC.  *See* Ex. C §§ VIII, IX.  More generally, HSBC, as trustee, had a duty to exercise all rights available under the PSAs to protect Certificateholders' interests and do so with due care.

85.     As set forth below in Section III, HSBC breached its statutory, fiduciary and contractual duties by failing to take actions to address Master Servicer and Servicer defaults and Events of Default.

### E.     HSBC Is Liable for Negligence in Performing Its Duties

86.     Under the plain language of the PSAs, the TIA, the Streit Act and applicable common law, HSBC had a duty to perform its duties under the PSAs competently and is liable for its negligent failure to do so.  Section 8.01 of the Merrill Lynch PSA provides in

relevant part:

> ***No provision of this Agreement shall be construed to relieve the
> Trustee or the Securities Administrator from liability for its own
> negligent action, its own negligent failure to act or its own
> misconduct, its negligent failure to perform its obligations in
> compliance with this Agreement, or any liability that would be
> imposed by reason of its willful misfeasance or bad faith***; provided,
> however, that:
>
> Prior to the occurrence of an Event of Default, and after the curing
> of all such Events of Default that may have occurred, the duties and
> obligations of the Trustee shall be determined solely by the express
> provisions of this Agreement;
>
> Neither the Trustee nor the Securities Administrator shall,
> individually or as Trustee or Securities Administrator, as applicable,
> be liable for an error of judgment made in good faith by a
> Responsible Officer or Responsible Officers of the Trustee ***unless
> the Trustee*** or Securities Administrator, as applicable, ***was
> negligent or acted in bad faith or with willful misfeasance***; and
>
> The Trustee shall not be liable with respect to any action taken,
> suffered or omitted to be taken by it in good faith in accordance with
> the direction of the NIMs Insurer or the Holders in accordance with
> this Agreement relating to the time, method and place of conducting
> any proceeding for any remedy available to the Trustee, or
> exercising any trust or power conferred upon the Trustee under this
> Agreement.

(Emphasis added.)  The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust

Trusts contain substantially similar provisions.  *See* Ex. C § VI.

      87.     Every trustee also has a non-waivable duty to exercise due care in the

performance of ministerial acts required to be undertaken in the course of the administration

of the trust.  HSBC can be held liable for its own negligence in failing to perform its

requisite ministerial acts, including, among other things, its responsibility to: (i) give notice

to all parties to the PSAs of the breach of representations and warranties relating to the

mortgage loans once it discovered the Sponsors' widespread practice of including in

securitization trusts loans that breached such representations and warranties; and (ii) provide

notice of servicing related breaches known to the Trustee.

88.     Every trustee—including HSBC—has an absolute duty to avoid conflicts of

interest and a duty of undivided loyalty to trust investors.  This duty is non-waivable and

arises independently of the PSAs.

### III.    HSBC BREACHED ITS CONTRACTUAL, FIDUCIARY AND STATUTORY DUTIES

#### A.    HSBC Was Aware of but Failed to Provide Notice of Defaults Relating to the Sponsors' and Originators' Pervasive Representation and Warranty Breaches

89.     HSBC failed to give notice of defaults that occurred when the Sponsors or

Originators breached representation and warranty provisions providing that all loans met

applicable loan origination guidelines.  In reality, during the 2005 to 2007 time period, the

Sponsors and Originators regularly disregarded their underwriting guidelines and the

representations and warranties made to securitization trusts.

90.     For example, for the Fremont Trust, the Originator represented and warranted

in the PSA that "[t]he Mortgage Loan[s] [were] underwritten in accordance with the

Underwriting Guidelines in effect as of the date of origination of such Mortgage Loan."

Fremont PSA Schedule IV.  The Originator further represented and warranted the following:

> (a)Mortgage Loans as Described. The information set forth in the Mortgage Loan Schedule is complete, true and correct in all material respects as of the Cut-off Date;
>
> (b) Payments Current. As of the Closing Date, other than with respect to (i) not more than 0.50% of the Mortgage Loans by outstanding principal balance, all payments required to be made up to the Closing Date for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet one month delinquent, have been made and credited. No payment required under the Mortgage Loan is 90 days or more delinquent;

(c) No Outstanding Charges. As of the Closing Date, other than payments due but not yet one month or more delinquent, there are no defaults in complying with the terms of the Mortgage . . .;

(f) Hazard Insurance. Pursuant to the terms of the Mortgage, all buildings or other improvements upon the Mortgaged Property are insured by a generally acceptable insurer against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located. If required by the National Flood Insurance Act of 1968, as amended, each Mortgage Loan is covered by a flood insurance policy. . . ;

(g) Compliance with Applicable Laws. Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity and disclosure laws, all predatory, abusive and fair lending laws or unfair and deceptive practices laws applicable to the Mortgage Loan. . . ;

(j) Valid First or Second Lien. Each Mortgage is a valid and subsisting first or second lien of record on a single parcel of real estate constituting the Mortgaged Property. . . ;

(k) Validity of Mortgage Documents. The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms . . . ;

(o) LTV. No Mortgage Loan was originated with an LTV greater than 100%;

(p) Title Insurance. The Mortgage Loan is covered by an ALTA lender's title insurance policy, or with respect to any Mortgage Loan for which the related Mortgaged Property is located in California a CLTA lender's title insurance policy. . . ;

(q) No Defaults. As of the Closing Date, other than with respect to (i) not more than 0.50% of the Mortgage Loans by outstanding principal balance . . . ;

(t) Origination; Payment Terms. The Mortgage Loan was originated by a mortgagee approved by the Secretary of Housing and Urban Development . . . . The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no

untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. . . ;

(w) Occupancy of the Mortgaged Property. As of the Closing Date the Mortgaged Property is lawfully occupied under applicable law. . . ;

(kk) Appraisal. The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan application by a qualified appraiser, duly appointed by the related originator . . . ;

(qq) Prior Servicing. Each Mortgage Loan has been serviced in all material respects in compliance with Accepted Servicing Practices and the Originator has reported or caused to be reported, the Mortgagor credit files to each of the three primary credit repositories monthly in a timely manner;

(tt) Predatory Lending Regulations. None of the Mortgage Loans are (i) subject to the Home Ownership and Equity Protection Act of 1994 as amended or (ii) in violation of, or classified as "high cost", "threshold", "covered", "high risk" or "predatory" loans under, any other applicable state, federal or local law. . . ;

(yy) Recordation. Each original Mortgage was recorded and. . . ;

(lll) Delivery to the Custodian. The Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered with respect to each Mortgage Loan pursuant to this Agreement and the Pooling and Servicing Agreement, have been delivered to the Trust Administrator in its capacity as Custodian all in compliance with the specific requirements of this Agreement and the Pooling and Servicing Agreement.

*Id*. The PSAs for the DB, Merrill Lynch, MHC, Nomura, PHH, SG and SunTrust Trusts contain substantially similar provisions. *See* Ex. C § XI.

91.    As noted above in Section II(B), each party, including HSBC, had an obligation to provide notice of breaches of these representations and warranties, and such notice triggered the Sponsors or Originators' obligation to repurchase or substitute the defective loans.

92.    Each party had an obligation to provide notice of breaches of these

representations and warranties and such notice triggered the Sponsors' or Originators'

obligation to repurchase or substitute the defective loans.

93.     HSBC knew that the Sponsors and Originators regularly disregarded their

underwriting guidelines and representations and warranties made to securitization trusts

long before Certificateholders learned of such problems.

94.     HSBC served as trustee of hundreds of RMBS trusts from 2004 to 2007

including many transactions involving the Sponsors and Originators.  In the course of

administering these trusts, HSBC learned that the Sponsors and Originators had departed

from their underwriting guidelines, engaged in predatory lending and failed to ensure

mortgage loans complied with state and federal laws.

95.     For example, while serving as trustee for various RMBS trusts, HSBC was

presented with a large number of defaulted loans that were originated by the Sponsors and

Originators here, and foreclosures were commenced often in HSBC's name.

96.     Indeed, HSBC commenced foreclosure actions between 2005 and 2008 for

numerous loans in which the Sponsors or Originators were at issue, including, for example,

foreclosure actions in which:

> a.   American Home Mortgage Corporation served as Originator.  *See, e.g.*, *HSBC Bank USA, N.A. v. Hagg*, No. 15-cv-850192 (N.Y. Sup. Ct. New York Cnty. 2014) (initiating action for loan included in the DBALT 2007-AR1 Trust); *HSBC Bank v. Soffer*, No. 08-cv-034098 (N.Y. Sup. Ct. Kings Cnty. 2008) (initiating action for loan included in the DBALT 2006-AB4 Trust).
>
> b.   Deutsche Bank Structured Products, Inc. served as Sponsor.  *See, e.g.*, *HSBC Bank v. Soffer*, No. 08-cv-034098 (N.Y. Sup. Ct. Kings Cnty. 2008) (initiating action for loan included in the DBALT 2006-AB4 Trust); *HSBC Bank v. Lacey*, No. 07-cv-064538 (C.P. Summit Cnty. 2007).
>
> c.   Fremont Investment & Loan served as Originator.  *See, e.g.*, *HSBC Bank v. Palladino*, No. 09-CH-4548 (Du Page Cnty. 2008) (initiating action for loan included in the FHLT 2006-D Trust); *HSBC Bank USA, N.A. v. Addie*, No. 08-

cv-2211 (Medina Cnty. 2008) (same); *HSBC Bank v. Coyne*, No. 08-cv-1768 (C.P. Medina Cnty. 2008); *HSBC Bank v. Key*, No. 07-cv-031931 (C.P. Summit Cnty. 2007); *HSBC Bank v. Newton*, No. 07-cv-36007 (N.Y. Sup. Ct. Suffolk Cnty. 2007) (initiating action for loan included in the FHLT 2006-D Trust).

d.   Nomura Credit & Capital Inc. served as Sponsor.  *See, e.g.*, *HSBC Bank v. Levy*, No. 06-cv-112035 (N.Y. Sup. Ct. 2006) (initiating action for loan included in the NAA 2005-AR6 Trust).  *See also HSBC Bank v. Dahan*, No. 06-cv-10349 (N.Y. Sup. Ct. 2006).

e.   Ownit Mortgage Solutions Inc. served as Originator.  *See, e.g.*, *HSBC Bank v. Maynard*, No. 07-cv-1415 (C.P. Medina Cnty. 2007) (initiating action for loan included in the OWNIT 2005-2 Trust); *HSBC Bank v. Kurz*, No. 07-cv-1493 (C.P. Medina Cnty. 2007) (initiating action for loan included in the OWNIT 2005-2 Trust); *HSBC Bank v. Tufts*, No. 08-cv-021788 (C.P Summit Cnty. 2008); *HSBC Bank v. Mosley*, No. 07-cv-128493 (C.P. Summit Cnty, 2007); *HSBC Bank v. Given*, No. 07-cv-118379 (C.P. Summit Cnty. 2007); *HSBC Bank v. Puma*, No. 07-cv-043005 (C.P. Summit Cnty. 2007).

97.     Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized.  In each foreclosure, HSBC and the Master Servicer had a duty to examine foreclosure filings.  *See, e.g.*, Merrill Lynch PSA § 8.1 ("Each of the Trustee and the Securities Administrator, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee that are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform on their face to the requirements of this Agreement"). Having lent its name to the foreclosure proceedings, HSBC had a duty to review and approve filings.

98.     Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts.  These facts, some of which are detailed in Exhibit G, demonstrated that the Sponsors and Originators regularly included loans in securitizations

that did not comply with applicable underwriting guidelines, made predatory loans and failed to meet state and federal lending guidelines.  While investors such as Plaintiffs lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, HSBC had knowledge of specific problems with specific loans as well as access to the mortgage loan files.  At a minimum, in its role as trustee to hundreds of RMBS trusts, HSBC was privy to information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts.  Having caught wind of the problem, HSBC had statutory and common law duties requiring it to "nose to the source."  This is a continuing duty that HSBC is still disregarding.

99.    HSBC also commenced repurchase actions against the Sponsors or Originators at issue here.  However, only two of these actions included Covered Trusts, despite allegations by HSBC that the Sponsors' and Originators' misconduct was widespread and systemic.  *See, e.g.*, Compl., *Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE4, by HSBC Bank USA, N.A. as Trustee v. DB Structured Products, Inc.*, No. 13-cv-653394 (N.Y. Sup. Ct. Mar. 4, 2013); Compl., *Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE1, by HSBC Bank USA, N.A. as Trustee v. DB Structured Products, Inc.*, No. 13-cv-650327 (N.Y. Sup. Ct. Jan. 29, 2013).  For example, at the direction of certain certificateholders, HSBC, in its role as trustee or securities administrator, commenced actions against, among other entities, Deutsche Bank Structured Products, Inc. (the Sponsor for 14 of the Covered Trusts) and Nomura Credit & Capital, Inc. ("Nomura") (the Sponsor for three of the Covered Trusts) to compel repurchase of loans that breached representations and warranties.  *See, e.g.*, Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust,*

35

*Series 2007-OA3, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 13-cv-02999 (S.D.N.Y. Apr. 30, 2013); Compl., *Nomura Home Equity Loan Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, No. 12-cv-653783 (N.Y. Sup. Ct. Apr. 16, 2013).  In each of the repurchase actions brought by HSBC, loan level reviews were conducted which identified breach rates with respect to loans originated during the same period as the loans in the Covered Trusts as high as 99%.

100.    HSBC also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

101.    Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline insurers.  The sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS.  The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

102.    Monoline insurers have filed many complaints against the Sponsors and Originators of the Covered Trusts for breaches of their representations and warranties in connection with other RMBS trusts.  Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue.

103.    For example, in *Ambac Assurance Corp. v. Nomura Credit & Capital, Inc.*, No. 13-cv-651359 (N.Y. Sup. Ct. Apr. 15, 2013), the monoline insurer, Ambac, sued Nomura, reporting that its review of the loan files securitized by Nomura revealed breaches of

representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that Nomura represented would be followed. *Id.* Of the approximately 1,800 loan files that were reviewed by Ambac, over 95% contained one or more breaches of the mortgage loan representations. *Id.*

104. HSBC received notice of the Nomura monoline action as it was the trustee for the respective trusts in that action.

105. Because the monoline insurers' findings from loan level reviews, set forth both in their breach notices and publicly available lawsuits, reflected these common mortgage loan sellers' systemic and pervasive violations of underwriting and securitization guidelines, HSBC discovered that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

106. Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both a state and federal level, there are various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties. For example, the Sponsors' and Originators' systemic abandonment of underwriting guidelines has had a devastating effect on the performance of the Covered Trusts. Many of the Certificates acquired by Plaintiffs were triple-A or double-A rated at the time of purchase. *See* Ex. D. Now most are "junk" bonds that do not qualify for any investment grade rating. *See id.* These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines. *See* Ex. E. A summary of

the Covered Trusts' high default and delinquency rates and enormous cumulative losses is attached as Exhibit E.  HSBC was aware of the high level of defaults and should have carefully investigated these issues, notified Certificateholders, including Plaintiffs, of the issues, and taken action to address these issues.

107.    If HSBC had provided the required notice, it would have forced the Sponsors or Originators to repurchase, or substitute if within the period specified in the PSAs, the relevant loans, and the Sponsors would not have been able to issue additional fraudulent RMBS certificates.  HSBC had a continuing duty to provide such notice but failed to do so throughout its tenure as Trustee.  Indeed, HSBC let the statute of limitations to bring repurchase claims lapse by failing to provide notice or take other action within six years of the closing of each Covered Trust.

### 1.    The Originators' and Sponsors' Pervasive Breaches of Representations and Warranties

108.    Either the Sponsor or Originator, and sometimes both, provided representations and warranties to the Covered Trusts.

109.    The failure of the parties to the PSAs to provide notice of their breaches of representations and warranties constituted a default that would have ripened into Events of Default had HSBC provided notice of the default.

110.    The chart below identifies each of the entities disclosed to be the Sponsors, Originators and obligors of the loans included in the Covered Trusts.

|   | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|-----------|-------------|-----------------|--------------|
| 1 | ACE 2005-AG1 | DB Structured Products, Inc. | Argent Mortgage Company, LLC | DB Structured Products, Inc. |
| 2 | ACE 2006-ASP1 | DB Structured Products, Inc. | DB Structured Products, Inc. | DB Structured Products, Inc. |

|   | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 3 | ACE 2006-ASP2 | DB Structured Products, Inc. | DB Structured Products, Inc. | DB Structured Products, Inc. |
| 4 | ACE 2006-ASP5 | DB Structured Products, Inc. | DB Structured Products, Inc. | DB Structured Products, Inc. |
| 5 | ACE 2006-HE1 | DB Structured Products, Inc. | Fremont Investment & Loan; Ownit Mortgage Solutions, Inc. | DB Structured Products, Inc. |
| 6 | ACE 2006-HE4 | DB Structured Products, Inc. | First NLC Financing Services, LLC; Chapel Funding Corporation | DB Structured Products, Inc. |
| 7 | ACE 2007-ASL1 | DB Structured Products, Inc. | DB Structured Products, Inc. | DB Structured Products, Inc. |
| 8 | ACE 2007-HE1 | DB Structured Products, Inc. | Argent Mortgage Company, LLC | DB Structured Products, Inc. |
| 9 | DBALT 2006-AB4 | DB Structured Products, Inc. | American Home Mortgage Corporation | DB Structured Products, Inc. |
| 10 | DBALT 2006-AF1 | DB Structured Products, Inc. | GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; American Home Mortgage Corporation | DB Structured Products, Inc. |
| 11 | DBALT 2006-AR3 | DB Structured Products, Inc. | Mortgage IT, Inc.; Countrywide Home Loans, Inc. | DB Structured Products, Inc. |
| 12 | DBALT 2006-AR6 | DB Structured Products, Inc. | Mortgage IT, Inc.; Countrywide Home Loans, Inc. | DB Structured Products, Inc. |
| 13 | DBALT 2007-AR1 | DB Structured Products, Inc. | Mortgage IT, Inc.; IndyMac Bank, F.S.B.; American Home Mortgage Corporation | DB Structured Products, Inc. |
| 14 | DMSI 2006-PR1 | DB Structured Products, Inc. | Doral Financial Corporation | DB Structured Products, Inc.; Doral Financial Corporation |
| 15 | FBRSI 2005-2 | MHC I, Inc. | Encore Credit Corporation; Finance America, LLC; | MHC 1, Inc.; Encore Credit Corporation; |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | Accredited Home Lenders, Inc.; ResMae Mortgage Corporation | Finance America, LLC; Accredited Home Lenders, Inc.; ResMae Mortgage Corporation |
| 16 | FBRSI 2005-4 | MHC I, Inc. | ResMae Mortgage Corporation | MHC I, Inc.; ResMae Mortgage Corporation |
| 17 | FHLT 2006-B | Fremont Investment & Loan | Fremont Investment & Loan | Fremont Investment & Loan |
| 18 | FHLT 2006-C | Fremont Investment & Loan | Fremont Investment & Loan | Fremont Investment & Loan |
| 19 | FHLT 2006-D | Fremont Investment & Loan | Fremont Investment & Loan | Fremont Investment & Loan |
| 20 | MANA 2007-A2 | Merrill Lynch Mortgage Lending, Inc. | GreenPoint Mortgage Funding, Inc.; First National Bank of Nevada; National City Mortgage Co.; Ameriquest Mortgage Company | Merrill Lynch Mortgage Lending, Inc. |
| 21 | MANA 2007-OAR2 | Merrill Lynch Mortgage Lending, Inc. | IndyMac Bank, F.S.B.; Countrywide Home Loans, Inc.; Bayrock Mortgage Corporation | Merrill Lynch Mortgage Lending, Inc. |
| 22 | NAA 2005-AR6 | Nomura Credit & Capital, Inc. | Alliance Bancorp.; Silver State Mortgage Company; Aegis Mortgage Corporation | Nomura Credit & Capital, Inc. |
| 23 | NAA 2006-AR4 | Nomura Credit & Capital, Inc. | First National Bank of Nevada; Silver State Mortgage | Nomura Credit & Capital, Inc. |
| 24 | NHELI 2006-FM2 | Nomura Credit & Capital, Inc. | Freemont Investment & Loan | Nomura Credit & Capital, Inc. |

|    | Trust | Sponsor | Originators | Obligors |
|----|-------|---------|-------------|----------|
| 25 | OWNIT 2005-2 | Merrill Lynch Mortgage Capital Inc. | Ownit Mortgage Solutions Inc. | Ownit Mortgage Solutions Inc.; Merrill Lynch Mortgage Capital Inc. |
| 26 | OWNIT 2005-3 | Merrill Lynch Mortgage Lending Inc. | Ownit Mortgage Solutions Inc. | Ownit Mortgage Solutions Inc.; Merrill Lynch Mortgage Lending Inc. |
| 27 | OWNIT 2005-4 | Merrill Lynch Mortgage Lending Inc. | Ownit Mortgage Solutions Inc. | Ownit Mortgage Solutions Inc.; Merrill Lynch Mortgage Lending Inc. |
| 28 | PHHAM 2007-1 | PHH Mortgage Corporation | PHH Mortgage Corporation | PHH Mortgage Corporation |
| 29 | SGMS 2006-FRE1 | SG Mortgage Finance Corporation | Fremont Investment & Loan | SG Mortgage Finance Corporation; Fremont Investment & Loan |
| 30 | STALT 2006-1F | SunTrust Mortgage, Inc. | SunTrust Mortgage, Inc. | SunTrust Mortgage, Inc. |

111.    As detailed in Exhibit F, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.

112.    The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  These investigations and lawsuits contain ample evidence available to HSBC that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.  Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain

detailed information based on forensic reviews of individual loans.  Further, these lawsuits and investigations demonstrate that the Originators originated mortgage loans with the goal of increasing volume, rather than evaluating the mortgagor's ability to repay the loan and regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors.

113.    These lawsuits, in conjunction with the poor performance of the underlying loans (which HSBC was aware of as it issued regular reports regarding performance) and the public information concerning widespread issues among all originators, were more than sufficient to provide HSBC with notice that large numbers of loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

114.    HSBC was aware of these reports, investigations and lawsuits, and it also had additional information concerning representation and warranty violations it learned in the course of administering the Covered Trusts.  It also had access to non-public information regarding the Covered Trusts that would have confirmed the representation and warranty violations if HSBC had conducted even a limited investigation.  Thus, HSBC was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

**B.    HSBC Failed to Act Prudently to Enforce Repurchase Obligations**

115.    When HSBC learned that the Master Servicer or Servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, HSBC should have acted as a prudent person would in the exercise of its own affairs and (i) taken action against the Master Servicer or Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified Certificateholders of the Master Servicer's or Servicers' defaults and the breaches of representation and warranty provisions.  During the period that an Event of Default was in

existence, HSBC had a continuing duty to enforce repurchase rights.  As such, HSBC should have, at a minimum, reviewed all defaulted loans as they defaulted and determined whether a reasonable party was required to repurchase such loans.  HSBC continually failed to do so and let the statute of limitations to bring repurchase claims lapse by failing to take sufficient action within six years of the closing of each Covered Trust.

116.     Although certain Events of Default require formal notice and an opportunity to cure, HSBC cannot escape its duty of care by failing to provide the required notice.  As set forth in Section III(A), HSBC was aware (or would have been aware if it had carried out its duties) that the Master Servicer, Servicers, Depositors, Sponsors, and HSBC, itself, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts.  HSBC, however, did not provide notice of such defaults as it was required to do.  Because these defaults would have seasoned into Events of Default if notice had been provided, HSBC had a duty to act prudently to enforce repurchase provisions once it learned of such defaults.

117.     As described below, additional Events of Default occurred under the terms of the PSAs.  HSBC has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

### 1.     Events of Default Under the PSAs Relating to Document Delivery Failures in the Covered Trusts

118.     As discussed above in Section II(A), HSBC, or a Custodian acting on its behalf, had a duty to identify in final certifications and exception reports mortgage files that were missing documentation required to be delivered under the PSAs, which typically include documents sufficient to prove ownership of the note and mortgage or otherwise protect title.  HSBC knew of numerous instances where it did not receive: (i) the original

mortgage note with all intervening endorsements showing a complete chain of endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note affidavit and a duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that were MERS loans; or (iv) the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

119.     When HSBC prepared the final exception reports, it provided them to the Sponsors, Depositors and Master Servicer (or Servicers) indicating many of these missing documents.  When the Custodian prepared such reports, it provided them to HSBC, the Sponsors, Depositors and Master Servicer (or Servicers) and the reports similarly showed many documents that were required under the PSAs were not delivered.  HSBC was aware that affected loans were not repurchased or substituted because the Trustee was required to take action each time a loan was substituted or repurchased.  For example, Section 2.10 of the Merrill Lynch PSA requires the trustee to execute documents, or amend MERS registrations, whenever a loan is substituted for or repurchased.  The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts provide that it was the Trustee's duty to seek cure, repurchase or substitution remedies and, as a result, the Trustee knew that affected loans were not cured, repurchased, or substituted because it did not seek such remedies.  *See* Ex. C § V.

120.     Rather than take action to ensure the responsible parties cured such defects or substituted or repurchased the affected loans, HSBC stood by while the Sponsors, Servicers and Master Servicer of the Covered Trusts engaged in so called "robo-signing" on a

widespread basis when the missing documents were needed to foreclose on properties

underlying the Covered Trusts.  HSBC and the entities disclosed to be Sponsors, Servicers

and Master Servicer of the Covered Trusts have been implicated in numerous governmental

reports, court orders and press reports regarding servicing misconduct and the massive cover

up of the failure to deliver documentation concerning securitized mortgage loans known as

the "robo-signing" scandal.  This is powerful evidence of the systemic document delivery

failures and HSBC's knowledge of such failures.  Exhibit G contains a chart of the relevant

Sponsors, Servicers and Master Servicer for the Covered Trusts.  HSBC's and the relevant

Sponsors', Servicers' and Master Servicer's involvement in the robo-signing scandal is

summarized in Exhibit H.

122.    First, Section 7.01 of the Merrill Lynch PSA provides that an Event of Default

121.    Events of Default occurred shortly after final exception reports were delivered to

the Covered Trusts under multiple provisions of the PSAs.  These Events of Default triggered a

continuing duty to review defaulted loans to determine if such loans should be repurchased.

122.    First, Section 7.01 of the Merrill Lynch PSA provides that an Event of Default

occurs if the Depositor fails to perform its obligations under the PSA and such breach is not

remedied within 60 days of notice of the breach.  As discussed above in Section II(A), the

Depositor had an obligation to deliver complete mortgage files but failed to do so.  Pursuant to

Section 2.02 of the Merrill Lynch PSA, the final exception report provided notice of the

Depositor's breaches.  Sixty days after such notice, the breaches ripened into an Event of Default

and the Trustee had a duty to exercise due care to protect Certificateholders' interests.

123.    Second, each PSA requires that the Servicers' or Master Servicer's failure to

adhere to prudent servicing standards ripens into an Event of Default if left uncured within a

specified period after notice by the Trustee of such breach.  For example, Section 7.01 of the

Merrill Lynch PSA provides that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach is not remedied within 60 days of notice of the breach. The DB, Nomura, PHH, SG and SunTrust PSAs contain similar provisions. *See* Ex. C § VIII.

124.    As set forth in Exhibit H, when borrowers defaulted and the Servicers or Master Servicer were required to commence foreclosures, they fabricated the documents necessary to foreclose rather than cause the Sponsors, Depositors or Originators to repurchase or substitute the affected loan. HSBC was aware of this fact as it was aware of the contents of the document exception reports that properties with exceptions had defaulted and had not been repurchased or substituted. However, HSBC did not provide notice as it was required to do. Both the Servicers and HSBC were aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Exhibit H, the Servicers robo-signed the documentation required to foreclose. These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent servicer would have insisted that the loans be repurchased. Having failed to provide the required notice, HSBC had an obligation to act prudently to address all defaults.

125.    Third, the Fremont PSA provides that the Servicers' failure to perform their covenant to prudently service the mortgage loans ripened into a Servicer Event of Default 30 days after a Servicing Officer learned of such failures—no formal notice is required. *See* Ex. C § VIII. Because the Servicers failed to act prudently and cause the repurchase or substitution of loans with incomplete documentation rather than foreclose, an Event of Default was triggered under this PSA without regard to the notice required to be given by the Trustee.

126.    These Events of Default triggered HSBC's duty to act prudently to protect the interests of the Certificateholders in all respects, which duty continues to this day because the

document defects were not cured within the required period and the affected loans were not repurchased. HSBC had a continuing obligation to seek repurchase of loans missing required documentation throughout its tenure as Trustee, including as loans on the final exception report defaulted. HSBC further had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred. HSBC has repeatedly breached these duties throughout its tenure as Trustee.

### 2. Events of Default Under the MHC Trusts

127. As noted, the MHC Trusts were documented using an Indenture rather than a PSA. While the same type of Events of Default occurred under the Indenture as described in Section III(B)(1), the relevant provisions are slightly different in that the Issuer's (*i.e.,* the Trust's) breach of the Indenture gives rise to an Event of Default, rather than the Master Servicer's or Servicers' breaches.

128. Section 3.5(a) of the FBRSI 2005-4 Indenture provides in relevant part, "The Issuer will . . . take such other action necessary or advisable to: . . . (iii) enforce any rights with respect to the Trust Fund; or (iv) preserve and defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties." The Indenture for FBRSI 2005-2 contains substantively identical provisions.

129. The failure to do so is an Event of Default. For example, the Indenture for FBRSI 2005-4 provides that an Event of Default occurs when the Issuer fails:

> to observe or perform any covenant or agreement of the Issuer made in this Indenture . . . and such default shall continue or not be cured . . . for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the

> Indenture Trustee or to the Issuer and the Indenture Trustee by
> Noteholders representing at least 25% of the Outstanding Balance
> of the Notes, a written notice specifying such default . . . and
> requiring it to be remedied and stating that such notice is a notice
> of Indenture Default hereunder.

The Indenture for FBRSI 2005-2 contains substantively identical provisions.

130.    As discussed above, the Trustee provided written notice that the mortgage
files were incomplete.  The Issuer under the MHC Trusts failed to protect the trust assets, a
fact the Trustee was well aware of.  As a result, an Event of Default occurred under the
MHC Trusts in the first year of their existence.

131.    As detailed in Section III(A) and Exhibit F, HSBC became aware of public
information indicating that the Issuer failed to protect the trust assets by enforcing the
Sponsors' or Originators' repurchase obligations triggered by representation and warranty
violations.  Events of Default occurred as a result.  This triggered a continuing obligation to
protect the interests of Certificateholders that HSBC breached throughout its tenure as
Trustee.

### 3.    HSBC Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

132.    In addition to the Events of Default discussed above, on July 21, 2011, the
Association of Mortgage Investors ("AMI") notified all major RMBS trustees (including HSBC)
that "substantial evidence [] has emerged of abuses in the servicing and monitoring of" RMBS.
The letter set forth in detail the publicly available evidence demonstrating that there was
widespread evidence, including some of the evidence referenced in this Amended Complaint,
that loan originators had systemically breached representations and warranties provided to
securitization trusts, and that the parties servicing loans underlying securitization trusts had
systemically breached their obligations under applicable servicing agreements.  The letter

cautioned, "[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" and "you must comply with your obligations . . . to take action to remedy the servicer Events of Default in the best interests of the Certificateholders."

133.    Beginning in 2012, HSBC commenced lawsuits relating to RMBS trusts other than the Covered Trusts against certain Sponsors and Originators (including, among others, Deutsche Bank Structured Products, Inc.) alleging that, among other misconduct, the Originators sold a material number of loans to securitization trusts that did not comply with applicable underwriting guidelines in violation of their representations and warranties.

134.    These lawsuits, which alleged pervasive and systemic breaches of representations and warranties, demonstrate that HSBC was aware of similarly pervasive and systemic breaches of representations and warranties, in the Covered Trusts, but failed to exercise due care.

135.    For instance, between March 2012 and May 2013, HSBC, as trustee, filed at least 16 complaints against Deutsche Bank in its capacity as sponsor of 16 different trusts from the ACE and DBALT shelves.  *See, e.g.*, Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2007-OA3, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 13-cv-02999 (S.D.N.Y. Apr. 30, 2013); Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 12-cv-08594 (S.D.N.Y. Nov. 27, 2012); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-ASAP2, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 13-cv-651936 (N.Y. Sup. Ct. Nov. 4, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-ASAP1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 13-cv-650949 (N.Y. Sup. Ct. Aug. 1, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-WM1, by HSBC Bank USA, N.A.*

*v. DB Structured Prods., Inc.*, No. 13-cv-650310 (N.Y. Sup. Ct. June 3, 2013); Compl., *ACE Sec.*

*Corp. Home Equity Loan Trust, Series 2007-HE1, by HSBC Bank USA, N.A. v. DB Structured*

*Prods., Inc.*, No. 13-cv-650327 (N.Y. Sup. Ct. Jan. 29, 2013); Compl., *ACE Sec. Corp. Home*

*Equity Loan Trust, Series 2007-WM1 by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*,

No. 13-cv-650312 (N.Y. Sup. Ct. Jan. 28, 2013); Compl., *ACE Sec. Corp. Home Equity Loan*

*Trust, Series 2006-HE3, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 12-cv-

652231 (N.Y. Sup. Ct. Dec. 21, 2012).

136.     In each of these actions, HSBC cited forensic reviews of the loan files which

revealed that Deutsche Bank "dumped into the Trust a massive number of defective loans – loans

that blatantly breached Deutsche Bank Structured Products Inc.'s representations and

warranties."  HSBC asserted that Deutsche Bank's "*inaccuracies, misrepresentations, omissions,*

*and other breaches were so fundamental and numerous as to preclude any notion that they were*

*the result of mere inadvertence or accident*."  To further bolster its allegations of seller breaches,

HSBC referenced government investigations and reports and private litigation establishing

widespread abandonment of stated underwriting and securitization standards by common

originators and Deutsche Bank.

137.     In *ACE Sec. Corp., Series 2006-SL2 v. DB Structured Products, Inc.*, No. 12-cv-

650980 (N.Y. Sup. Ct. Mar. 28, 2012), HSBC brought an action to enforce Deutsche Bank's

repurchase obligations in connection with ACE 2006-SL2, a securitization that Deutsche Bank

sponsored containing a large percentage of loans originated by Fremont Investment & Loan.

HSBC alleged that an "investigation[] of over 1,600 of the Trust's Loans reveal[ed] that a

stunningly high percentage of those analyzed – 99 percent – [were] in fact Defective Loans."

HSBC explained that the findings were consistent with "[r]ecent government investigations,

[which] revealed that Deutsche Bank, via its wholly-owned subsidiaries Deutsche Bank

Structured Products, Inc. and ACE, disregarded underwriting guidelines, and as a result made

representations and warranties for mortgages that did not meet stated criteria in the governing

documents." *Id.* ¶ 31.  HSBC also acknowledged that "Fremont's originating practices were so

poor, they were separately sued by both Morgan Stanley and Lehman Brothers for breach of

contract arising out of Fremont's failure to repurchase loans that Fremont sold between 2004 and

2006." *Id.* ¶ 37.

138.    In *Deutsche Alt-A Sec. Mortgage Loan Trust v. DB Structured Products Inc.*, No.

12-cv-08594 (S.D.N.Y. Nov. 27, 2012), HSBC brought an action to enforce Deutsche Bank's

breaches of representations and warranties in connection with DBALT 2006-OA1, a

securitization containing 88.49% loans originated by Countrywide Home Loans, Inc.  A forensic

review revealed that 93% of the loan files reviewed contained breaches.  HSBC alleged: "The

breaches uncovered by the Forensic Review involve a high degree of borrower fraud and

dishonesty concerning such core matters as borrower income, employment, occupancy of the

subject property and other indebtedness." *Id.*

139.    While HSBC has pursued Deutsche Bank in two repurchase actions relating to

Covered Trusts, *see Ace Securities Corp. Home Equity Loan Trust, Series 2006-HE4, by

HSBC Bank USA, N.A. as Trustee v. DB Structured Products, Inc.*, No. 13-cv-653394 (N.Y.

Sup. Ct. Mar. 4, 2013) and *Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE1,

by HSBC Bank USA, N.A. as Trustee v. DB Structured Products, Inc.*, No. 13-cv-650327

(N.Y. Sup. Ct. Jan. 29, 2013), those actions are subject to significant timeliness defenses and

other defenses due to HSBC's inaction and fails to address much of the wrongdoing

described herein.

140.    Similarly, between May 2012 and September 2014, HSBC, as trustee, filed at least eight complaints against Nomura in its capacity as sponsor of eight different trusts from the NEHLI and NAA shelves due to "widespread and materially adverse breaches" of seller representations and warranties.  *See, e.g.*, Compl., *Nomura Home Equity Loan Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, No. 12-cv-653783 (N.Y. Sup. Ct. Apr. 16, 2013); Compl., *Nomura Asset Acceptance Corp., et al., v. Nomura Credit & Capital Inc.*, No. 14-cv-652842 (N.Y. Sup. Ct. Sept. 17, 2014).  HSBC similarly relied on forensic reviews of the loans associated with the mortgage loans held by the trusts conducted prior to initiating suit, revealing that Nomura systemically failed to provide accurate loan level information.  Specifically, an analysis showed breach rates in Nomura-label trusts of over 80% and sometimes as high as 91.8%. HSBC asserted that with respect to Nomura's securitizations, "[u]nderwriting guidelines were brushed aside, with loan originators abandoning minimum verification procedures and therefore leaving open the possibility of even greater risks being concealed."  In short, the incredibly high rates of defaults cited by HSBC in support of certain put back actions demonstrate that HSBC was well aware of the pervasive and systemic breaches of representations and warranties of the loans at issue here as well.

### 4.    Events of Default Concerning False Servicer Certifications

141.    Each PSA obligated the Master Servicer or Servicer to certify annually that it met its obligations under the PSAs and applicable federal regulations.  For example, Section 3.17 of the Merrill Lynch PSA requires the Servicer to certify, among other things, that:

> (i) a review of the activities of the Servicer during the preceding calendar year and of the performance under this Agreement or a similar agreement has been made under such officer's supervision, and

> (ii) to the best of such officers' knowledge, based on such review,

> the Servicer has fulfilled all of its obligations under this
> Agreement throughout such year, or, if there has been a default
> in the fulfillment of any such obligation, specifying such default
> known to such officers and the nature and status thereof.

The PSAs for the DB, Fremont, MHC, Nomura, PHH, SG and SunTrust Trusts set forth a

substantially similar process. *See* Ex. C § XI.

142.     The failure to provide a conforming certification is an Event of Default under

each of the PSAs. *See* Ex. C §§ VIII, XI.  Under the Fremont PSA, the Event of Default is

triggered by the breach whether or not notice is provided.  Under the remaining PSAs, the

Event of Default is triggered if the Servicer or Master Servicer fails to cure the breach

within a designated period of time.

143.     The Trustee received certifications that it knew to be false because the Master

Servicer and Servicers were not in fact meeting their obligations under the PSAs and failed

to disclose numerous representation and warranty violations.  As discussed in Sections

III(B) and III(C) the Master Servicer and Servicers breached the PSAs in many ways,

including by attempting to foreclose on defective loans rather than tendering loans for

repurchase or substitution and by looting trust assets through multiple servicing scams.  As

discussed in Section III(A), the Trustee was aware of numerous representation and warranty

violations that were not disclosed in the required servicing certifications.  The Trustee was

aware of these breaches and therefore knew the required servicer certifications did not

conform because they were false.  And the PSAs only allowed the Trustee to rely upon the

certifications if it had a good faith basis to believe the certifications to be true.  Events of

Default were triggered as a result and the Trustee had a continuing duty to act prudently to

protect the Certificateholders' interests.

144.     In addition, under the PSA for the SG Trust, the Servicer provides a

representation and warranty and covenant that all reports provided under the PSA, including servicing compliance certifications, were accurate and complete.  Section 2.05(viii) of the SG PSA provides that "[t]he Service hereby represents, warrants and covenants to the Master Servicer, the Securities Administrator, the Depositor and the Trustee, for the benefit of each such Persons and the Certificateholders, that as of the Closing Date or as of such date specifically provided herein . . . [n]either this Agreement nor any information, certificate of an officer, statement furnished in writing or report  delivered to the Trustee by the Servicer in connection with the transactions contemplated hereby contains any untrue statement of a material fact."

145.    The Trustee had a duty to provide notice of breaches of representations and warranties or covenants resulting from the Servicers' or Master Servicer's false certifications, but failed to do so despite being aware of them.  Because the Trustee cannot avoid the duty to act prudently by failing to give notice of a default, these breaches ripened into an Event of Default triggering the Trustee's duty to act prudently to protect the Certificateholders' interests.

### C.    HSBC Failed to Address the Master Servicer's and Servicers' Looting of Trust Assets

146.    In addition to the servicing related defaults and Events of Default described above, the Master Servicer and Servicers have engaged in a variety of schemes to overcharge borrowers in default.  These scams have dramatically increased loss severities on defaulted mortgages and, as a result, dramatically increased Plaintiffs' losses.

147.    From 2005 until today, the Servicers and Master Servicer have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including without limitation fees for property maintenance prior to

foreclosure), failing to properly oversee third-party vendors and procuring insurance policies for properties that were already insured.

148.    When a defaulting borrower's home is foreclosed upon and sold, the Servicers and Master Servicer deduct their fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and was entitled to the net sale proceeds.

149.    These overcharges are unlawful and resulted in breaches under the PSAs because they do not meet the prudent servicing standard.  As noted in Sections III(B)(1) through III(B)(3), servicing related defaults known to HSBC triggered HSBC's duty to act prudently.  HSBC is and was aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits and press coverage, including articles in banking industry publications like the *American Banker*.

150.    Exhibit I summarizes servicing misconduct involving the relevant Servicers and Master Servicer.  The relevant Servicers and Master Servicer for the Covered Trusts are identified in Exhibit G.

## IV.    HSBC SUFFERED FROM CONFLICTS OF INTEREST

151.    HSBC failed and unreasonably refused to take action to protect the Covered Trusts and Certificateholders against Originator breaches and Servicer violations because it would have exposed that HSBC was engaged in and facilitated the same misconduct in its role as servicer and originator for other mortgages and RMBS trusts.  In addition, HSBC conducted repeated business with the same Originators and Servicers and refused to take action to gain return favors when the roles were reversed.

55

152.     In 2010, the Federal Reserve System ("Federal Reserve"), the Office of the

Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and

the Office of Thrift Supervision ("OTS") conducted on-site reviews at HSBC of foreclosure

processing.  Interagency Review of Foreclosure Policies and Practices (April 2011), *available at*

http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_201104

13.pdf.  The purpose of the review was to evaluate the adequacy of controls and governance over

foreclosure processes.  *Id*.  The Federal Reserve, OCC, FDIC and OTS found "critical weakness

in HSBC's foreclosure document preparation process, and oversight and monitoring of third-

party vendors, including foreclosure attorneys."  *Id*.  In addition, the foreclosure governance

process of HSBC was "underdeveloped and insufficient to manage and control operational,

compliance, legal and reputational risk."  *Id*.

153.     On April 13, 2011, based on the deficiencies in the review and the risk of

additional issues as a result of weak controls and processes, the Federal Reserve Board

initiated formal enforcement actions requiring HSBC America Holdings, Inc. and HSBC

Finance Corporation, the corporate parent and affiliate of HSBC, to "address a pattern of

misconduct and negligence related to deficient practices in residential mortgage loan

servicing and foreclosure processing."  Press Release, Bd. of Governors of the Fed. Reserve

Sys. (Apr. 13, 2011), *available at* http://www.federalreserve.gov/newsevents/press/

enforcement/20110413a.htm.  The enforcement action required HSBC to improve its

residential mortgage loan servicing and foreclosure practices.  According to the Federal

Reserve Board press release, "[t]hese deficiencies represent significant and pervasive

compliance failures and unsafe and unsound practices at [HSBC]."

154.     As part of the enforcement action, HSBC North America Holdings, Inc. and

HSBC Finance Corporation entered into a consent order with the Federal Reserve Board, which found that HSBC had engaged in "unsafe or unsound practices with respect to the manner in which the Bank handled various foreclosure and related activities."

155.    On April 18, 2013, HSBC settled with the Federal Reserve and OCC in relation to its deficient practices in mortgage loan servicing and foreclosure processing and agreed to pay $249 million in cash payments and other assistance to help mortgage borrowers.  Press Release, Bd. of Governors of the Fed. Reserve & OCC, OCC and Federal Reserve Reach Agreement with HSBC to Provide $249 Million in Payments and Assistance (Jan. 18, 2013), *available at* http://www.occ.gov/news-issuances/news-releases/2013/nr-ia-2013-13.html.

156.    In April 2015, HSBC and Assurant Inc. ("Assurant") agreed to pay $1.8 million to end a class action lawsuit alleging that HSBC chose excessive coverage levels for force-place flood insurance contracts and took a bonus from Assurant.  Kat Greene, *HSBC, Assurant To Pay $1.8M To End Insurance Kickback Row*, Law360 (Apr. 10, 2015), http://www.law360.com/ articles/642100/hsbc-assurant-to-pay-1-8m-to-end-insurance-kickback-row.  If the agreement is approved, HSBC will be barred from ordering insurance for customers at a higher level than what they had when their policy lapsed, and HSBC would have to return 90% of its alleged commissions to the class of customers.  HSBC chose higher, more expensive levels of insurance coverage when homeowners let policies lapse.  In exchange for the underwriting business, an Assurant affiliate would kick back a portion of the premiums to HSBC.

157.    HSBC was also a leading sponsor of private-label mortgage-backed securities and securitized hundreds of millions of dollars of loans.  In this role, HSBC engaged in misconduct and breached applicable representations and warranties.  For example, in an action brought by the Federal Housing Finance Agency ("FHFA"), FHFA conducted a comprehensive loan-level

analysis of HSBC sponsored trusts and found that up to 13.26% of mortgage loans breached owner occupancy representations and warranties, and that up to 39.51% of mortgage loans breached loan-to-value representations and warranties.  Compl. ¶¶ 96, 100, *FHFA v. HSBC N. Am. Holdings, Inc.*, No. 11-cv-06189 (S.D.N.Y. Sept. 2, 2011).  Similarly, in *Deutsche Bank National Trust Co. v. HSBC Bank, USA, N.A.*, an investigation into the quality of loans sponsored by HSBC and found that approximately 45% of the loans analyzed were determined to be in breach of one or more of the representations and warranties.  No. 13-cv-652001 (N.Y. Sup. Ct. Nov. 12, 2013).

158.   Accordingly, because HSBC itself faced enormous repurchase liability for loans sold in breach of representations and warranties, HSBC was disincentivized to take any action against the Servicers for the Covered Trusts or even alert the Certificateholders to Servicer misconduct.

159.   Exhibits F, H and I contain additional details concerning HSBC's misconduct in servicing and originating residential mortgage loans.

## V.   HSBC'S CONDUCT INJURED PLAINTIFFS

160.   HSBC's breaches of its contractual, statutory and fiduciary duties have caused Plaintiffs over $340 million in damages.

161.   If HSBC had performed its duties as Trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses.  Further, if HSBC had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value as highly rated bonds with similar coupon rates are now trading at a very significant premium.

162.    HSBC's failure to address the Master Servicer's and Servicers' failure to adhere to prudent servicing practices also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, increased property tax and utility expenditures which were borne by the Covered Trusts, a decline in value of the underlying properties and ultimately less sale proceeds for the Covered Trusts and Certificateholders.  The overcharging for default-related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Master Servicer or Servicer from foreclosure sale proceeds.

163.    If HSBC had met its contractual, statutory and fiduciary duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Servicers, Sponsors, Depositors and Originators failed to deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans.  This would have included numerous loans that had already defaulted or would ultimately default.  Moreover, HSBC's failure to accept delivery of notes and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts that has impacted the market value of the Certificates.  And HSBC's failure to commence damages actions against the Master Servicer and Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

164.    HSBC's failure to meet its contractual, fiduciary, statutory and common law

duties once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm.  If HSBC had provided notice of representation and warranty violations and defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans and required the Master Servicer and Servicers to replace the assets they have looted from the Covered Trusts.

165.    Many, if not all, of the repurchase claims described above have lapsed due to HSBC's inaction as New York courts have held that the underlying representation and warranty claims that HSBC failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitization.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Violations of the TIA)

166.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

167.    The PSAs underlying and establishing the Covered Trusts are "indentures," and HSBC is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

168.    As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the TIA.

169.    The TIA applies to the PSAs and the related Certificates.  15 U.S.C. § 77ddd(a)(1).

170.    HSBC violated the TIA in at least three ways.

171.    First, TIA Section 315(b) provides that the indenture trustee must notify Certificateholders of "all defaults known to the trustee, within ninety days after the occurrence

thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, HSBC

failed to carefully investigate serious known issues with the loans in the Covered Trusts, or to

notify Certificateholders of numerous defaults, including the failure of the responsible parties to

cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans

affected by breaches of representations and warranties.

172.   Second, in the case of defaults (as that term is defined in the indenture), the TIA

requires that the trustee exercise its rights and powers under the governing agreement as a

"prudent man would exercise or use [them] under the circumstances in the conduct of his own

affairs."  15 U.S.C. § 77ooo(c).  Here, as set forth above, HSBC did not act prudently after

learning of numerous serious issues related to material breaches of representations and

warranties and servicer defaults and Events of Default.  A prudent person would have taken

action to investigate these issues carefully, pursue repurchase remedies and cure defective

mortgage loans.  In addition, a prudent person would have taken action against the responsible

parties for the failure to properly execute and deliver mortgage file documents.

173.   Finally, the TIA states that "[n]otwithstanding any other provisions of the

indenture to be qualified, the right of any holder of any indenture security to receive payment of

the principal of and interest on such indenture security, on or after the respective due dates

expressed in such indenture security . . . shall not be impaired or affected without the consent of

such holder."  15 U.S.C. § 77ppp(b).  HSBC has impaired the ability of the Covered Trusts, and

consequently the Certificateholders, to receive payment in connection with defective mortgage

loans for which HSBC failed to take action to correct.  In addition, HSBC has impaired the

ability of the Covered Trusts, and consequently the Certificateholders, to receive payment by

failing to enforce the repurchase remedy.

174.    These breaches materially and adversely affected the interests of the Certificateholders, including Plaintiffs, because they resulted in Covered Trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties and Originators.

175.    HSBC is liable to Plaintiffs for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

176.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

177.    The PSAs are valid and binding contracts entered into between HSBC, each Covered Trust, the Sponsors, the Master Servicer, the Servicers and Depositors.

178.    The PSAs provide, among other things, the terms under which HSBC acts as trustee for the Covered Trusts.

179.    As current holders of Certificates or Notes issued by each Covered Trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee.

180.    HSBC breached several obligations that it undertook on behalf of Plaintiffs as Certificateholder including, without limitation, to:

> (a) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

> (b) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

    (c) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

    (d) provide notice of and take steps to remedy the Master Servicer's and Servicers' failures to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

    (e) enforce the repurchase obligations of the Sponsors and/or Originators.

181.    The specific provisions breached by HSBC are further detailed herein and in the Exhibits hereto.

182.    HSBC's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their Certificates and diminished their value.

183.    Plaintiffs have performed their obligations under the PSAs.

184.    HSBC is liable to Plaintiffs for the losses they suffered as a direct result of HSBC's failure to perform its contractual obligations under the PSAs.

### THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

185.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

186.    As set forth in detail above, HSBC owed Certificateholders, including Plaintiffs, a fiduciary duty to act in good faith, avoid conflicts of interest when performing the obligations set forth in the PSAs and to exercise all powers under the PSAs prudently to protect Certificateholders' rights once an Event of Default occurred or payments to Certificateholders became impaired.  These obligations included, without limitation, duties to protect the interests of the beneficiaries of the Covered Trusts, make prudent decisions concerning the exercise of appropriate remedies following events of Default and enforce the repurchase obligations of the Sponsors and/or Originators.

187.     As set forth in detail above, HSBC breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

188.     The violations by HSBC of its fiduciary obligations impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

### FOURTH CAUSE OF ACTION
**(Negligence and Gross Negligence)**

189.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

190.     HSBC owed the Certificateholders, including Plaintiffs, extra-contractual duties to perform ministerial acts with due care, act with undivided loyalty and avoid conflicts of interests.  As described above, HSBC performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.

191.     HSBC's negligence and gross negligence impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

### FIFTH CAUSE OF ACTION
**(Violation of the Streit Act)**

192.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

193.     As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care

in performing its obligations.  N.Y. Real Prop. Law § 124.

194.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).  HSBC conducted business with respect to the mortgage investments in New York and many properties underlying the certificates are located in New York.

195.    The PSAs underlying and establishing the Covered Trusts are "indentures," and HSBC is a "trustee," under the Streit Act.  N.Y. Real Prop. Law § 125(3).

196.    Section 126(1) of the Streit Act provides that upon an "event of default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture and must use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

197.    As set forth above, HSBC failed to exercise its rights under the PSA after becoming aware of "events of default" by failing to:

  (a) protect the interests of the beneficiaries of the Covered Trusts;

  (b) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

  (c) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once they discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

  (d) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

  (e) provide notice of and take steps to remedy the Master Servicer's and Servicers' failures to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

  (f) enforce the repurchase obligations of the Sponsors and/or Originators.

198.    HSBC is liable to Plaintiffs for damages incurred as a result of its violations

of the Streit Act.

## SIXTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith)

199.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding

paragraphs above as if fully set forth herein.

200.     At all relevant times, HSBC owed Plaintiffs, as express, intended third party

beneficiaries under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that

required HSBC to ensure that it did not, by act or omission, injure the rights of the Plaintiffs to

receive the benefits and protections provided for under the PSAs.

201.     By the conduct described above, HSBC breached its duty of good faith and fair

dealing under the PSAs.

202.     HSBC's breaches are material.

203.     As a result of these breaches, Plaintiffs have suffered damages and will continue

to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.     Awarding compensatory damages and/or equitable relief in favor of Plaintiffs

against HSBC for breaches of its statutory, contractual and fiduciary duties, its gross

negligence and its ordinary negligence in an amount to be proven at trial, including interest

thereon;

B.     Awarding Plaintiffs their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

C.     Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated:  July 1, 2015


By:    /s/  David H. Wollmuth

        David H. Wollmuth
        Randall R. Rainer
        Michael C. Ledley
        Steven S. Fitzgerald
        Niraj J. Parekh
        Roselind F. Hallinan

**WOLLMUTH MAHER & DEUTSCH LLP**
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
rrainer@wmd-law.com
mledley@wmd-law.com
sfitzgerald@wmd-law.com
nparekh@wmd-law.com
rhallinan@wmd-law.com


George A. Zelcs
John A. Libra
Matthew C. Davies
Max C. Gibbons
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Fax: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com
mdavies@koreintillery.com
mgibbons@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (312) 241-3525
stillery@koreinterillery.com

*Attorneys for Plaintiffs*