**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PHOENIX LIGHT SF LTD., *et al.*,

    Plaintiffs,

    v.

HSBC BANK USA, NATIONAL
ASSOCIATION,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Case No. 14-cv-10101-LGS-SN**

 

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
<u>PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT......................................................................................................................4

I.    HSBC's standing, champerty, and collateral estoppel defenses fail. ................................4

      A.  Plaintiffs have Article III standing.........................................................................5

      B.  Plaintiffs have prudential standing.........................................................................8

      C.  Collateral estoppel does not apply. ......................................................................10

II.    Phoenix Light's claims are not time-barred under German law ......................................12

      A.  The German statute of limitations does not apply ................................................12

      B.  Phoenix Light's claims are timely even if German Law applied ........................13

III.    The document defect claims are timely and based on duties set
forth in the PSAs ............................................................................................................15

IV.    HSBC breached its duty to enforce R&W provisions in ACE 2005-AG1 ......................18

      A.  Record evidence shows that HSBC failed to enforce DBSP's obligation to
repurchase loans that breached R&W's .............................................................19

      B.  The ACE 2005-AG1 PSA does not require direction and indemnity before
HSBC can be charged with its enforcement duties.............................................23

      C.  All of Plaintiffs' R&W breach claims are timely ...............................................26

V.    HSBC failed to exercise rights and remedies prudently after EODs occurred ................26

      A.  The evidence demonstrates that EODs occurred and HSBC was aware of them
or, at a minimum, was negligent in ascertaining facts relating to them...............27

        (1)  The Master Servicer and Servicers admitted their noncompliance .............28

        (2)  Servicers liquidated loans subject to repurchase claims .............................29

(3)  Servicers failed to foreclose on properties in a timely manner and employ prudent loss-mitigation practices........................................................................30

(4)  Servicers failed to maintain REO properties .................................................30

B. The prevention doctrine would apply if there was a lack of notice ......................31

C. Following an EOD, the Trustee must act as if its own money is on the line..........32

D. Plaintiffs' post-EOD claims are timely ................................................................34

VI.    HSBC should have exercised its rights and powers to seek servicing improvements and compensation for losses caused by the Servicers and Master Servicer. ...........................36

VII.    HSBC's "good faith" arguments fail on the facts and the law .........................................38

VIII.    The Streit Act and reservation of rights relating to the TIA ...........................................40

IX.    Plaintiffs' tort claims are valid........................................................................................40

X.    HSBC's summary judgment damages arguments fail .....................................................42

A.  The guarantee covering losses on Phoenix Light's Class B notes is irrelevant ...42

B.  Plaintiffs' damages are general because they are the "natural and probable" consequence of HSBC's breaches ......................................................................43

C.  HSBC is liable for liquidated loans under the ACE 2005-AG1 PSA ................45

D.  HSBC's "ability to pay" argument is unsupported by competent evidence ........47

E.  HSBC's mitigation of damages affirmative defense should be dismissed..........49

CONCLUSION..................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

<u>Case</u>                                                                                      <u>Page(s)</u>

*Air Et Chaleur, S.A. v. Janeway,*
   757 F.2d 489 (2d Cir. 1985) ................................................................ 49

*Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.,*
   76 A.D.2d 68 (4th Dep't 1980) ........................................................... 34

*Aircraft Servs. Resales LLC v. Oceanic Cap. Co.,*
   2013 U.S. Dist. LEXIS 114956 (S.D.N.Y. Aug 14, 2013) ................................. 25

*Am. Elec. Power Co. v. Westinghouse Elec. Corp.,*
   418 F. Supp. 435 (S.D.N.Y. 1976) ........................................................ 45

*Am. Home Assurance Co. v. Int'l Ins. Co.,*
   90 N.Y.2d 433 (1997) ...................................................................... 11

*Arch Specialty Ins. Co. v. Entm't Specialty Ins. Servs.,*
   2005 U.S. Dist. LEXIS 4746 (S.D.N.Y. Mar. 23, 2005) ................................... 19

*Aretakis v. Caesars Ent.,*
   2018 U.S. Dist. LEXIS 29552 (S.D.N.Y. Feb. 23, 2018) .................................. 10

*Aretakis v. Cole's Collision,*
   165 A.D.3d 1458 (3d Dep't 2018) ......................................................... 43

*Art & Antique Dealers League of Am., Inc. v. Seggos,*
   394 F. Supp. 447 (S.D.N.Y. 2019) ........................................................ 19

*Baena v. Woori Bank,*
   2006 U.S. Dist. LEXIS 74549 (S.D.N.Y. Oct. 11, 2006) .................................. 13

*Bakal v. U.S. Bank Nat'l Ass'n,*
   747 F. App'x 32 (2d Cir. 2019) .......................................................... 32

*Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Telos CLO 1006-1 Ltd.,*
   274 F. Supp. 3d 191 (S.D.N.Y. 2017) .................................................... 39

*Bank of N.Y. Mellon v. WMC Mortg., LLC,*
   2015 U.S. Dist. LEXIS 108320 (S.D.N.Y. Aug. 17, 2015) ................................. 48

*Bano v. Union Carbide Corp.,*
   361 F.3d 696 (2d Cir. 2004) .......................................................... 14, 16

*Bauman v. Mount Sinai Hosp.*,
  72 A.D.3d 511 (1st Dep't 2010) ...................................................... 11

*Beck v. Mfrs. Hanover Tr. Co.*,
  218 A.D.2d 1 (1st Dep't 1995) ....................................... 1, 32, 33, 36, 37

*Bifolck v. Philip Morris USA Inc.*,
  936 F.3d 74 (2d Cir. 2019) ............................................................. 11

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*,
  22 N.Y.3d 799 (2014) ..................................................................... 3

*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n.*,
  2017 U.S. Dist. LEXIS 133373 (S.D.N.Y. Aug. 21, 2017) ........................... 20, 21

*Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n.*,
  247 F. Supp. 3d 377 (S.D.N.Y. 2017) ..................................................... 7, 14, 21

*BlackRock Balanced Cap. Portfolio (FI) v. U.S. Bank Nat'l Ass'n*,
  165 A.D.3d 526 (1st Dep't 2018) ......................................................... 32

*Bluebird Partners, L.P. v. First Fid. Bank, Nat'l Ass'n*,
  94 N.Y.2d 726 (2000) ...................................................................... 8, 9, 10

*BNP Paribas Mortg. Corp. v. Bank of Am., Nat'l Ass'n.*,
  778 F. Supp. 2d 375 (S.D.N.Y. 2011) ................................................... 40

*Buechel v. Bain*,
  97 N.Y.2d 295 (2001) ..................................................................... 11

*Bulova Watch Co. v. Celotex Corp.*,
  46 N.Y.2d 606 (1979) ..................................................................... 35

*Cambridge Constr. Corp. v. Bfc Constr. Corp.*,
  191 Misc. 2d 25 (1st Dep't. 2001) ....................................................... 25

*Carbures Eur., S.A. v. Emerging Mkts. Intrinsic Cayman Ltd.*,
  148 A.D.3d 421 (1st Dep't 2017) ......................................................... 44

*Carco Grp., Inc. v. Maconachy*,
  383 F. App'x 73 (2d Cir. 2010) ........................................................... 44

*Caruso v. Bon Secours Charity Health Sys.*,
  2016 U.S. Dist. LEXIS 104067 (S.D.N.Y. Aug. 5, 2016) ............................. 48

iv

*Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*,
   807 F. Supp. 1007 (S.D.N.Y. 1992) ...................................................... 31

*City Bank Farmers Tr. Co. v. Cannon*,
   291 N.Y. 125 (1943) ....................................................................... 40

*Coan v. Estate of Chapin*,
   156 A.D.2d 318 (1st Dep't 1989) ......................................................... 39

*Commerce Bank v. Bank of N.Y. Mellon*,
   141 A.D.3d 413, (1st Dep't 2016) ......................................................... 21

*Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*,
   234 F. Supp. 3d 462 (S.D.N.Y. 2017) ..................................................... 12

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*,
   457 F. Supp. 3d 233 (S.D.N.Y. 2020) .................................................. Passim

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*,
   277 F. Supp. 3d 483 (S.D.N.Y. 2017) ................................................. 21, 41

*Corhill Corp. v. S. D. Plants, Inc.*,
   9 N.Y.2d 595 (1961) ....................................................................... 18

*Cortese v. Skanska Koch, Inc.*,
   2021 U.S. Dist. LEXIS 114076 (S.D.N.Y. June 17, 2021) ........................... 31, 41

*Davis v. Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013) ..................................................... 25

*Dietrich v. Bauer*,
   126 F. Supp. 2d 759 (S.D.N.Y. 2001) ..................................................... 39

*DZ-Bank v. HSBC N. Am. Holdings, Inc.*,
   2013 U.S. Dist. LEXIS 178462 (S.D.N.Y. Dec. 17, 2013) ............................. 14

*Empresa Cubana Exportadora De Azucar y Sus Derivados v. Lamborn & Co.*,
   652 F.2d 231 (2d Cir. 1981) ................................................................ 9

*Eskenazi v. Mackoul*,
   72 A.D.3d 1012 (2d Dep't 2010) ........................................................... 49

*Fantozzi v. Axsys Techs., Inc.*,
   2008 U.S. Dist. LEXIS 94040 (S.D.N.Y. 2008) ......................................... 39

*FDIC v. Citibank, Nat'l Ass'n*,
   2017 U.S. Dist. LEXIS 108104 (S.D.N.Y. 2017) ................................................ 7

*FDIC v. Drysdale*,
   2013 WL 5965723 (E.D.N.Y. Nov. 7, 2013) ...................................................... 45

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   104 F. Supp. 3d 441 (S.D.N.Y. 2015) ............................................................... 34

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017) ...................................................................... 26, 34

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   783 F.3d 395 (2d Cir. 2015) ............................................................................ 4

*Fixed Income Shares: Series M v. Citibank Nat'l Ass'n*,
   130 F. Supp. 3d 842 (S.D.N.Y. 2015) ............................................................... 31

*Fixed Income Shares: Series M v. Citibank, Nat'l Ass'n*,
   157 A.D.3d 541 (1st Dep't 2018) ............................................................... 20, 32

*FMS Bonds, Inc. v. Bank of N.Y. Mellon*,
   2016 U.S. Dist. LEXIS 98856 (S.D.N.Y. July 28, 2016) ................................... 24

*FPP, LCC v. Xaxis US, LLC*,
   2017 U.S. Dist. LEXIS 225397 (S.D.N.Y. Feb. 2, 2017) ................................... 28

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
   991 F.3d 370 (2d Cir. 2021) ............................................................................ 6

*Guilbert v. Gardner*,
   480 F.3d 140 (2d Cir. 2007) ...................................................................... 15, 26

*Harch Int'l Ltd. v. Harch Capital Mgmt.*,
   2011 WL 11047191 (N.Y. Sup. Ct. Mar. 16, 2011) .......................................... 23

*Harmit Realties LLC v. 835 Ave. of Ams., L.P.*,
   128 A.D.3d 460 (1st Dep't 2015) ..................................................................... 44

*Hildene Cap. Mgmt., LLC v. Bank of N.Y. Mellon*,
   963 N.Y.S.2d 38 (1st Dep't 2013) ..................................................................... 7

*Hoffman v. Nutmeg Music Inc.*,
   2018 U.S. Dist. LEXIS 158505 (D. Conn. Sept. 18, 2018) ................................ 44

*Home Equity Mortg. Tr. Series 2006-1 v. DLJ Mortg. Cap., Inc.*,
  175 A.D.3d 1175 (1st Dep't 2019) .................................................. 23

*House of Eur. Funding I Ltd. v. Wells Fargo Bank Nat'l Ass'n*,
  2015 U.S. Dist. LEXIS 118729 (S.D.N.Y. Sept. 4, 2015) .................... 7

*House of Eur. Funding I, Ltd. v. Wells Fargo Bank, Nat'l Ass'n*,
  2014 U.S. Dist. LEXIS 49894 (S.D.N.Y. Mar. 31, 2014) ................... 6, 12, 13, 42

*IKB Deutsche Industriebank AG v. McGraw Hill Fin., Inc.*,
  634 F. App'x 19 (2d Cir. 2015) ...................................................... 14

*IKB Int'l, S.A. v. LaSalle Bank Nat'l Ass'n*,
  2021 N.Y. Misc. LEXIS 347 (N.Y. Sup. Ct. Jan. 27, 2021) ................. 17

*Inchaustegui v. 666 5th Ave. Ltd. P'ship.*,
  96 N.Y.2d 111 (2001) .................................................................. 42

*Indus. Risk Insurers v. Port Auth.*,
  493 F.3d 283 (2d Cir. 2007) ......................................................... 12

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  2017 U.S. Dist. LEXIS 122868 (S.D.N.Y. June 28, 2017) .................. 19

*In re GM LLC Ignition Switch Litig.*,
  407 F. Supp. 3d 212 (S.D.N.Y. 2019) ............................................ 43

*In re Lloyd's Am. Tr. Fund Litig.*,
  954 F. Supp. 656 (S.D.N.Y. 1997) ................................................. 40

*In re M/V MSC Flaminia*,
  2017 U.S. Dist. LEXIS 119146 (S.D.N.Y. July 28, 2017) .................. 47

*In re NXXI Inc.*,
  216 F. Supp. 3d 381 (S.D.N.Y. 2016) ............................................ 45

*In re Parmalat Sec. Litig.*,
  594 F. Supp. 2d 444 (S.D.N.Y. 2009) ........................................... 38, 39

*In re State St. Bank & Tr. Co. ERISA Litig.*,
  579 F. Supp. 2d 512 (S.D.N.Y. 2008) ............................................ 42

*Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*,
  38 F.3d 1279 (2d Cir. 1994) ......................................................... 44

*Justinian Capital SPC v. West LB AG, N.Y. Branch*,
  28 N.Y.3d 160 (2016) .................................................................. 9

*Knight v. U.S. Fire Ins.*,
    804 F.2d 9 (2d Cir. 1986) ......................................................... 49

*Korea Life Ins. Co. v. Morgan Guar. Tr. Co.*,
    2004 U.S. Dist. LEXIS 16436 (S.D.N.Y. Aug. 20, 2004) ................... 49

*Kronos, Inc. v AVX Corp.*,
    81 N.Y.2d 90 (1993) .............................................................. 47

*Lindenman v. Kreitzer*,
    7 A.D.3d 30 (1st Dep't 2004) .................................................. 47

*Lituchy v. Guinan Lithographic Co.*,
    60 A.D. 2d 622 (2d Dep't 1977) ............................................... 15

*LNC Invs., Inc. v. First Fid. Bank, Nat'l Ass'n*,
    935 F. Supp. 1333 (S.D.N.Y. 1996) ....................................... 33, 37

*LNC Invs., Inc. v. First Fid. Bank, Nat'l Ass'n*,
    1997 U.S. Dist. LEXIS 12858 (S.D.N.Y. Aug. 27, 1997)....................34

*Lomaglio Assocs. v. LBK Mktg. Corp.*,
    892 F. Supp. 89 (S.D.N.Y. 1995) .............................................. 31

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..............................................................6

*Marom v. Gordon*,
    2020 U.S. Dist. LEXIS 159864 (S.D.N.Y. Aug. 30, 2020) ................. 19

*MASTR Adjustable Rate Mort. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*,
    2015 U.S. Dist. LEXIS 24988 (S.D.N.Y. Jan. 9, 2015) ..................... 45

*M. O'Neil Supply Co. v. Petroleum Heat & Power Co.*,
    280 N.Y. 50 (1939) ............................................................... 29

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
    41 A.D.3d 269 (1st Dep't 2007) ............................................... 39

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002) ................................................... 10

*Mellon Bank, Nat'l Ass'n v. United Bank Corp. of N.Y.*,
    31 F.3d 113 (2d Cir. 1994) ..................................................... 25

*Menucha of Nyack, LLC v. Fisher*,
110 A.D.3d 1037 (2d Dep't 2013) ................................................... 11

*Minebea Co. v. Papst*,
444 F. Supp. 2d 68 (D.D.C. 2006) .............................................. 13, 14

*MLRN LLC v. U.S. Bank N.A.*,
2019 N.Y. Misc. LEXIS 6085 (N.Y. Sup. Ct., Nov. 13, 2019) ............................................. 6

*MMS USA Holdings, Inc. v. Pricewaterhousecoopers LLP*,
2013 N.Y. Misc. LEXIS 6130 (N.Y. Sup. Ct., Mar. 19, 2013) ........................................... 44

*MVP Health Plan, Inc. v. Optuminsight, Inc.*,
765 F. App'x 615 (2d Cir. 2019) .............................................. 44, 45

*MVP Health Plan, Inc. v. Optuminsight, Inc.*,
2017 U.S. Dist. LEXIS 136188 (N.D.N.Y. Aug. 24, 2017) ................................. 44

*Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*,
410 F. Supp. 3d 662 (S.D.N.Y. 2019) ................................................ 32

*Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*,
2020 U.S. Dist. LEXIS 130601 (S.D.N.Y. July 23, 2020) ................................. 21

*Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*,
898 F.3d 243 (2d Cir. 2018) .................................................. 6

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ........................................................ 50

*Niagra Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
596 F.3d 112 (2d Cir. 2010) ............................................... 19

*N. Indus. Holdings, LLC v. E. Envtl. Grp. Inc.*,
2016 WL 8541049 (N.D.N.Y. Feb. 23, 2016) ...................................... 5

*Nineveh Invs. Ltd. v. United States*,
2019 U.S. Dist. LEXIS 137528 (E.D. Pa. Aug. 13, 2019) ............................................. 13, 14

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*,
133 A.D.3d 96 (1st Dep't 2015) .................................................. 6

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap, Inc.*,
30 N.Y.3d 572 (2017) .................................................. 18, 46

*Nouveau Elevator Indus. v. Cont'l Cas. Ins. Co.*,
   U.S. Dist. LEXIS 41495 (E.D.N.Y. June 21, 2006)............................................................39

*Ocean Ships, Inc. v. Stiles*,
   315 F.3d 111 (2d Cir. 2002) ................................................................................... 42

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
   2018 U.S. Dist. LEXIS 64271 (S.D.N.Y. Apr. 17, 2018) ..................................... 2

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
   2021 U.S. Dist. LEXIS 32417 (S.D.N.Y. Feb. 22, 2021) ..................................... 8

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
   2017 U.S. Dist. LEXIS 145044 (S.D.N.Y. Sept. 7, 2017) ............................................Passim

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
   2020 U.S. Dist. LEXIS 49231 (S.D.N.Y. Mar. 20, 2020) ............................................... 33, 38

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
   172 F. Supp. 3d 700 (S.D.N.Y. 2016) ...................................................... 16, 17, 31

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*,
   2020 U.S. Dist. LEXIS 46950 (S.D.N.Y. Mar. 18, 2020) .................................5, 11

*Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., Nat'l Ass'n*,
   907 F. Supp. 2d 536 (S.D.N.Y. 2012)...................................................................21

*Proforma Partners, LP v. Skadden Arps Slate Meagher & Flom, LLP*,
   280 A.D.2d 303 (1st Dep't 2001) ................................................................ 13

*Reichert v. N. MacFarland Builders Inc.*,
   85 A.D.2d 767 (3d Dep't 1981) ................................................................ 45

*Richbell Info. Servs., Inc. v. Jupiter Partners L.P.*,
   723 N.Y.S.2d 134 (1st Dep't 2001) ................................................................ 9

*RJ Capital, S.A. v. Lexington Cap. Funding III, Ltd.*,
   2013 U.S. Dist. LEXIS 47535 (S.D.N.Y. Mar. 30, 2013) ................................... 39

*Robb Evans & Assocs. LLC v. Sun Am. Life Ins.*,
   2013 U.S. Dist. LEXIS 4683 (S.D.N.Y. Jan. 8, 2013) ....................................... 13

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*,
   2016 U.S. Dist LEXIS 120131 (S.D.N.Y. Aug. 31, 2016) ................................. 50

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
    2016 U.S. Dist. LEXIS 12982 (S.D.N.Y. Feb. 3, 2016) ...................................................... 18

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*,
    2018 U.S. Dist. LEXIS 17623 (S.D.N.Y. Feb. 1, 2018) ...................................................... 50

*Royal Park Invs. SA/NA v. HSBC Bank USA Nat'l Ass'n*,
    2017 U.S. Dist. LEXIS 35353 (S.D.N.Y. Mar. 10, 2017) .................................................. 21

*Scentsational Techs., LLC v. Pepsi, Inc.*,
    2018 U.S. Dist. LEXIS 24375 (S.D.N.Y. Feb. 14, 2018) .................................................. 47

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) ................................................................................................44

*Sirico v. F.G.G. Prods., Inc.*,
    71 A.D.3d 429 (1st Dep't 2010) ........................................................................................ 35

*SM Kids, LLC v. Google LLC*,
    963 F.3d 206 (2d Cir. 2020) ................................................................................................ 6

*Soc'y of Plastics Indus. v. Suffolk*,
    77 N.Y.2d 761 (1991) .......................................................................................................... 7

*Sprint Commc'ns. Co., L.P. v. APCC Servs.*,
    554 U.S. 269 (2008) ............................................................................................................ 6

*Stark v. U.S. Tr. Co.*,
    445 F. Supp. 670 (S.D.N.Y. 1978) .................................................................................... 34

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg.*,
    487 F.3d 89 (2d Cir. 2007) ................................................................................................ 42

*Travelers Indem. Co. v. Maho Mach. Tool Corp.*,
    952 F.2d 26 (2d Cir. 1991) ................................................................................................ 49

*Tr. for the Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp.*,
    13 N.Y.3d 190 (2009) .......................................................................................................8, 9

*Tr. for the Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp.*,
    591 F.3d 116 (2d Cir. 2010) ............................................................................................ 8, 9

*Tydings v. Greenfield, Stein & Senior, LLP*,
    11 N.Y.3d 195 (2008) ........................................................................................................ 10

*U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*,
    696 F. Supp. 2d 428 (S.D.N.Y. 2010) .............................................................................. 50

*U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*,
   176 A.D.3d 466 (1st Dep't 2019) ........................................................ 23

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*,
   205 F. Supp. 3d 386 (S.D.N.Y. 2016) .................................................21

*Under Spinelli v. Nat'l Football League*,
   903 F.3d 185 (2d Cir. 2018) ............................................................... 39

*Unilever United States, Inc. v. Johnson Controls, Inc.*,
   2017 U.S. Dist. LEXIS 121996 (N.D. Il. Aug. 2, 2017) ..................... 44

*Upwood Invs. Ltd. v. U.S. Bank Nat'l Ass'n*,
   2012 N.Y. Misc. LEXIS 6337 (N.Y. Sup. Ct. July 16, 2012) ............. 23

*Ventura Assocs. v. Int'l Outsourcing Servs.*,
   2005 U.S. Dist. LEXIS 13991 (S.D.N.Y. July 12, 2005) .................... 43

*W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*,
   129 N.E.3d 1085 (Ohio Ct. App. 2019) .............................................. 18

*W. & S. Life Ins. Co. v. U.S. Bank Nat'l Ass'n*,
   2020 N.Y. Misc. LEXIS 8191 (N.Y. Sup. Ct. Nov. 5, 2020)........................................ Passim

*Wells Fargo Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*,
   627 F. App'x 27 (2d Cir. 2015) .......................................................... 45

*Wells Fargo Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*,
   2014 U.S. Dist. LEXIS 15000 (S.D.N.Y. Feb. 6, 2014) ..................... 45

## **Statutes**

NY Judiciary Law § 489 ......................................................................... 8

NY Real Property Law §126 ................................................................ 32

## **Rules**

CPLR § 202 ........................................................................................... 12

Rule 44.1 .............................................................................................. 13

## GLOSSARY OF TERMS IN PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW

Except as indicated elsewhere, Plaintiffs' Consolidated Memorandum of Law in

Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross-

Motion for Summary Judgment will use the following capitalized terms for ease of reference.

| | |
|---|---|
| ACE 2005-AG1: | ACE Securities Corp. Home Equity Loan Trust, Series 2005-AG1 Asset Backed Pass-Through Certificates |
| CDO: | Collateralized Debt Obligation, a type of re-securitization transactions |
| Certificates: | The RMBS certificates at issue in this case |
| Cross Mot. 56.1: | Plaintiffs' Counter-Statement of Undisputed Facts Pursuant to Rule 56.1 of the Local Civil Rules of the Southern District of New York in Opposition to Defendant's Motion For Summary Judgment and in Support of Plaintiffs' Cross- Motion For Summary Judgment |
| Custodian: | Any entity that reviews and holds Mortgage Files on behalf of the Trustee |
| DBSP: | Deutsche Bank Structured Products |
| EAA: | Erste Abwicklungsanstalt |
| EOD: | Event of Default (any event defined in Governing Documents as triggering fiduciary duties, including Master Servicer Event of Default, Servicer Event of Default, Master Servicer Event of Termination, or Servicer Event of Termination, as listed in Underwood Exs. A-C |
| FHLT 2006-C: | Fremont Home Loan Trust 2006-C |
| HSBC: | Defendant HSBC Bank USA, National Association |
| Mansel Declaration: | Declaration of Prof. Dr. Heinz-Peter Mansel dated July 12, 2020 in Support of Plaintiffs' Cross Motion |

|  |  |
|---|---|
|  | for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment |
| Master Servicer: | The Master Servicer for each Trust, Wells Fargo Bank, N.A. |
| Mortgage File: | The file required to be delivered under the PSA that should contain the original note, the mortgage, any mortgage assignments, the title policy, and other documents |
| Mortgage Loan Purchase Agreement: | The agreement that transfers the transfer of mortgage loans |
| Mot.: | HSBC's Memorandum of Law in Support of Its Motion for Summary Judgment |
| NAA 2005-AR6: | Nomura Asset Acceptance Corporation Mortgage Pass-Through Certificates, Series 2005-AR6 |
| Originator: | The entity that originate mortgage loans that are held in the Trusts |
| Phoenix Light: | Phoenix Light SF Ltd. (n/k/a Phoenix Light SF DAC) |
| Plaintiffs: | Phoenix Light SF Ltd., Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding IX Ltd., C-BASS CBO XIV Ltd., C-BASS CBO XVII Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, and Silver Elms CDO II Ltd, |
| PSA: | Pooling and servicing agreement |
| R&W: | Representation and warranty |
| Regulation AB: | A Securities and Exchange Commission rule governing compliance for RMBS |
| REO: | Real-Estate-Owned properties acquired through foreclosure or otherwise |
| Resp. 56.1: | Plaintiffs' Responses HSBC's Statement of Undisputed Facts Pursuant to Local Rule 56.1 in Support of Its Motion for Summary Judgment |

| | |
|---|---|
| RMBS: | Residential mortgage backed securities |
| Servicers: | The entities that serviced loans held in the Trusts |
| TIA: | Trust Indenture Act |
| Trusts: | ACE 2005-AG1, FHLT 2006-C, and NAA 2005-AR6 |
| Trustee or HSBC: | Defendant HSBC Bank USA, National Association |
| Underwood Declaration: | Declaration of Matthew Underwood dated June 15, 2021 in Support of Defendant's Motion for Summary Judgment dated June 15, 2021 |

**Frequently cited rulings or authorities:**

| | |
|---|---|
| *Commerzbank v. USB*: | *Commerzbank AG v. U.S. Bank N.A.*, 457 F. Supp. 3d 233 (S.D.N.Y. 2017) |
| *HOE I* | *House of Eur. Funding I, Ltd. v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 49894 (S.D.N.Y. Mar. 31, 2014) |
| MTD Op.: | *Opinion and Order, Phoenix Light SF Ltd., et al. v. HSBC Bank USA N.A.*, 14-cv-10101, ECF No. 43 (June 1, 2015) |
| *NCUA v. USB*: | *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243 (2d Cir. 2018) |
| *Love Funding*: | *Tr. for the Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 199 (2009) |
| *PL v. BNYM*: | *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2017 U.S. Dist. LEXIS 145044 (S.D.N.Y. Sept. 7, 2017) |
| *PL v. DB*: | *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700 (S.D.N.Y. 2016) |

*PL v. USB*:                                 *Phoenix Light SF Ltd. v. United States Bank N.A.*,
                                            2020 U.S. Dist. LEXIS 46950 (S.D.N.Y. Mar. 18,
                                            2020) *appeal at* No. 20-1312 (2d Cir.)

*RP v. DB*:                                  *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr.
                                            Co.*, 2016 U.S. Dist. LEXIS 12982 (S.D.N.Y. Feb.
                                            3, 2016)

*W&S v. USB*:                                *W&S Life Ins. Co. v U.S. Bank N.A.*, 2020 N.Y.
                                            Misc. LEXIS 8191 (N.Y. Sup. Ct. Nov. 5, 2020)

## PRELIMINARY STATEMENT

HSBC attempts to downplay the critically important role of an RMBS trustee, highlighting snippets of the PSAs purporting to demonstrate that the trustee's role was virtually an afterthought and that a trustee need not comply with its duties unless expressly directed to do so. The PSAs, however, say no such thing. They provide that HSBC is required to enforce the obligation of loan sellers to repurchase loans that did not comport with the PSAs and to assume the role of a fiduciary after EODs, taking any action permitted under the PSAs to recover investor losses. "Subsequent to default, it is usually only the trustee who is able to act swiftly and effectively to assure, insofar as assurance can be had, that the rights of bondholders to recover what they are owed will ultimately be vindicated." *Beck v. Mfrs. Hanover Tr. Co.*, 218 A.D.2d 1, 12 (1st Dep't 1995). The isolated language HSBC repeatedly clings to does not negate well-settled rules of contractual construction requiring contracts to be read in a way that gives meaning to all provisions, avoids absurd results, and construes ambiguities against the drafter of contractual language.

Contrary to HSBC's effort to prejudice this Court's view of the merits of the motion, the courts in this District that have considered similar claims at summary judgment *on the merits* have found genuine issues of fact for trial for virtually all at issue trusts.[1] In *Commerzbank v. USB*, Judge Pauley held similar evidence was sufficient to demonstrate that the trustee failed to enforce the loan sellers' obligation to repurchase loans and that EODs occurred. 457 F. Supp. 3d 233, 252-56 (S.D.N.Y. 2020). In *PL v. BNYM*, Judge Caproni found issues of fact as to whether the trustee breached its duties after EODs occurred in multiple trusts, rejected arguments that a trustee need not take action unless directed by certificateholders, held that the trustee discovered R&W breaches, and declined to dismiss claims relating to false compliance certifications impacting most

---

[1] HSBC's mischaracterization of the RMBS at issue as high-risk/high-reward is similarly misleading because they were all rated A, AA, or AAA at the time of purchase, the highest ratings available. Resp. 56.1 ¶ 131.

1

trusts. 2017 U.S. Dist. LEXIS 145044, at *33-42, n.23 (S.D.N.Y. Sept. 7, 2017). The decision that dismissed claims entirely—*PL v. USB,* which is on appeal—did so for lack of Article III or prudential standing, not for lack of evidence of breaches. Undoubtably recognizing it will fare no better on the merits, HSBC raises a multitude of scattershot defenses, most of which have nothing to do with the merits of Plaintiffs' claims or the language of the PSAs.

*Champerty*. HSBC contends that this Court should dismiss for lack of standing because the court in *PL v. USB* did so applying the ancient doctrine of champerty. But it is indisputable that Plaintiffs have multiple proprietary interests that were impaired when HSBC breached its duties and, thus, had Article III standing. Champerty does not apply when a plaintiff had these types of pre-existing proprietary interests. Collateral estoppel does not apply because *PL v. USB* was based on alternative holdings and non-identical, purely legal issues and HSBC does not event attempt to make the required showing of fairness. Plaintiffs are entitled to summary judgment rejecting HSBC's champerty and related standing and collateral estoppel defenses.

*German statute of limitations*. German law does not apply to Phoenix Light's claims because Phoenix Light resides in Ireland, not Germany. HSBC's argument that the Court should look to the location of Phoenix Light's noteholder under the borrowing statute violates New York law. Even if German law applied, HSBC's five-sentence throwaway argument misapplies German law and does not come close to demonstrating any claims are untimely.

*Pre-EOD document defect claims*. HSBC refers to its duties owed prior to an EOD as "pre-EOD" duties. The PSAs do not set a time for enforcement of HSBC's pre-EOD duty to enforce repurchase of loans with document defects. Therefore, as a matter of law, performance was due within a reasonable time, which is subject to numerous disputed factual issues in this case.

*Pre-EOD R&W breach claims*. HSBC received written notices identifying specific loans

in ACE 2005-AG1 breaching R&Ws and possessed information demonstrating that these loans represented a fraction of breaching loans in the Trust. HSBC's assertion that it was not required to do more than pass these notices along to the parties to the PSA absent specific direction from certificateholders is contrary to case law.

*EOD claims*. HSBC's assertion that EODs did not occur or that it was unaware of them ignores the factual record which contains (i) written admissions from the Master Servicer and Servicers that they did not comply with their duties; (ii) evidence that the Servicers liquidated loans eligible for repurchase at a loss without lifting a finger to refer them for repurchase and the Master Servicer failed to take remedial action; (iii) evidence that the Master Servicer failed to enforce appropriate loss mitigation practices; and (iv) evidence that the Servicers failed to properly maintain properties that the Trusts owned after foreclosure and the Master Servicer failed to remediate the problems. HSBC's contention that it need not exercise rights and remedies prudently after an EOD unless directed to do so is entirely made up. The PSAs do not say that.

*Servicing damages.* When EODs occurred, HSBC had a duty to exercise all of its rights and remedies as Trustee to recover the certificateholders' losses in the same manner that a prudent person would if her money was on the line. A prudent person would have taken action to ensure that the Trusts' Master Servicer and Servicers mitigated losses properly and compensated the Trusts for their failure to do so.

*Bad faith*. Once again HSBC ignores the language of the PSA, arguing that it cannot be held liable for its failure to take required action unless it acted in bad faith. But the PSA expressly provides that HSBC is liable if it was negligent, even if it acted in good faith. Moreover, even if bad faith was the standard—which it is not— HSBC has the burden of proving that it acted in good faith and cannot meet that burden because there is evidence that HSBC employed systemic willful

3

blindness to breaches in the Trusts and even active hostility to investors.

*Tort claims.* HSBC mischaracterizes Judge Scheindlin's motion to dismiss decision, which sustained a post-EOD fiduciary duty claim and a claim for breach of HSBC's pre-EOD duty to avoid conflicts of interest. The Court expressly rejected the assertion that these claims were duplicative or barred by the economic loss doctrine. These holdings are law of the case and Plaintiffs have marshalled evidence sufficient to show that HSBC breached both sets of duties.

*Damages.* None of HSBC's four additional last-gasp damages arguments are availing because (i) the contention that Phoenix Light had a guarantee that covered its losses is factually wrong and legally irrelevant; (ii) the damages Plaintiffs seek are general damages that were the foreseeable consequence of HSBC's breaches, not consequential damages; (iii) multiple courts have rejected HSBC's contention that the repurchase price of liquidated loans is zero; and (iv) HSBC has no competent evidence demonstrating the party responsible for repurchasing defective loans in FHLT 2006-C could not have done so. In addition, Plaintiffs are seeking summary judgment as to HSBC's mitigation of damages defense because HSBC has not presented any evidence suggesting that Plaintiffs could have mitigated their damages after learning of HSBC's breaches or quantified the purported impact of mitigation.

## ARGUMENT

## I.   HSBC's standing, champerty, and collateral estoppel defenses fail.

Plaintiffs are entities created in connection with CDO or re-securitization transactions. Cross Mot. 56.1 ¶ 1, 15. A CDO or re-securitization issuer "purchases, or assumes the risk of, a portfolio of assets . . . [intended to] generate cash, which is then paid out to the [CDO issuer's] investors." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015). Plaintiffs issued notes to investors which are paid with proceeds from a pool of securities acquired

by Plaintiffs, including the at issue RMBS. Cross Mot. 56.1 ¶ 4-6, 15. To secure their obligation to pay the notes, Plaintiffs provided a grant of the at issue RMBS, as well as other collateral securities, to an indenture trustee. *Id.* ¶ 3, 16. But Plaintiffs retained the reversionary interest in their collateral securities, *i.e.*, when notes issued by Plaintiffs were paid off, the indenture trustee released its lien and Plaintiffs became the sole holder. *Id.* ¶ 8, 18. Plaintiffs also had numerous performance obligations, including to ensure that rights relating to their collateral securities were enforced and to otherwise protect the collateral. *Id.* ¶ 9-11, 20-24. In 2014, it became apparent that Plaintiffs' indenture trustees would not pursue claims against RMBS trustees, including the claims in this action. *Id.* ¶ 36. Plaintiffs' indenture trustees were in many cases also RMBS trustees; they were not going to sue themselves or file actions taking positions that could be used against them. *Id.* ¶ 29-31. As a result, Plaintiffs sued the RMBS trustees directly, and Plaintiffs' indenture trustees assigned any right they had to bring the instant claims to address any real party in interest objection HSBC might raise. *Id.* ¶ 32-34.

HSBC obliquely asserts that Plaintiffs lack standing without taking a position as to whether it is claiming Plaintiffs lack Article III standing, prudential standing, or both. Its argument boils down to the superficial assertion that this Court should follow the erroneous ruling that is currently on appeal. *See PL v. USB*, 2020 U.S. Dist. LEXIS 46950 (S.D.N.Y. Mar. 18, 2020) *appeal at* No. 20-1312 (2d Cir.).

### A.  Plaintiffs have Article III standing.

There is no genuine issue of material fact that Plaintiffs have Article III standing:

> [I]n order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (*i.e.*, a 'concrete and particularized' invasion of a 'legally-protected interest'); (2) causation (*i.e.*, a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability.

*Sprint Commc'ns. Co., L.P. v. APCC Servs.*, 554 U.S. 269, 273-74 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiffs' suit is based upon the harm to their pre-existing proprietary interests in the RMBS Certificate cash flows and other obligations related to the RMBS Certificates and claims. HSBC caused that injury by failing to take the required actions to mitigate losses.

Because the second and third factors in the *Lujan* three-factor test are easily satisfied here, any dispute over Plaintiffs' Article III standing focuses on whether a CDO or re-securitization issuer in these circumstances has an "injury in fact" to redress harm to the collateral. The Second Circuit has held that a party that re-securitized RMBS Certificates, in a manner similar to Plaintiffs' CDO transactions, has Article III standing in such circumstances and that the district court committed legal error in holding to the contrary. *See NCUA v. USB*, 898 F.3d 243, 258 (2d Cir. 2018). NCUA had Article III standing despite having granted "all right, title and interest" to the RMBS Certificates at issue because ownership of the RMBS Certificates would later revert back to the plaintiff. *Id.* at 257-58. ("[W]e agree that the District Court committed the asserted legal error").[2] More generally, the Second Circuit recently confirmed—after *PL v. USB*—that an assignment of claims does not divest a party of Article III standing. *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 380 (2d Cir. 2021); *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (Article III standing did not depend upon validity of assignment).

In *HOE I*, then District Court Judge Sullivan ruled that "a CDO issuer like HOE I owns the underlying assets and is therefore injured by actions that adversely affect the underlying assets." 2014 U.S. Dist. LEXIS 49894, at *32 (S.D.N.Y. Mar. 31, 2014). In a subsequent opinion in the

---

[2] *See also NCUA v. USB*, 898 F.3d at 248 (describing reversionary interest created by plaintiffs' ownership of Owner Trust Certificates); Plaintiffs' App. Br., *NCUA v. USB*, 2017 WL 2844591, at *43 (2d Cir. June 28, 2017) ("NCUA was injured by defendants' breaches of contract that diminished payments made by the RMBS trusts to the NGN Trusts and thus harmed the value of NCUA's NGN Owner Trust Certificates," which created the reversionary interest).

same case, Judge Sullivan held that a CDO issuer does not divest itself of Article III standing when it "assigns its rights" to an indenture trustee. *House of Eur. Funding I, Ltd. v. Wells Fargo Bank*, 2015 U.S. Dist. LEXIS 118729, at \*17 (S.D.N.Y. Sept. 4, 2015). Rather, Judge Sullivan clarified that dismissal was initially required because "a party who assigns its rights is 'no longer the real party in interest with respect to an action upon the instrument and retained no right to pursue a claim,' *not* because it had not suffered an injury-in-fact sufficient to satisfy Article III." *Id.* (citation omitted) (italics in original).[3]

A leading New York State court decision, which was relied upon by Judge Sullivan in his 2014 decision in *House of Europe*, holds that a CDO issuer has standing to intervene in a dispute relating to harm to the underlying collateral because it "has 'an actual legal stake in the matter being adjudicated.'" *Hildene Cap. Mgmt., LLC v. Bank of N.Y. Mellon*, 963 N.Y.S.2d 38, 40 (1st Dep't 2013) (quoting *Soc'y of Plastics Indus., Inc. v. Cnty. of Suffolk*, 77 N.Y.2d 761, 772 (1991)); *see also Soc'y of Plastics*, 77 N.Y.2d at 772-73 (New York courts also require "injury in fact" as a basis for their own jurisdiction); Cross Mot. 56.1 ¶ 38 (Plaintiffs' provisions substantantively identical to Hildene indenture).

Plaintiffs had multiple proprietary interests in the at issue RMBS Certificates that were impaired by HSBC's breaches: *e.g.*, they retained a reversionary interest in the at issue Certificates, and they used the proceeds from the Certificates to pay their noteholders and their expenses in carrying out their duties as issuers. Cross Mot. 56.1 ¶ 8-12, 18, 25-28. HSBC's motion does not argue otherwise, and summary judgment should be entered in favor of Plaintiffs on HSBC's affirmative defense of lack of Article III standing.

---

[3] *See also Blackrock Allocation Target Shares v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 415 n.19 (S.D.N.Y. 2017) (plaintiff had standing because it retained a reversionary interest); *FDIC v. Citibank, N.A.*, 2017 U.S. Dist. LEXIS 108104, at \*8-9 (S.D.N.Y. 2017) (FDIC had Article III standing despite grant of all right, title and interest).

**B.      Plaintiffs have prudential standing.**

As for contractual standing, a form of prudential standing, the court in *PL v. USB* erred when it held that the assignments were void under the ancient doctrine of champerty, as codified in New York Judiciary Law § 489. *See Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 94 N.Y.2d 726, 733 (2000) ("[t]he 'champerty' concept is based on a type of French feudal tenure in land"). In New York, "the prohibition of champerty has always been 'limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs.'" *See Love Funding Corp.*, 13 N.Y.3d 190, 199 (2009) (quoting *Bluebird*, 94 N.Y.2d at 734). In narrowing the champerty statute, New York's highest court has held that "[t]he bottom line is that Judiciary Law § 489 requires that the acquisition be made with the intent and for *the* purpose (as contrasted to *a* purpose) of bringing an action or proceeding." *Bluebird*, 94 N.Y.2d at 736 (italics in original).

An entity "that takes an assignment of a claim does not violate Judiciary Law § 489(1) if its purpose is to collect damages, by means of a lawsuit, for losses on a debt instrument *in which it holds a preexisting proprietary interest*." *Love Funding*, 13 N.Y.3d at 195 (emphasis added). *Love Funding* involved an RMBS securitization similar to the underlying transaction at issue here. That case involved a "conduit lending" arrangement in which a mortgage originator, defendant Love Funding, made R&Ws to Paine Webber (which later became UBS) concerning mortgage loans that Paine Webber acquired from Love Funding. *Tr. for the Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp.*, 591 F.3d 116, 118 (2d Cir. 2010). Paine Webber sold some of the loans to Merrill Lynch, which securitized those mortgage loans into RMBS, and sold notes to investors through an RMBS trust. *Id.* at 118-19. After a mortgage loan at issue defaulted, UBS (as successor to Paine Webber) assigned to the RMBS trust its claims against Love Funding under the "conduit lending" arrangement, and the RMBS trust sued Love Funding. *Id.*

8

The district court found the assignment was champertous, but the Second Circuit reversed on appeal after certifying questions to the New York Court of Appeals. *Id.* at 124; *Love Funding*, 13 N.Y.3d at 202 (assignment not champertous because "the Trust's purpose in taking assignment of UBS's rights under the Love MLPA was to enforce its rights").

After *Love Funding* it is clear the champerty statute only applies to *strangers* to an underlying transaction who do *not* have a "preexisting proprietary interest" in the underlying transaction and who later acquire the interest for *the* sole purpose of bringing a lawsuit.[4] Plaintiffs have numerous proprietary interests in the RMBS and claims in this action. As noted above in Section I.A, the at issue RMBS revert back to Plaintiffs when Plaintiffs' notes are paid off. Plaintiffs also had a duty to protect their collateral and they used proceeds from RMBS to pay their obligations. Because Plaintiffs here are *not* strangers to the transactions at issue, but instead have many preexisting proprietary interests in the claims at issue, Plaintiffs' assignments from their indenture trustees *cannot* be champertous as a matter of law *even if* their "purpose is to collect damages, by means of a lawsuit, for losses on [a] debt instrument[s]," *i.e.*, the RMBS Certificates. *Love Funding*, 13 N.Y.3d at 195.[5]

Even if *Love Funding* were not dispositive, champerty does not apply merely because litigation was "*a* purpose"; litigation must be "*the* purpose" to the exclusion of all others. *Bluebird*,

---

[4] *See Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co.*, 652 F.2d 231, 235-36 (2d Cir. 1981) (denying champerty because plaintitiff "was *not a stranger* to the commercial transaction giving rise to [the] claim, but was instead intimately involved in it") (emphasis added); *Richbell Info. Servs., Inc. v. Jupiter Partners*, 723 N.Y.S.2d 134, 139-40 (1st Dep't 2001) ("[T]he question here is whether the investors are, as defendants allege, *strangers to the dispute merely speculating on the suit* or, as plaintiffs allege, parties seeking to protect interests of theirs that are financially related to plaintiffs' interests") (emphasis added).

[5] HSBC cites *Justinian Capital SPC v. West LB AG, N.Y. Branch*, but that case is a paradigm example of a stranger to the transaction at issue acquiring an assignment solely for the purposes of being paid to bring litigation in violation of New York's champerty statute. *See Justinian*, 28 N.Y.3d 160, 170-71 (2016) ("In essence, the agreement at issue here was a sham transaction between the owner of a claim which did not want to bring it (DPAG) and an undercapitalized assignee which did not want to assume the $500,000 risk required to qualify for the safe harbor protection of section 489 (2) (Justinian)"). The plaintiff there did not have a legitimate preexisting interest.

94 N.Y.2d at 736 (italics in original). The snippets of testimony that HSBC cites from depositions taken in *PL v. USB* do not establish that litigation was the *sole purpose* of the assignments.[6] The 30(b)(6) witness HSBC cites testified that the re-assignments were obtained because Plaintiffs' indenture trustees "were conflicted and it was known they weren't going to take action against these claims." Resp. 56.1 ¶ 36. The excerpt of testimony relied upon by HSBC makes clear that litigation was only "part of" the reason the assignments were obtained. *Id*. And while a director stated that he was not aware of a purpose other than litigation, he also testified that he was not involved in negotiating the assignments. *Id.* ¶ 37.

Summary judgment should be entered in Plaintiffs' favor rejecting HSBC's prudential standing and champerty affirmative defenses. At a minimum, HSBC's motion should be denied because there are issues of fact as to Plaintiffs pre-existing interests and whether the assignments were obtained due to a legitimate business concern that the indenture trustees were conflicted and would not adequately protect the rights of certificateholders.

### C.     Collateral estoppel does not apply.

HSBC contends that even if *PL v. USB* was wrongly decided, this Court should nevertheless hold that it has collateral estoppel effect. In order to establish collateral estoppel, HSBC must demonstrate four elements: (1) the prior issue was identical; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party against who estoppel is sought had a full and fair opportunity to litigate the issue; and (4) resolution of the issue was necessary to support a valid and final merits judgment. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288–89 (2d Cir. 2002). In addition, HSBC must prove that it would be fair to apply collateral estoppel

---

[6] *Aretakis v. Caesars Entm't* is inapposite because the plaintiff had no other purpose or pre-existing proprietary interest. 2018 U.S. Dist. LEXIS 29552, at *27 (S.D.N.Y. Feb. 23, 2018). The Plaintiff argued a golfer's prior verbal agreement to share contest proceeds created a preexisting interest, but that agreement lacked consideration. *Id.*

against Plaintiffs. *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 80, 84 (2d Cir. 2019). This Court should reject HSBC's collateral estoppel argument and enter summary judgement in Plaintiffs' favor for four independent reasons.

First, *PL v. USB* cited alternative bases for dismissal "find[ing] that Plaintiffs lack[ed] both constitutional and prudential standing to bring" the action. 2020 U.S. Dist. LEXIS 46950 at *46. Collateral estoppel does not apply to alternate holdings because the issue was not necessarily decided. *Tydings v. Greenfield, Stein & Senior, LLP*, 11 N.Y.3d 195, 199 (2008) (adopting the "general rule" that collateral estoppel does not apply to a dismissal on alternative grounds).[7]

Second, *PL v. U.S. Bank* also involved wholly different securities and distinct claims against a different defendant. *Buechel v. Bain*, cited by HSBC, is not on point because the dispute involved the same trust distributions that were at issue in the prior proceeding. 97 N.Y.2d 295, 300-01 (2001). As a result, the issue of whether a related fee agreement applied to those distributions was identical. *Id.* at 306. Here, different securities are at issue.

Third, collateral estoppel does not apply to pure questions of law. *Am. Home Assur. Co. v. Int'l Ins. Co.*, 90 N.Y.2d 433, 440 (1997). Whether *Love Funding* permits an investment vehicle to take an assignment to enforce rights with respect to its collateral is a "pure question of law" that is not subject to collateral estoppel. *Id.* (party was entitled to relitigate "whether an excess carrier must make a showing of actual prejudice when it seeks to avoid its coverage obligations").

Fourth, HSBC is required to prove it would be fair for the Court to not apply collateral estoppel, *Bifolck*, 936 F.3d at 84, 85, yet it has not even tried to meet that burden. Thus, its motion is facially insufficient, and it cannot remedy that shortcoming on reply. In any event, applying

---

[7] *See also Menucha of Nyack, LLC v. Fisher*, 110 A.D.3d 1037, 1041 (2d Dep't 2013) ("alternative determination" not preclusive); *Bauman v. Mount Sinai Hosp.*, 72 A.D.3d 511, 512 (1st Dep't 2010) (dismissal on alternative grounds not preclusive).

collateral estoppel to *PL v. USB* would be unfair because that decision is demonstrably wrong and because an appeal is pending. *See Indus. Risk Insurers v. Port Auth.*, 493 F.3d 283, 288 n.3 (2d Cir. 2007) ("[T]here are many New York cases suggesting caution in applying preclusion" when an appeal is pending).

## II.     Phoenix Light's claims are not time-barred under German law.

HSBC's contention that Phoenix Light's claims are untimely under German law is wrong because (A) German law does not apply; and (B) record evidence demonstrates the claims are timely even if German law applied.

### A.     The German statute of limitations does not apply.

Ireland's limitation period, not Germany's, applies to Phoenix Light's claims. For economic injuries, the place of accrual under the borrowing statute is generally "where the plaintiff resides and sustains the economic impact of the loss." *HOE I*, 2014 U.S. Dist. LEXIS 49894, at *41 (quotations omitted). Phoenix Light is "a distinct legal entity that has a place of incorporation and principal place of business." *Id.* at *44. For corporate entities, "the place of residence for the purposes of CPLR § 202 is traditionally the state of incorporation or the corporation's principal place of business." *Commerzbank AG v. Deutsche Bank Nat'l Tr.Co.*, 234 F. Supp. 3d 462, 469 (S.D.N.Y. 2017). Ireland is Phoenix Light's place of incorporation and principal place of business. Resp. 56.1 ¶ 205. Therefore application of the borrowing statute therefore is clear: Phoenix Light's economic harm was felt in Ireland and Ireland's SOL applies under the borrowing statute. Ireland's statute of limitations is six years, the same as New York's. *See* Irish Statute of Limitations Act of 1957 § 11.

HSBC argues that Phoenix Light "remains wholly owned" by German entities, Mot. at 10, but the evidence it cites merely demonstrates that a German entity, EAA, holds the notes issued

by Phoenix Light. Resp. 56.1 ¶ 25. It does not own Phoenix Light's equity shares. *Id.* Regardless, "it is not the place of residence of the owners of plaintiff that is pertinent but the location of the business itself." *Proforma Partners, LP v. Skadden Arps Slate Meagher & Flom, LLP*, 280 A.D.2d 303, 304 (1st Dep't 2001). In *HOE I*, Judge Sullivan rejected the same argument with respect to another entity associated with WestLB in which EAA had an ownership interest. 2014 U.S. Dist. LEXIS 49894, at *43-44 (Cayman SOL applied because that is where entity was incorporated and had its office). Undeterred, HSBC claims without any support that this case is "unusual." Mot. at 10. It is not. Phoenix Light has directors who conduct business on its behalf in Ireland and make decisions for the entity. Resp. 56.1 ¶¶ 26, 28, 205. Phoenix Light also suffers losses in the first instance, *id.* ¶ 206, and the fact that it passes losses on to its noteholders in the form of lower recoveries is irrelevant because all corporations ultimately pass losses onto stakeholders. *HOE I*, 2014 U.S. Dist. LEXIS 49894, at *32.[8] There is no reason to treat Phoenix Light—a corporate entity—differently than any other company for statute of limitations purposes. *See Robb Evans & Assocs. LLC v. Sun Am. Life Ins.*, 2013 U.S. Dist. LEXIS 4683, at *4 (S.D.N.Y. Jan. 8, 2013).

**B.  Phoenix Light's claims are timely even if German Law applied.**

HSBC's five-sentence argument does not come close to meeting its burden to establish any claims are time-barred. Mansel Decl. ¶¶ 17-20.[9] The relevant German limitations period is ten

---

[8] HSBC's only cited case *Baena v. Woori Bank*, supports Plaintiffs, not HSBC, because the court applied the law of Belgium as that is where the corporation resided and the directors of the corporation operated in Belgium. 2006 U.S. Dist. LEXIS 74549, at *21 (S.D.N.Y. Oct. 11, 2006). The court recognized the *Lang* exception is applied only in the "extremely rare" circumstance where the plaintiff established a wholly separate financial base. *Id.* at 20. HSBC does not even argue that Phoenix Light has a separate financial base.

[9] Dr. Mansel is a leading authority on the German statute of limitations. Mansel Decl. ¶¶ 1-3. HSBC's expert, Dr. Rohe, specializes in Islamic law. *See* Chairholder Biography, https://www.zr2.rw.fau.de/lehrstuhl/lehrstuhlinhaber (last visited July 13, 2021); *Publikationsverzeichnis*, https://www.zr2.rw.fau.de/files/2021/05/publikationsverzeichnis_12-05-2021.pdf (last visited July 13, 2021) (publications predominantly on Islamic law). Rohe's opinions on German SOL should be given little weight, and his factual findings and opinion on the ultimate issue of the timeliness of Phoenix Light's claims should be disregarded. *See, e.g, Nineveh Invs. Ltd. v. United States*, 2019 U.S. Dist. LEXIS 137528, at *12 (E.D. Pa. Aug. 13, 2019) ("For purposes of the Rule 44.1 analysis, the relevant

years unless HSBC establishes a shorter three-year limitations period applies. *Id.* ¶ 4. For the shorter limitations period to apply, HSBC must prove that Phoenix Light acquired factual knowledge (or was grossly negligent in not doing so) for its claims sufficient to have an expectation of success at trial *in Germany* before 2011. *Id.* ¶ 7; *IKB Deutsche Industriebank AG v. McGraw Hill Fin., Inc.*, 634 F. App'x 19, 22 (2d Cir. 2015). Because there is no pretrial discovery in Germany, this means that Phoenix Light had to have sufficient evidence of HSBC's breaches in hand before 2011 to have an expectation of success. Mansel Decl. ¶ 10. German law holds that the requisite knowledge is not satisfied by generalized knowledge or suspicion of possible misconduct, knowledge of wrongdoing by defendant in other contexts, or knowledge of wrongdoing by others. *Id.* ¶ 8. HSBC must meet this high burden for each separate breach. *Id.* ¶ 5; *see also Blackrock*, 247 F. Supp. 3d at 420. Instead, HSBC relies on a German professor's summary of general news reports that do not mention HSBC as Trustee or the at issue Trusts. *See* Mansel Decl. ¶ 18-20 (insufficiency of facts relied upon by HSBC's professor). Moreover, where, as here, HSBC cannot conclusively show that the plaintiff had knowledge of facts triggering the limitations period, "the question [of timeliness] should be left to the trier of fact." *Bano v. Union Carbide Corp*. 361 F.3d 696, 710 (2d Cir. 2004).

HSBC's professor also charges Phoenix Light with gross negligence for not knowing of HSBC's breaches before 2011, but he gets the standard completely wrong. Mansel Decl. ¶¶ 12, 20. Any duty to investigate under the German statute of limitations is limited to objects "in plain sight" and "readily available" without "incur[ing] considerable effort." *DZ-Bank v. HSBC N.A. Holdings, Inc.*, 2013 U.S. Dist. LEXIS 178462, at *25 (S.D.N.Y. Dec. 17, 2013). In other words,

---

part of the experts' evidence is the law upon which the experts rely, not their ultimate legal conclusions"); *Minebea Co. v. Papst*, 444 F. Supp. 2d 68, 182 (D.D.C. 2006) ("The purpose of expert testimony . . . is to aid the court in determining the content of the applicable foreign law - not to apply it to the facts of the case").

HSBC must show that Phoenix could have obtained specific knowledge of specific breaches by HSBC with virtually no effort and at virtually no cost. HSBC fails to do so. And it cannot to do so, as this would require proving that Phoenix was grossly negligent for not discovering claims against HSBC in 2010 – four years before any other investor brought similar claims against HSBC.

## III.    The document defect claims are timely and based on duties set forth in the PSAs.

HSBC contends that Plaintiffs' claims arising from HSBC's failure to enforce repurchase obligations for document-defect loans are untimely because they allegedly accrued when the Custodian issued the final exception reports. Mot. at 12. But that misstates both Plaintiffs' claims and the governing law.

The PSAs specify no dates or hard deadlines for HSBC's duty to enforce the sellers' obligation to repurchase loans with uncured document defects. *See* Underwood Ex. A § 2.03(c), Ex. B § 2.05, Ex. C § 9.01; Resp. 56.1 ¶ 47, 52-53.[10] Where, as here, a contract does not set a time for performance, New York law implies a reasonable time, *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007), and no cause of action accrues "[until] such reasonable time has expired." *Lituchy v. Guinan Lithographic Co*., 60 A.D. 2d 622, 622 (2d Dep't 1977). HSBC points to the deadline to deliver exception reports set forth in the ACE 2005-AG1 Custodial Agreement, Mot. at 11-12, but that merely specifies when exception reports are due, it does not reference enforcement. Plaintiffs do not claim—and the PSAs do not require—that HSBC should have enforced repurchases the moment a loan appeared on an exception report.

---

[10] HSBC argues in a footnote that under the ACE 2005-AG1 PSA it is required to enforce within "30 days" of the expiration of the seller's cure period. Mot. at 13 n.13. But a 30-day deadline does not appear in the cited provision. It provides that the seller's obligation to repurchase under the separate Mortgage Loan Purchase Agreement arises "ninety (90) days after the date on which the Seller was notified of such missing document." Underwood Ex. A § 2.03(a). That refers to when the obligation to repurchase arises. Any contrary reading would be absurd because it would require HSBC to enforce before the repurchase obligation arose. Moreover, as noted above, the evidence shows the time to cure and enforce was a more fluid concept and any ambiguities should be construed against HSBC as it participated in the drafting. Resp. 56.1 ¶ 162-63; *infra* fn 21.

The absence of a specific timeframe for enforcement is sensible because a variety of factors must be considered to determine when enforcement should occur. The evidence demonstrates that parties would work to cure defects, especially when the loan was performing, and only seek repurchase after those efforts became futile. Resp. 56.1 ¶ 47. Further, parties would not require the repurchase of a performing loan even if a document defect was not cured within the period specified within the cure period. *Id.* Plaintiffs have shown, however, that it would not have been reasonable—*i.e.,* it would be negligent—to provide unlimited time to cure. *Id.* In 2010 it was no longer reasonable to permit additional time to cure because by then the statute of limitations to enforce repurchase claims was rapidly approaching. *Id.* This is why Plaintiffs assert claims for HSBC's failure to repurchase delinquent loans with document defects begining in 2010. Courts considering accrual of similar claims have consistently held that the trustees' enforcement duties do not accrue when the seller's obligation to repurchase first arose and that what constitutes a reasonable time for enforcement presents factual issues.[11]

HSBC's after-the-fact litigation position that enforcement duties arose immediately after the seller failed to cure a breach is refuted by HSBC's contemporaneous conduct. When HSBC filed repurchase actions in other trusts it generally did so shortly before (and in some cases after) the statute of limitations for bringing such claims expired. *W. & S. v. USB*, 2020 N.Y. Misc. LEXIS 8191, at *19-20 (N.Y. Sup. Ct. Nov. 5, 2020) (timing of filing of other lawsuits relevant consideration in assessing reasonable time for performance); Resp. 56.1 ¶ 150.

HSBC also argues that Plaintiffs' repurchase enforcement claims fail because Judge

---

[11] *PL v. DB,* 172 F. Supp. 3d 700, 709-10 (S.D.N.Y. 2016) (holding that accrual of claims based on failure to take possession of mortgage files is distinct from those relating to enforcing repurchases); *W&S v. USB*, 2020 N.Y. Misc. LEXIS 8191, at *19 (allegation that Trustee filed actions in other trusts before statute of limitations against seller expired suggested a reasonable time for performance was much later than asserted by Trustee); *MLRN LLC v. U.S. Bank N.A.*, 2019 N.Y. Misc. LEXIS 6085, at *8-9 (N.Y. Sup. Ct. Nov. 13, 2019) (similar holding); *see also Bano*, 361 F.3d at 710 (unless clear, "the question [of timeliness] should be left to the trier of fact").

Scheindlin stated in the MTD Opinion that all alleged breaches relating to receiving mortgage loan files and creating certification and exception reports occurred at or near the time the trusts closed. Mot. at 13-14 (citing MTD Op. at 35-36). In the section of the MTD Opinion regarding accrual, Judge Scheindlin discussed only alleged breaches of HSBC's duties to "make certifications pursuant to Regulation AB, taking physical possession of mortgage files, and preparing and delivering certification and exception reports." MTD Op. at 33-34. There is no analysis or discussion of the trustee's separate and distinct enforcement duty. *Id*. at 33-36; *see also PL v. DB*, 172 F. Supp. 3d at 709 (noting that the MTD Op. addressed only "claims related to document delivery, receiving mortgage loan files, and creating certification and exception reports").

HSBC's citation to *IKB Int'l, S.A. v. Lasalle Bank N.A.* is similarly unavailing because the quoted language regarding accrual applies only to the trustee's duty to provide notice of missing or defective mortgage loan files, 2021 N.Y. Misc. LEXIS 347, at *13 (N.Y. Sup. Ct. Jan. 27, 2021), and is neither mentioned in nor applicable to that court's separate discussion of the trustee's duty to enforce the repurchase of loans, including loans with mortgage loan file defects. *Id*. at * 27 ("Enforcement of Repurchase Rights"). The remaining cases cited on page 13 of HSBC's brief are not on point because they address when a claim against a seller accrues, not what constitutes a reasonable time for enforcement of that repurchase obligation.

Contrary to HSBC's contention, Section 2.05 of the FHLT 2006-C PSA imposes a duty to enforce because HSBC agreed to "exercise the rights referred to above for the benefit of all present and future Holders of the Certificates." Underwood Ex. B. The majority of courts hold that substantively identical provisions create a duty to enforce because the "rights referred to above" include the rights to enforce the seller's repurchase obligations, which are set forth in the preceding

subsections of Article II.[12] Any other reading would excise HSBC's agreement to "exercise the rights referred to above" violating the "cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract . . . without force and effect.'" *Corhill Corp. v. S. D. Plants, Inc.*, 9 N.Y.2d 595, 599 (1961) (citation omitted).[13] As for NAA 2005-AR6, Plaintiffs rely on HSBC's duty to exercise rights and remedies after an EOD. Underwood Ex. C § 9.01(a). This duty does not arise until an EOD arises and HSBC's time to act depends upon when it would be "prudent" to do so. HSBC's assertion that Plaintiffs' damages expert relies upon the "shall enforce" language contained in the ACE 2005-AG1 PSA is a strawman. Dr. Mason's damages calculation is not in any way dependent upon particular language in a particular PSA because he is not construing contractual enforcement duties; he calculated damages under Plaintiffs' theory of the case and merely cited the "shall enforce" provision as background. Resp. 56.1 ¶ 54, 105.

## IV.    HSBC breached its duty to enforce R&W provisions in ACE 2005-AG1.

Section 2.03 of the ACE 2005-AG1 PSA provides that HSBC "shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase" loans that are eligible for repurchase due to R&W breaches. Underwood Ex. A. As set forth below, Plaintiffs have marshalled evidence sufficient to create a genuine issue of material fact as to whether HSBC

---

[12] *See RP v. DB*, 2016 U.S. Dist. LEXIS 12982, at *11-12 (S.D.N.Y. Feb. 3, 2016); *IKB Int'l, S.A.*, 2021 N.Y. Misc. LEXIS 347, at *30; *W&S v. USB*, 2020 N.Y. Misc. LEXIS 8191, *14-15.

[13] *Accord Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572, 581 (2017). *Commerzbank v. USB* held that similar language did not create "a generalized good faith obligation." 457 F. Supp. 3d at 257-58. But Plaintiffs here do not rely on an implied covenant of good faith. An Ohio state court decision rendered after a bench trial concluded that similar language did not create an enforcement duty based on the mistaken belief that Judge Nathan's opinion in *RP v. DB* addressed a PSA that required the Trustee to demand repurchase from the seller. *W. & S. Life Ins. Co. v. Bank of N. Y. Mellon*, 129 N.E.3d 1085, 1094 (Ohio Ct. App. 2019) (citing inapplicable provision in unrelated section of opinion and adopting interpretation that rendered agreement to "exercise the rights referred to above" superfluous).

breached this duty and HSBC's arguments to the contrary are without merit.[14]

**A.    Record evidence shows that HSBC failed to enforce DBSP's obligation to repurchase loans that breached R&Ws.**

DBSP was the sponsor of ACE 2005-AG1 and the party responsible for repurchasing loans with R&W breaches that materially and adversely affected the certificateholders' interest in the loans or the value of the loans. Resp. 56.1 ¶ 148. HSBC filed several actions to compel DBSP to repurchase loans in RMBS trusts, but it never filed an action to compel repurchases in ACE 2005-AG1. *Id.* ¶ 149.[15] HSBC conducted loan-level reviews in these other trusts and asserted in court filings that loans breached at shockingly high rates. *Id.* ¶ 151. HSBC asserted that R&W breaches "exist *throughout* many other Mortgage Loans" even if those loans had not yet been reviewed, *id.* ¶ 152 (emphasis added), and "given the extent and severity of the breaches, the Breach Notices were sufficient to put DBSP on *notice* that Mortgage Loans throughout the *entire Trust — not merely the specific Defective Loans identified in the Breach Notices*" breached R&Ws. *Id.* ¶ 153 (emphasis added). HSBC concluded that DBSP's "breaches were so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident." *Id.* ¶ 155.[16] DBSP admitted to wrongdoing in originating and securitizing loans in connection with a $7.2 billion settlement with the DOJ that implicated individuals involved with ACE 2005-AG1 PSA.

---

[14] Plaintiffs are no longer pursuing claims relating to HSBC's failure to enforce repurchases triggered by R&W violations relating to loans held in FHLT 2006-C and NAA 2006-AR6. However, as noted elsewhere, Plaintiffs are still pursuing claims relating to HSBC's failure to enforce the responsible parties' obligation to repurchase loans held in these Trusts that breached covenants concerning document defects and for HSBC's failure to meet post-EOD duties.

[15] Plaintiffs request that the court take judicial notice of these actions and other public records related to filed litigation or litigation positions taken by HSBC cited in opposition to HSBC's motion. *See* Resp. 56.1 ¶ 30-31, 99, 109, 149-59, 165, 203; *Marom v. Gordon*, 2020 U.S. Dist. LEXIS 159864, at *32 (S.D.N.Y. Aug. 30, 2020) (judicial notice of parties contradictory position in other litigation is proper); *Arch Specialty Ins. Co. v. Entm't Specialty Ins. Servs.*, 2005 U.S. Dist. LEXIS 4746, at *27 (S.D.N.Y. Mar. 23, 2005) (similar holding); Fed. R. Evid. 201.

[16] Plaintiffs request that the Court take judicial notice of this and other regulatory actions cited in opposition to HSBC's motion to demonstrate that DBSP, HSBC and others were the subject of adverse regulatory actions. Resp 56.1 ¶ 99, 118, 123, 160(a);  *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 124 n.12 (2d Cir. 2010) (taking judicial of consent order); *Art & Antique Dealers League of Am., Inc. v. Seggos*, 394 F. Supp. 3d 447, 455 (S.D.N.Y. 2019) (same); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 U.S. Dist. LEXIS 122868, at *14 (S.D.N.Y. June 28, 2017) (taking judicial notice of regulatory orders and consent decrees).

Resp. 56.1 ¶ 160(a).

HSBC does not dispute that it received written notices identifying loans in the ACE 2005-AG1 Trust with material R&W breaches. Resp. 56.1 ¶ 154. This alone is enough to create a genuine issue of material fact for trial. *See Commerzbank v. USB*, 457 F. Supp. 3d at 259. HSBC was also aware of governmental reports revealing that "DBSP and ACE disregarded underwriting guidelines, and as a result made representations and warranties for mortgages that did not meet stated criteria in the governing documents," Resp. 56.1 ¶ 156, and that half the loans a third-party due diligence firm DBSP hired to review failed to comply with underwriting guidelines. *Id.* ¶ 159 (complaints alleging facts from the Congressional reports). HSBC used these congressional reports as support in actions against DBSP. HSBC was also aware of claims brought by the FHFA in 2011 asserting "DBSP knowingly misrepresented the quality of the Mortgage Loans," including in ACE 2005-AG1, and relied on the FHFA's allegations in litigation. *Id.* ¶ 157. HSBC knew that the noticed loans were just the tip of the iceberg. The fact that HSBC was active in the origination and securitization of mortgage loans and was accused of the same wrongdoing as DBSP further supports this inference. Resp. 56.1 ¶ 160.

HSBC asserts that it cannot be charged with enforcement duties unless a loan was specifically identified as breaching in a written notice provided to HSBC. Mot. at 15-16. That is inconsistent with the ACE 2005-AG1 PSA because it conflates the term "discovery" in the PSA with "actual knowledge" in a manner that is inconsistent with New York appellate authority. *See Fixed Income Shares: Series M v. Citibank, N.A.*, 157 A.D.3d 541, 542 (1st Dep't 2018) ("discovery" and actual knowledge "have different meanings."). Judge Failla similarly held that "discovery" includes "conscious avoidance or *implied* actual knowledge." *BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo, N.A.*, 2017 U.S. Dist. LEXIS 133373, at *141

(S.D.N.Y. Aug. 21, 2017) (emphasis added). Implied actual knowledge means "[k]nowledge of information that would lead a reasonable person to inquire further." *Id.* at \*141-42 (*quoting Express Actual Knowledge, Implied Actual Knowledge, Constructive Knowledge, Willful Blindness, Black's Law Dictionary* (10th ed. 2014)). "While '[l]earning of facts merely suggestive of a breach would not require the Trustee to immediately raise a claim, *upon receipt of such notice, it becomes incumbent upon the [Trustee] to pick up the scent and nose to the source.'" BlackRock Allocation Target Shares: Series S Portfolio*, 247 F. Supp. 3d at 393 (quoting *Policemen's Annuity & Benefit Fund of City of Chi. v. Bank of Am., NA*, 907 F. Supp. 2d 536, 553 (S.D.N.Y. 2012)). Judge Pauley similarly held that when an RMBS trustee has access to information concerning widespread R&W Breaches, poor loan performance, and industry-wide misconduct, "the Trustee[] at the very least should have been prompted to look more closely at the loans underlying the trusts." *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 494 (S.D.N.Y. 2017). HSBC ignores this body of law and instead cites Judge Netburn's discovery order, but that order expressly states, "this opinion should not be deemed to have law-of-the-case effect." *Royal Park Invs. SA/NA v. HSBC Bank USA N.A.*, 2017 U.S. Dist. LEXIS 35353, at \*240-41 (S.D.N.Y. March 10, 2017).[17] HSBC cites no cases, as there are none, supporting its contention that HSBC can only know something if it receives written notice.[18]

---

[17] Contrary to HSBC's misreading of the case, *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, recognized that constructive knowledge will suffice if the plaintiff can demonstrate "willful blindness." 205 F. Supp. 3d 386, 425 (S.D.N.Y. 2016). And *Commerce Bank v. Bank of N.Y. Mellon*, is not on point because the court did not interpret the meaning of "discovery" and instead found there was no extra-contractual fiduciary duty to "nose to the source." 141 A.D.3d 413, 416 (1st Dep't 2016).

[18] HSBC's reliance upon the first motion to dismiss decision in *NCUA Bd. v. U.S. Bank Nat'l Ass'n* (Mot. at 16) is unavailing because, in a subsequent decision, the court let stand claims for the trustee's failure to enforce when the plaintiff was able to identify some loan-specific breach notices. 2020 U.S. Dist. LEXIS 130601, at \*10-11 (S.D.N.Y. July 23, 2020). These notices, coupled with other evidence, were sufficient to trigger the Trustee's enforcement duties at the trust level. *Id.* Similarly, the court in *PL v. BNYM* held that, for "four trusts" there was a genuine issue of material fact as to whether the trustee breached its enforcement duties because the plaintiff demonstrated the trustee received written notice of breaches, but the court did not suggest that was the only method of proving discovery. 2017 U.S. Dist. LEXIS 145044, at \*31.

As discussed above, HSBC had, at a minimum, implied actual knowledge of R&W breaches because it received written notice of breaches and was aware that DBSP had intentionally securitized large numbers of loans that had been misrepresented. The evidence further shows that HSBC consciously avoided knowledge of breaches. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Prior to the time this policy was put in place, HSBC had no policy at all. *Id.* ¶ 138. HSBC employees admitted that when it received information suggesting repurchases were required, they would simply "[f]ile [those documents] in the cabinet with the rest of the hard copies" without assessing their contents even if they reflected that there were problems with thousands of loans. *Id.* ¶ 142-43. HSBC also staffed its corporate trust division with individuals who were ill-equipped to support HSBC' role as RMBS Trustee. *Id.* ¶ 137, 140-41, 144-46. HSBC even erected barriers to prevent certificateholders from discovering R&W breaches themselves. *Id.* ¶ 132-33.

HSBC's position that it required written notice identifying specific breaching loans before having any enforcement obligation is inconsistent with industry practice. Trustees do not limit themselves to specifically noticed loans when they pursue enforcement. RMBS trustees are permitted to provide notice that specific loans materially breached and, where there is evidence of widespread breaches, demand that the seller repurchase both the specifically identified loans and

all other loans with material R&W breaches.[19] As noted above, HSBC did not limit itself to loans specifically identified in written notice when it sued DBSP. Resp. 56.1 ¶ 152-53.

**B.      The ACE 2005-AG1 PSA does not require direction and indemnity before HSBC can be charged with its enforcement duties.**

HSBC's position that "enforce" means to await direction from certificateholders is nonsensical because the PSAs do not provide for notice to certificateholders when R&W breaches are discovered by the parties to the PSA. *E.g.,* Underwood Ex. A § 2.03(c). If the parties intended enforcement to occur only at the direction of certificateholders, the PSAs would have required notice to certificateholders. Although in some cases—HSBC admits not all—HSBC posted a notice of discovery of certain breaches, that notice was not contemplated under the terms of the PSAs because the Trustee was charged with enforcement, not certificateholders. The passive interpretation of the term HSBC advocates also cannot be reconciled with the commonly understood meaning of "enforce," which is "to compel obedience" or "compel a person to pay damages." *Black's Law Dictionary* (11th ed. 2019).

HSBC's own cited authority rejects the contention that an RMBS trustee is not charged with enforcement duties absent a direction and indemnity from certificateholders. *See PL v BNYM*, 2017 U.S. Dist. LEXIS 145044, at *32 (trustee can point to "no contractual provision requiring certificateholder direction before it was obligated to enforce the Seller's repurchase obligations").[20] None of the provisions in Section 9.02 of the ACE 2005-AG1 PSA cited by HSBC

---

[19] *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.,* 176 A.D.3d 466, 466 (1st Dep't 2019) (Trustee permitted to provide notice that "informed defendant that a substantial number of identified loans were in breach, and that the pool of loans remained under scrutiny, with the possibility that additional nonconforming loans might be identified"); *Home Equity Mortg. Tr. Series 2006-1 v. DLJ Mortg. Cap., Inc.,* 175 A.D.3d 1175, 1176 (1st Dep't 2019) ("presuit letters, which stated that DLJ had placed defective loans into the trusts 'on a massive scale,'" sufficed).

[20] *See also Harch Int'l Ltd. v. Harch Capital Mgmt.,* 2011 WL 11047191, at *3 (N.Y. Sup. Ct. Mar. 16, 2011) (Trustee did not show pre-existing indemnity was inadequate); *Upwood Invs. Ltd. v. U.S. Bank Nat'l Ass'n,* 2012 N.Y. Misc. LEXIS 6337, at *15-16, 22-23 (N.Y. Sup. Ct. July 16, 2012) (similar holding).

supports its position. The first words in Section 9.02 are "[e]xcept as otherwise provided in Section 9.01." Underwood Ex. A. Section 9.01 provides that "[n]o provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own misconduct." *Id.* If HSBC performs, or fails to perform, in a negligent manner, it is liable regardless of anything in Section 9.02.

In any event, Section 9.02(a)(iii) does not relieve HSBC of any obligation to pursue litigation; it provides that the Trustee is not required to do so "*at the request*, order or direction of any of the Certificateholders" unless the certificateholders offered "reasonable security or indemnity." Underwood Ex. A (emphasis added). Section 9.02(a)(v) similarly does not relieve HSBC of any obligation to investigate; it provides that before an EOD, HSBC may accept as true statements in a "resolution, certificate" or other statement provided to it. *Id*. And, contrary to HSBC's contention, Section 9.02(c) does not address any right to indemnification at all. *Id.* Even if it did, HSBC already received adequate indemnity from multiple sources. Resp. 56.1 ¶ 166, 169; *see PL v BNYM*, 2017 U.S. Dist. LEXIS 145044, at *31-32 (trustee has burden to demonstrate existing indemnity inadequate); *FMS Bonds, Inc. v. Bank of N.Y. Mellon*, 2016 U.S. Dist. LEXIS 98856, at *52 (S.D.N.Y. July 28, 2016) (trustee not entitled to additional indemnity).

Section 9.01(i), which provides that prior to an EOD HSBC's duties are limited to "the duties and obligations as specifically set forth in" the PSA, does not help HSBC because Plaintiffs rely on an express duty; the PSA states HSBC "shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase." Underwood Ex. A § 2.03(a). The fact that the PSA does not explain how HSBC should go about enforcement does not change the fact that it had a duty to do so. Even if "shall enforce" were ambiguous, such ambiguity should be construed against HSBC as it participated in the drafting of the PSA. Resp. 56.1 ¶ 162-64. At best the

ambiguity raises issues of fact.[21]

      The numerous repurchase actions filed by HSBC involving other trusts further undercuts its assertion that litigation is not a tool it was expected to utilize to enforce its repurchase obligations. Resp. 56.1 ¶ 149. Whether or not HSBC acted in response to a direction in these actions is irrelevant because the ACE 2005-AG1 PSA unambiguously says that HSBC "shall enforce" and these actions show what was done to pursue enforcement in other trusts. There is also no admissible evidence supporting HSBC's assertion that it never acted without direction in these actions. All HSBC offers is a self-serving declaration that does not even reference the actions against DBSP. *Id.* ¶ 76. The Court should strike this vague and self-servicing statement because HSBC successfully shielded from discovery documents relating to other trusts not part of the bellwether on the ground that such documents are irrelevant. *See* ECF 373 at 9 (denying permission to add defenses because they implicated how HSBC acted in other trusts and HSBC successfully limited discovery to the bellwether trusts). Allowing HSBC to inject a self-serving affidavit on an issue for which it refused to provide document discovery would be particularly inappropriate because "HSBC is largely in control of the documents and information the Plaintiffs would need to rebut its claims." *Id.*; *see also Davis v. Carroll,* 937 F. Supp. 2d 390, 432 (S.D.N.Y. 2013) (holding a "self-serving affidavit, standing apart from any record evidence or any independent corroboration, does not create a genuine dispute of fact. . . .").

      Finally, even if HSBC were able to establish that it and other trustees routinely ignored R&W breaches absent a direction and indemnity from a controlling group of certificateholders, industry custom and practice is "not controlling" particularly where, as here, "the industry was

---

[21] *See Aircraft Servs. Resales LLC v. Oceanic Capital Co.*, 2013 U.S. Dist. LEXIS 114956, at *10-11 (S.D.N.Y. Aug 14, 2013) ("New York law provides that ambiguities in a contract must be construed against the drafter."); *Cambridge Constr. Corp. v. Bfc Constr. Corp.*, 191 Misc. 2d 25, 26 (1st Dep't 2001) (same); *see also See Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994) (ambiguity creates an issue of fact).

comprised of only a few participants who controlled the practice." *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 131-32 (2d Cir. 2017) ("reasonable care standard will not countenance an industry-wide 'race to the bottom' to set the least demanding standard") (quotation omitted).

### C.      All of Plaintiffs' R&W breach claims are timely.

Finally, HSBC argues that it cannot be liable prior to an EOD for its failure to enforce repurchase of four loans because it purportedly received notice of breaches more six years prior to the filing of this lawsuit. Mot. at 20. However, as set forth above in Section III, the ACE 2005-AG1 PSA does not include a time by which HSBC must enforce. "Where a contract does not specify a date or time for performance, New York law implies a reasonable time period." *Guilbert*, 480 F.3d at 149. The evidence demonstrates that HSBC often enforced repurchase obligations through litigation shortly before the six-year limitations period for filing claims expired. Resp. 56.1 ¶ 150; *W&S v. USB*, 2020 N.Y. Misc. LEXIS 8191, at *19 (timing of filing of other lawsuits is relevant in assessing reasonable time for performance). HSBC does not point to any evidence that suggests its performance was due prior to December 23, 2008. Therefore, it cannot demonstrate that Plaintiffs' claims were untimely under the applicable six-year statute of limitations period.

## V.      HSBC failed to exercise rights and remedies prudently after EODs occurred.

Each of the PSAs contain language substantively identical to Section 9.01 of the ACE 2005-AG1 PSA: "During the continuance of a Master Servicer Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." Underwood Ex. A § 9.01; *see also id.* Ex. B § 8.01; *id.*

Ex. C § 9.01(a). Nothing in Section 9.01 (or the equivalent) conditions this duty upon actual knowledge of the EOD. *Id.* The word "knowledge" simply does not appear. Nor does any term that is synonymous with actual knowledge. HSBC points to Section 9.02, which states that the "Trustee shall not be deemed to have notice of any default" unless it has "actual knowledge" of it or receives "written notice of any event which is in fact such a default." *Id.* Ex. A; *id.* Ex. B § 8.02; *id.* Ex. C § 9.02. HSBC, however, fails to explain why that provision matters when the duties in Section 9.01 (or the equivalent) are not qualified by written notice, actual knowledge, or any other type of notice. Section 9.01 provides that no provision of the agreement relieves HSBC of its negligent failure to act or of negligence in ascertaining facts. *Id.* Ex. A § 9.01, Ex. B § 8.01, Ex. C § 9.01(d). If HSBC should have known of events constituting EODs, and failed to act, it is liable.

Judge Scheindlin did not rule otherwise at the motion to dismiss stage. The Court rejected HSBC's contention that the Plaintiffs failed to allege actual knowledge and stated in *dicta* that Plaintiffs would need to adduce some evidence of actual knowledge at trial. MTD Op. at 30. This *dicta* was not based on a textual analysis of the PSAs at issue here, nor could it be as the motion to dismiss was generally addressing claims across multiple plaintiff groups and 283 trusts. *Id.* at 3. The three PSAs at issue here do not condition HSBC's post-EOD duties upon actual knowledge. Regardless, as discussed below, Plaintiffs have marshalled evidence sufficient to create a genuine issue of material fact that EODs occurred and HSBC was aware of them.

### A.     The evidence demonstrates that EODs occurred and HSBC was aware of them or, at a minimum, was negligent in ascertaining facts relating to them.

The three at issue PSAs use different terms to refer to the EODs that will trigger HSBC's post-EOD duties. Resp. 56.1 ¶ 171-73. Generally, they are material failures to perform by the Servicers or Master Servicer that are not cured. Each PSA requires Servicers to service the loans in the best interests of certificateholders subject to prudent, customary, or usual standards of

practice. *Id.* ¶ 174. The Master Servicer must supervise and enforce the obligations of the Servicers and are responsible for accurate remittances and reporting. *Id.* ¶ 175. All of the PSAs provide that a "Master Servicer Event of Default" or "Master Servicer Event of Termination" (encompassed within the definition of EOD used herein) will occur if the Master Servicer fails to perform and fails to cure after receiving written notice. *Id.* ¶ 170. And, under Section 7.01(a)(ii) of the FHLT 2006-C PSA, a "Servicer Event of Default" occurs when the Servicer fails to perform and fails to cure within a period specified after it obtained actual knowledge of the failure or received written notice. Underwood Ex. B. Record evidence shows that HSBC knew of multiple categories of performance failures relating to servicing and deficient master servicing but did nothing.[22]

(1)   **The Master Servicer and Servicers admitted their noncompliance**. For all the Trusts, the PSAs require the Master Servicer and Servicers to send compliance statements to the Trustee annually. Resp. 56.1 ¶ 176. The Master Servicer for each Trust and the Servicer for FHLT 2006-C admitted in annual statements of compliance provided to HSBC that they were materially noncompliant with their duties under the PSAs. *Id.* ¶ 86. In many cases, the Master Servicer and Servicers failed to deliver annual compliance statements at all, which is also a default. *Id.* ¶ 177. Contrary to HSBC's contention, Mot. at 22, n.25, these statements disclose breaches (or should have disclosed had they been provided) in specific trusts by the Master Servicer in its capacity as Master Servicer. Resp. 56.1 ¶ 178. In addition, the Master Servicer and Servicers disclosed failures to perform in their assessments of compliance provided in their platform-level certifications required under SEC Regulation AB, including breaches relating to the failure to timely complete

---

[22] HSBC served a premature contention interrogatory in this case and Plaintiffs refused to answer it. *See* Underwood Ex. 38. After some meet and confer discussions, HSBC dropped the issue and never requested supplementation or sought an order compelling Plaintiffs to answer. As a result, HSBC's observation that Plaintiffs did not answer the contention interrogatory is irrelevant. *FPP, LCC v. Xaxis US, LLC*, 2017 U.S. Dist. LEXIS 225397, at *3-4 (S.D.N.Y. Feb. 2, 2017) (party not precluded when not compelled to respond to premature contention interrogatory).

foreclosures. *Id.* ¶ 86. Platform level assessments of compliance reflect problems that impacted the entire servicing platform, which includes the Trusts. *Id.* ¶ 199-200.

Judge Pauley found the same types of compliance statements sufficient to create a genuine issue of material fact that EODs occurred and the trustee had actual knowledge of them. *Commerzbank v. USB*, 457 F. Supp. 3d at 252-54. Notices of this type are sufficient to satisfy the written notice requirement because "[r]equiring additional notice from other parties to the Servicer of information disclosed by the Servicer would be pointless." *W&S v. USB*, 2020 N.Y. Misc. LEXIS 8191, at *26 (emphasis in original). To the extent HSBC argues that the fact that the written notice was delivered by the servicer matters, the New York Court of Appeals has long held that performance will not be excused merely because a party other than the party specified in the contract has caused the occurrence of a condition precedent. *M. O'Neil Supply Co. v. Petroleum Heat & Power Co.*, 280 N.Y. 50, 53, 56 (1939) ("hairline distinctions will not be drawn nor circuitous reasoning indulged nor technicalities relied on to bar recovery. . . ."); *accord W&S v. USB*, 2020 N.Y. Misc. LEXIS 8191, at *26.

**(2) Servicers liquidated loans subject to repurchase claims**. When loans default, the Servicer should conduct a pre-foreclosure file review that includes a determination of whether any key documents are missing from the Mortgage File. Resp. 56.1 ¶ 196. A prudent Servicer would have ensured that action was taken to ensure that defaulted loans that were missing documentation were repurchased. *Id.* ¶ 196-97. The Servicers of the Trusts instead liquidated 1,772 loans at a loss without taking any action to refer a loan for repurchase and the Master Servicer took no action to enforce the Servicers' obligation to properly mitigate losses. *Id.* ¶ 180. Trust custodial records provided to the Master Servicer demonstrated that loans with uncured document exceptions remained uncured and trust monthly reporting provided by the Master Servicer identified the loans

that defaulted or were liquidated (including loans with uncured exceptions). *Id.* ¶ 180, 198.

The court in *Commerzbank v. USB* found similar evidence sufficient to establish that EODs occurred. 457 F. Supp. 3d at 254-55 (EODs occurred "when Servicers or Master Servicers liquidated loans with document defects" without ensuring repurchases were pursued). If HSBC was not aware of these EODs, it was negligent because it had access to all Trust custodial and remittance records and there were numerous regulatory actions and reports implicating the Master Servicer (as well as HSBC itself) in servicing misconduct in foreclosure relating to the fabrication of missing documents. Resp. 56.1 ¶ 99, 180.

(3)     **Servicers failed to foreclose on properties in a timely manner and employ prudent loss-mitigation practices**. Prudent servicing practices require foreclosures to be completed within industry standard timelines absent special circumstances. Resp. 56.1 ¶ 181. EODs were triggered in all three at issue Trusts by Servicers exceeding industry standard foreclosure timelines approximately 58.5% of the time and by 308 days on average, which failures went uncorrected by the Master Servicer. *Id.* ¶ 182. The Servicer for FHLT 2006-C admitted in a writing provided to HSBC that it was not completing foreclosures within required timeframes. *Id.* ¶ 183. HSBC also received written notice that the Servicers failed to follow prudent loss mitigation practices on a widespread basis. *Id.* ¶ 184-86. At a minimum, these notices demonstrate that HSBC was negligent in failing to ascertain that EODs occurred.

(4)     **Servicers failed to maintain REO properties**. Servicers are responsible for ensuring that REO properties are properly maintained. Resp. 56.1 ¶ 187. HSBC's records show it knew that Wells Fargo, the Master Servicer for the Trusts, and Ocwen, a Servicer for FHLT 2006-C, failed to maintain REO properties because they were cited by municipalities for code violations impacting REO properties. For example, HSBC sent a letter to Ocwen regarding judgments entered

by the New York Environmental Control Board ("NYCECB") against HSBC for properties Ocwen serviced. Resp. 56.1 ¶ 188. The letter attached property maintenance citations issued by the NYCECB to HSBC, including at least three properties underling FHLT 2006-C, and requested that Ocwen confirm in writing that all relevant REO properties have been reviewed and are in compliance with the corresponding PSAs. *Id.* There is no evidence that Ocwen complied with this request. *Id.* HSBC made similar requests to Wells Fargo and it similarly ignored them. *Id.* ¶ 189. These are grounds for more EODs. *See, e.g.*, *Commerzbank v. USB*, 457 F. Supp. 3d at 254-55 (EODs resulting from failure to properly maintain REO properties).

**B.    The prevention doctrine would apply if there was a lack of notice.**

At the motion to dismiss stage, Judge Scheindlin held that HSBC could not rely on the absence of notice to the Master Servicer or Servicers, noting:

> While it is unclear whether HSBC had a duty to give notice, the Agreements specifically designate HSBC as one of the parties who could give the required notice to trigger an Event of Default. As such, HSBC is insisting on the performance of a condition that HSBC itself had the power to satisfy. "'[I]t has been established for over a century that a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party itself.'" Under New York law "[t]he implied covenant of good faith and fair dealing requires a promisor to reasonably facilitate occurrence of a condition precedent by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence."

MTD Op. at 28-29 (footnotes omitted) (*quoting Lomaglio Assocs. v. LBK Mktg. Corp.*, 892 F. Supp. 89, 93 (S.D.N.Y. 1995) and *Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*, 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992)). Courts in this District have uniformly agreed. *See PL v. DB*, 172 F. Supp. 3d at 715; *Fixed Income Shares: Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 855 (S.D.N.Y. 2015). This holding is law of the case, *Cortese v. Skanska Koch, Inc.*, 2021 U.S. Dist. LEXIS 114076, at \*28 (S.D.N.Y. June 17, 2021), and HSBC has not provided a compelling reason

31

to depart from it. In fact, the case for the prevention doctrine is stronger now because it is clear under Section 8.03(b) of the ACE 2005-AG1 PSA that HSBC had a duty to provide notice "of any event, which constitutes or which, with notice or lapse of time or both, would constitute a Servicer Event of Default or a Master Servicer Event of Default." Underwood Ex. A.

HSBC argues that this Court should rule differently based on two subsequent First Department decisions that contain minimal analysis. Mot. at 23 (*citing BlackRock Balanced Cap. Portfolio (FI) v. U.S. Bank N.A.*, 165 A.D.3d 526 (1st Dep't 2018), and *Fixed Income v. Citibank*, 157 A.D.3d at 541). However, these rulings are so perfunctory that at least three judges in this District have declined to follow them. *See Commerzbank v. USB*, 457 F. Supp.3d at 250 ("This Court also believes that the New York Court of Appeals would not affirm these First Department decisions."); *Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 685 (S.D.N.Y. 2019) (Stein, J.) (same); *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 2018 U.S. Dist. LEXIS 64271, at * 4 (S.D.N.Y. Apr. 17, 2018) (Failla, J.). And *Bakal v. U.S. Bank N.A.* (a) has no precedential effect and (b) does not even mention the prevention doctrine.

**C.    Following an EOD, the Trustee must act as if its own money is on the line.**

HSBC's argument that it satisfied its post-EOD duties because it did not have to do anything after an EOD is circular and unsupportable under the PSAs. Mot. at 24-25. After an EOD, the Trustee must use the same degree of care and skill as a prudent person would exercise in the conduct of such person's own affairs. *See, e.g.,* Underwood Ex. B § 8.01(a). This heightened post-default duty exists in every PSA because it is statutorily mandated by either the TIA or the Streit Act, NY Real Property Law §126 (for New York-based trusts not subject to the TIA). This standard requires a trustee to confront an EOD as a prudent person protecting herself would do; in other words, after an EOD, the trustee must act as if its own money were on the line. *See Beck*, 218

A.D.2d at 12 (post-default, bond trustee has a fiduciary-like duty to "assure" to the greatest extent possible that bondholders will "recover what they are owed"). HSBC's suggestion that *Beck* somehow limits its duties is wrong because "*Beck* requires an indenture trustee to perform prudently even the more general obligations in the indenture, and applies to any conduct not specifically prohibited by the indenture which would enable the investors to secure repayment of the trust certificates." *LNC Invs., Inc. v. First Fid. Bank, Nat'l Ass'n*, 935 F. Supp. 1333, 1348 (S.D.N.Y. 1996). Similarly, HSBC's assertion that its compensation was low is totally irrelevant because it agreed to perform the duties of Trustee. It also ignores the commercial reality that it assumed the role of Trustee to foster relationships with the parties who made HSBC's lucrative RMBS securitizations possible. Resp. 56.1 ¶ 6, 160.

Plaintiffs have presented sufficient evidence of what a prudent person would do under the circumstances. Resp. 56.1 ¶ 190-91, 193-95, 201-02 (describing steps that Government Sponsored Enterprises take when they serve as the trustee and Master Servicer of their own securitizations); *id.* ¶ 161, 191-92, 203 (identifying actions taken to enforce repurchases); *id.* ¶ 147, 204 (HSBC took action to enforce R&W breaches and servicing obligations when its own money was on the line).[23] To the extent that HSBC argues that evidence relating to parties other than RMBS trustees should be disregarded, HSBC is wrong because "examples need not be limited to actions" taken by trustees as the standard is a "prudent person" with their own money on the line, not a prudent trustee. *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2020 U.S. Dist. LEXIS 49231, at *22 (S.D.N.Y. Mar. 20, 2020). "Put differently, following one's industry colleagues in a race to the bottom does not mean that the bottom reflects prudent conduct." *Id.*

---

[23] Once again HSBC argues that Judge Netburn's discovery order addressing sampling somehow found that HSBC had no duty, Mot. at 25 & 26 n.29, but Judge Netburn expressly disclaimed any ruling addressing the scope of the Trustee's duties and she was not considering the evidence provided by Plaintiffs in response to HSBC's motion.

HSBC's contention that it need not perform any of its duties after an EOD unless directed and indemnified by a controlling group of holders is wrong. *PL v. BNYM*, 2017 U.S. Dist. LEXIS 145044, at *12. As discussed above in Section IV.B, Section 9.02(a)(iii) of the ACE 2005-AG1 PSA (and the equivalent in the other two Trusts) merely provides that the Trustee need not act in response to a request from a certificateholder unless they have provided reasonable indemnity. Resp. 56.1 ¶¶ 72, 90. Section 9.02(a)(v) (or the equivalent) merely states that the Trustee may accept as true statements in certain documents. *Id.* And both provision expressly state they do not apply if there is an EOD. *Id.* ¶ 90. In any event, if HSBC claims it was relieved from acting because the multiple indemnities that it receives under the PSA (*id.* ¶ 166-69) were somehow inadequate, it has the burden to demonstrate through record evidence that it reached that conclusion when faced with the decision as to whether to act. *PL v. BNYM*, U.S. Dist. LEXIS 145044, at *31-32, 37. Where, as here, there is no evidence that HSBC's inaction after EODs was the result of "careful and informed deliberation," HSBC's inaction is *per se* imprudent. *LNC Invs., Inc. v. First Fid. Bank, Nat'l Ass'n*, 1997 U.S. Dist. LEXIS 12858, at *53 (S.D.N.Y. Aug. 27, 1997) (citing *Stark v. U.S. Tr. Co.*, 445 F. Supp. 670, 680 (S.D.N.Y. 1978)). Prudent people "do[] not assume a totally passive, willfully blind role in the management of [their] own property." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 578 (S.D.N.Y. 2015), *aff'd* 873 F.3d 85 (2d Cir. 2017).

### D.     Plaintiffs' post-EOD claims are timely.

The duty to exercise rights and remedies prudently after an EOD is indisputably a continuing duty because each PSA states that this duty is owed "[d]uring the continuance" of an EOD or while it "remains uncured." Underwood Ex. A § 9.01, Ex. B § 8.01, Ex. C § 9.01(a).[24]

---

[24] *See Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 80 (4th Dep't 1980) ("[W]here a contract provides for continuing performance over a period of time, each breach may begin the running of the statute [of limitations] anew such that accrual occurs continuously and plaintiffs may assert claims for damages occurring up

HSBC contends post-EOD claims are untimely because if HSBC breached its duties it was shortly after it received exception reports showing that there were missing and materially defective documents. As set forth in Section III, that contention is wrong for HSBC's pre-EOD claims. It is doubly wrong for the post-EOD claims because the duty is to exercise rights and remedies that arise after the EOD occurs. HSBC's conduct after the EOD, not before, is what matters. HSBC does not claim that EODs were cured more than six years before the filing of this action and, thus, it has failed to meet its burden of establishing that any breaches of its post-EOD duties are untimely.

HSBC's contention that it would have had to conduct a "widespread review" of Mortgage Files to identify document defects is absurd. Trust agents maintained lists of documents that were missing or materially defective. Resp. 56.1 ¶ 198. Plaintiffs also are not speculating that the responsible parties would "voluntarily agree[]" to repurchase loans. Mot. at 26. The PSAs state that the responsible parties had an obligation to repurchase if they failed to cure after notice—this obligation was not discretionary. Underwood Ex. A § 2.03(a), Ex. B. § 2.03(c), Ex. C § 2.03(c). Whether they did so willingly or were compelled to do so, a prudent person would have exercised rights and remedies to ensure the responsible parties honored their obligations.

Finally, HSBC's claim that Judge Scheindlin already found that post-EOD claims based on document defects are untimely is wrong. As discussed in Section III, the motion to dismiss decision addressed only a subset of pre-EOD claims unrelated to repurchase. The Court expressly disclaimed any application to Plaintiffs' "broad[er]" claims. MTD Op. at 36 n.121. Similarly, the language that HSBC relies upon in *PL v. BNYM* (Mot. at 27) addresses pre-EOD duties, not those that arise after an EOD.

---

to six years prior to filing of the suit."); *see also Bulova Watch Co. v. Celotex Corp.*, 46 N.Y.2d 606, 611 (1979) (same); *Sirico v. F.G.G. Prods., Inc.*, 71 A.D.3d 429, 435 (1st Dep't 2010).

**VI.     HSBC should have exercised its rights and powers to seek servicing improvements and compensation for losses caused by the Servicers and Master Servicer.**

In each Trust EODs are triggered by nonperformance by the Master Servicer and, in FHLT 2006-C, Servicer noncompliance also results in an EOD. Resp. 56.1 ¶ 170-73. When an EOD has occurred and is continuing "the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." Underwood Ex. A § 9.01. "Subsequent to default, it is usually only the trustee who is able to act swiftly and effectively to assure, insofar as assurance can be had, that the rights of bondholders to recover what they are owed will ultimately be vindicated." *Beck*, 218 A.D.2d at 12. As shown above, HSBC was aware of nonperformance by the Master Servicer and Servicers. *See supra* Section V.A. A prudent person in such circumstances would have, among other things, taken action to ensure that the Servicers and Master Servicer were employing prudent loss mitigation practices and compensating the Trusts for any failure to do so. Resp. 56.1 ¶ 201-04. For ACE 2005-AG1 and FHLT 2006-C, this could have been achieved by exercising appropriate oversight of the Servicers and Master Servicer and making the appropriate demands. *Id.* ¶ 193-95. Plaintiffs do not advance this damage theory for NAA 2005-AR6.

Rather than address the contractual duty to exercise its rights and powers prudently after an EOD, HSBC resorts to more misdirection arguing that it does not have a duty to service loans or oversee the Servicers. But HSBC cannot deny that as Trustee it had the "right" and the "power" to exercise oversight of the Master Servicer and Servicers. Resp. 56.1 ¶ 176,  179. Even before an EOD, the Master Servicer and Servicers were required to provide reports to HSBC concerning their compliance. *Id.* ¶ 176. "One of the primary purposes of a Trustee in the RMBS context is to evaluate Servicer performance and cure any Servicer deficiencies," and "the Trustee is the only

party in position to learn of a servicer breach." *Commerzbank v. USB*, 457 F. Supp. 3d at 250. HSBC argues that it should not be liable for any damages caused by the failure to oversee the Servicers and Master Servicer prior to the occurrence of EODs. Mot. at 28-29. Plaintiffs, however, have presented evidence that is sufficient to demonstrate that a prudent person would have demanded compensation for past servicing breaches. Resp. 56.1 ¶ 193-95, 201-04. As noted, HSBC had the "right" and "power" to do so. Plaintiffs do not claim those damages would have accrued prior to an EOD. *Id.* ¶ 96. Instead, consistent with Plaintiffs' legal theory, their experts' damages analyses assume that the Servicers and Master Servicer were required to provide compensation *after* the EOD occurred. *Id.*

As for the losses caused by the Servicers' and Master Servicer's breaches after an EOD, HSBC appears to argue that it did not have an express duty to take action to ensure they met their servicing obligations. Mot. at 29. That argument ignores entirely HSBC's post-EOD duty to exercise all of its rights and powers, which are not limited to carrying out duties expressly identified in the PSAs. Underwood Ex. A § 9.01, Ex. B § 8.01, Ex. C § 9.01; *see LNC*, 935 F. Supp. at 1348 (after an EOD "the trustee must take any authorized action necessary to protect the investors," including "any conduct not specifically prohibited by the indenture"); *Beck*, 218 A.D.2d at 13 (trustee must "exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation.").

HSBC's assertion that there is no evidence that the Servicers or Master Servicer failed to perform their duties is wrong. As set forth above in Section V.A, there is ample evidence the Servicers and Master Servicer failed to perform. This is trust- and loan-specific evidence of breaches. *See Commerzbank v. USB*, 457 F. Supp. 3d at 252-55. HSBC argues the Court should disregard the detailed findings of the regulators who oversaw the Servicers and Master Servicer

and found they had engaged in widespread falsification of documents in foreclosure proceedings because those findings did not identify specific loans. Mot. at 30. The findings, however, are corroborated by the fact that thousands of loans were missing critical documentation but were nonetheless forced through foreclosure. Resp. 56.1 ¶ 180.

Finally, contrary to HSBC's suggestion, Mot. at 29, Plaintiffs' claim is not based on a loan guarantee provided by Servicers. Plaintiffs' experts analyzed loan performance because servicing, and servicing oversight, impacts loan performance. This damages methodology has been found to be admissible by multiple courts in this District. *See Pac. Life Ins. Co. v. Bank of N.Y. Mellon,* 2021 U.S. Dist. LEXIS 32417, at \*10-11 (S.D.N.Y. Feb. 22, 2021); *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2020 U.S. Dist. LEXIS 49231, at \*32-34.

## VII.   HSBC's "good faith" arguments fail on the facts and the law.

HSBC incorrectly claims Plaintiffs must show evidence of HSBC's bad faith. Mot. at 30-31. In fact, HSBC pled "good faith" as an affirmative defense. ECF 62 at 42-43. "[O]n a motion for summary judgment … the defendant[s] must put forth [their] own evidence sufficient to direct a conclusion of law that [they are] entitled to the defense." *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 456 (S.D.N.Y. 2009) (alteration in original) (citations omitted).

Regardless, the relevant standard is negligence, not bad faith. The controlling provisions of the PSAs state that the Trustee may not be liable "for an error of judgment made in good faith . . . *unless it shall be proved that the Trustee . . . was negligent in ascertaining the pertinent facts*." Resp. 56.1 ¶ 98 (emphasis added).[25] The PSAs further state that HSBC is not relieved of its negligence or other misconduct. *E.g.,* Underwood Ex. A § 9.01. If HSBC erroneously concluded

---

[25] To the extent that HSBC relies on Section 9.02(a)(iv) of the ACE 2005-AG1 PSA, or the equivalent provision in other Trusts, that clause is subject to provisions in section 9.01. *See* Underwood Ex. D at 64-67 ("[e]xcept as provided in Section 9.01").

that it was not required to take action when, in fact, it was, HSBC was negligent in ascertaining facts because it does not, and cannot, contend that it relied on the advice of counsel in interpreting the PSAs. *See* ECF 255 (striking HSBC's advice of counsel defense); ECF 297 (affirming). Having offered literally no evidence, HSBC did not bear its burden, and cannot cure that on reply.

Even assuming *arguendo* that bad faith was the standard, substantial evidence proves that despite its express duty to act for the benefit of certificateholder, HSBC instead employed systemic willful blindness and even active hostility to investors. Resp. 56.1 ¶ 132-47. A party's intentional disregard of facts that should have motivated it to act proves lack of good faith. *In re Parmalat*, 594 F. Supp. 2d at 456-57; *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 768 (S.D.N.Y. 2001). "[W]hether a party to a contract has acted in good faith generally presents a question of fact for a jury." *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Telos CLO 1006-1 Ltd.*, 274 F. Supp. 3d 191, 215 (S.D.N.Y. 2017) (denying defendant's summary judgment motion "as barred by issues of material facts").[26] HSBC's lone cite, *Nouveau Elevator Indus. v. Cont'l Cas. Ins. Co.*, is irrelevant as it was a "bad-faith claim" brought against an insurer where the *plaintiff* bore the burden to prove bad faith. 2006 U.S. Dist. LEXIS 41495, at *29-30 (E.D.N.Y. June 21, 2006). Here, "good faith" is a *defense*. *HSBC* has the burden, but has not carried it.

The evidence of bad faith also supports Plaintiffs' implied covenant claim. Under *Spinelli v. NFL*, 903 F.3d 185 (2d Cir. 2018), where a contract's meaning and/or the scope of a party's discretion are disputed, claims for breach of contract and implied covenant are properly asserted in the alternative and are not duplicative. *Id*. at 205-06; *see Fantozzi v. Axsys Techs., Inc.*, 2008 U.S. Dist. LEXIS 94040, at *24 (S.D.N.Y. 2008) (denying summary judgment); *Maddaloni*

---

[26] *See also RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, 2013 U.S. Dist. LEXIS 47535, at *38 (S.D.N.Y. Mar. 30, 2013) (Trustee's summary judgment motion based on exculpatory clause denied because "good faith" is a fact question); *Coan v. Estate of Chapin*, 156 A.D.2d 318, 319 (1st Dep't 1989).

*Jewelers, Inc. v. Rolex Watch U.S.A., Inc.,* 41 A.D.3d 269, 270 (1st Dep't 2007) (same). Here, the meaning of key PSA clauses is disputed and HSBC agrees that the scope of its discretion is at issue, Mot. at 18-19. *Spinelli* controls, and the claim survives.

## VIII.   The Streit Act and reservation of rights relating to the TIA.

As set forth in Section V.C, the Streit Act prohibits acceptance of a covered trust instrument that does not include language requiring the trustee to exercise rights and remedies prudently after an EOD. If HSBC is correct that the PSA did not require it to exercise rights and remedies prudently unless directed to do so, or for any other reason, HSBC violated the Streit Act. *See* MTD Op at 41-42. Plaintiffs acknowledge that the TIA claims must be dismissed under binding authority for the at issue Trusts only, but reserve the right to challenge that authority on appeal.

## IX.   Plaintiffs' tort claims are valid.

Judge Scheindlin held that HSBC had duties in tort both prior to and after the occurrence of EODs. Prior to an EOD, HSBC had a duty to avoid conflicts of interest and Plaintiffs had alleged a viable claim. MTD Op. at 9 (describing the duty to avoid conflicts of interest as a "pre-default obligation[]"); *id.* at 40 (holding Plaintiffs alleged viable conflict of interest claim). After an EOD, a trustee has a broader fiduciary duty of undivided loyalty and the Court sustained that claim that as well. *Id.* at 37. A trustee's duty of undivided loyalty requires more than avoidance of conflicts of interest. A trustee must place the interests of beneficiaries ahead of its own and affirmatively protect their interests.[27]

HSBC's contention that these tort claims are duplicative was already rejected by the Court

---

[27] *See, e.g., BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,* 778 F. Supp. 2d 375, 400-01 (S.D.N.Y. 2011) (trustee breaches fiduciary duty of loyalty if it fails to protect the interests of holders); *In re Lloyd's Am. Tr. Fund Litig.*, 954 F. Supp. 656, 679-80 (S.D.N.Y. 1997) (trustee breaches fiduciary duty of loyalty when it "plac[es] its own interests above those of the beneficiaries"); *see also City Bank Farmers Tr. Co. v. Cannon*, 291 N.Y. 125, 131 (1943) ("Undivided loyalty is the supreme test, unlimited and unconfined by the bounds of classified transactions").

because "they arise out of a separate, extra-contractual duty." MTD Op. at 38 n.127 ("It is irrelevant that plaintiffs claim that while violating these duties, HSBC was also breaching the contracts."); *accord Commerzbank v. USB*, 277 F. Supp. 3d at 497 (collecting cases). The Court further found the economic loss doctrine inapplicable when a party working in a professional capacity had an extra-contractual duty. MTD Op. at 13; *accord Commerzbank v. USB*, 457 F. Supp. 3d at 261-62. These holdings are law of the case. *See, e.g., Cortese*, 2021 U.S. Dist. LEXIS 114076, at *28 (rejecting defendant's legal challenges previously considered at motion to dismiss stage).

Plaintiffs have marshalled evidence sufficient to raise a genuine issue of material fact as to whether HSBC breached its pre-EOD duty to avoid conflicts of interest. This evidence shows HSBC was involved in the sale and securitization of mortgage loans in the same roles as the parties who sold and securitized the loans held in the Trusts, and was accused of the same misconduct that it would have to accuse loan sellers of if it enforced repurchases. Resp. 56.1 ¶ 99. HSBC was similarly accused of the same servicing misconduct as the Servicers and Master Servicer, *id.*, and adopted policies to ensure it remained willfully blind to the wrongdoing of the sellers and the Servicers and Master Servicer. *Id.* ¶ 132-47; MTD Op. at 40 (willingness to "look[] the other way" to promote own interests constitutes an actionable conflict of interest). Judge Pauley found that an RMBS trustee's "paralysis," in the face of the "frequency and breadth of Servicer breaches," like HSBC's here, was "telling" and "raises a material question of fact about self-dealing that precludes summary judgment." *Commerzbank v. USB*, 457 F. Supp. 3d at 262.

As for the duty of loyalty claim, there is no real dispute that HSBC acted in a manner that violated its fiduciary duty of loyalty. HSBC did not take any action to protect investors after EODs occurred. And its contention that it was entitled to refrain from taking any action unless it received

a separate indemnity from certificateholder, Mot. at 25, is totally inconsistent with its obligation to place certificateholders' interests first.

## X.      HSBC's summary judgment damages arguments fail.

### A.      The guarantee covering losses on Phoenix Light's Class B notes is irrelevant.

HSBC falsely claims that "Phoenix Light has a guarantee that makes up losses incurred by the Certificates." Resp. 56.1 ¶ 101; Mot. at 33. The Court need look no further than the witnesses HSBC relies upon to identify this misdirection. They all testified that the referenced guarantee applies to the Class B notes issued by Phoenix Light, not the at issue RMBS Certificates. *See* Resp. 56.1 ¶ 101; Underwood Ex. 2 at 299:19-300:19 (guarantee benefits "holder of Class B notes" for losses that "reside on the Class B notes"); Underwood Ex. 19 (guarantor "is paying for any losses on the B notes"); *see also id.* ¶ 102 (Terms and Conditions explain how guarantee payments are calculated). The Class B notes were issued by Phoenix Light and are not RMBS, they are entirely different securities. Resp. 56.1 ¶ 101. The purported fact that Phoenix Light's agents calculate and receive guarantee draws, and pass payments along to the Class B noteholder, is irrelevant because the payments cover losses on the Class B notes under a guarantee that is provided to the Class B noteholder, not Phoenix Light. *Id.* ¶ 101-02.

Phoenix Light suffered losses because a re-securitization issuer is "injured by actions that adversely affect the underlying assets" regardless of whether or not losses are ultimately passed through to noteholders. *HOE I*, 2014 U.S. Dist. LEXIS 49894, at *32; *see also* Resp. 56.1 ¶ 206. Moreover, even if Phoenix Light were entitled to indemnity for losses associated with the Certificates—it is not—HSBC would still be liable for all damages recoverable under the collateral source rule. *See Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 116 n.2 (2d Cir. 2002) (damages not offset by insurance recoveries); *In re State St. Bank & Tr. Co. ERISA Litig.*, 579 F. Supp. 2d 512,

517 (S.D.N.Y. 2008) (same); *Ventura Assocs. v. Int'l Outsourcing Servs.*, 2005 U.S. Dist. LEXIS

13991, at *21 (S.D.N.Y. July 12, 2005) ("the rule continues to apply to contract claims").[28] *In re*

*GM LLC Ignition Switch Litig.*, cited by HSBC, is not on point as it addressed breach of warranty

claims under California, Texas and Missouri law and the impact of subsequent repairs. 407 F.

Supp. 3d 212, 231 (S.D.N.Y. 2019).

### B.  Plaintiffs' damages are general because they are the "natural and probable" consequence of HSBC's breaches.

Plaintiffs' damages are general damages arising directly from HSBC's breaches. HSBC's

argument (Mot. at 33-36) that investment losses are consequential damages is contrary to guidance

from the New York Court of Appeals defining general damages as those damages that "are the

natural and probable consequence of the breach," in contrast to consequential (or special) damages

that are not. *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 805 (2014)

("*Biotronik*").[29] Damages flowing from the contract are general; damages resulting from collateral

business arrangements are consequential. *Id.* at 805–06; *see also Tractebel Energy Mktg., Inc. v.*

*AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007).

Here, Plaintiffs' damages flow directly from the contract because, had HSBC not breached

its duties, more money would be remitted to the relevant two Trusts and paid to investors pursuant

to the "waterfall" or distribution formulas set forth in the PSAs. Resp. 56.1 ¶¶ 105-106. Similar to

its failures at the motion to dismiss stage, HSBC again cites no "cases that characterize investment

---

[28] In *Inchaustegui v. 666 5th Ave. Ltd. P'ship*, the court held that the collateral source rule did not apply in a breach of contract action when a "landlord procured its own insurance covering the risk" that its tenant would fail to procure required liability insurance. 96 N.Y.2d 111, 114 (2001). *Inchaustegu* is inapposite because Phoenix Light is not indemnified for the risk of loss caused by HSBC's breaches. *See also Aretakis v. Cole's Collision*, 165 A.D.3d 1458, 1460 (3d Dep't 2018) (summary judgment inappropriate when issues of fact existed as to whether collateral source was intended to compensate for particular damages).

[29] *Biotronick* held that losses under a distribution contract were not consequential, because the plaintiff would have received money based on the "pricing formula" in the contract. 22 N.Y.3d at 808–09.

losses as consequential damages." MTD Op. at 50. Plaintiffs' damages flow from the Trustee's failure to protect the Trusts' assets. *Id.*; *see also Carbures Europe, S.A. v. Emerging Mkts. Intrinsic Cayman Ltd.*, 148 A.D.3d 421, 421–22 (1st Dep't 2017) (investment losses due to mismanagement of collateral are general damages). The "explicit objective of the contract" was to appoint a Trustee to enforce repurchase obligations prior to an EOD and exercise rights and remedies to protect the interests of the Trusts and certificateholders before and after an EOD. Damages flowing from failure to protect collateral are general damages. *Unilever U.S., Inc. v. Johnson Controls, Inc.*, 2017 U.S. Dist. LEXIS 121996, at *12 (N.D. Il. Aug. 2, 2017) ("general damages" against security firm under New York law include losses arising from failure to protect the premises).[30] Plaintiffs' damages flow directly from HSBC's failures to enforce repurchase obligations and prudent loss-mitigation procedures in ACE 2005-AG1 and NAA 2005-AR6.

HSBC's cases are inapposite because they involve losses relating to collateral business arrangements, not losses directly flowing from breaches of the main contract. In *Schonfeld v. Hilliard*, the plaintiffs' damages arose from failure of a separate agreement to start a television channel. 218 F.3d 164, 170 (2d Cir. 2000). In *MMS USA Holdings, Inc. v. PricewaterhouseCoopers LLP*, which pre-dates *Biotronick*, the plaintiffs' damages arose from a share transfer to a foreign entity. 2013 N.Y. Misc. LEXIS 6130, at *2-3 (N.Y. Sup. Ct. Mar. 19, 2013). HSBC's other cases are also procedurally inapposite (post-trial or inquest) in addition to seeking damages that could not be considered within the contemplation of the parties.[31] And even

---

[30] *See also Hoffman v. Nutmeg Music Inc.*, 2018 U.S. Dist. LEXIS 158505, at *26-27 (D. Conn. Sept. 18, 2018) (damages flowing from improper reduction of revenues resulting in decreased payments to plaintiff are general damages); *Harmit Realties LLC v. 835 Ave. of Ams., L.P.*, 128 A.D.3d 460, 461 (1st Dep't 2015) (reduction in development value caused by defendant's misreporting of asset transfers are general damages because they "flow[ed] from the breach").

[31] *Carco Grp., Inc. v. Maconachy*, 383 F. App'x 73, 74-75 (2d Cir. 2010) (bench trial; "any damages resulting from Carco's inability to secure new business were consequential"); *MVP Health Plan, Inc. v. Optuminsight, Inc.*, 2017 U.S. Dist. LEXIS 136188, at *2, 42 (N.D.N.Y. Aug. 24, 2017), *aff'd*, 765 F. App'x 615 (2d Cir. 2019) (bench trial;

these cases show that whether damages are general or consequential is fundamentally an issue for trial, not summary judgment. Whether damages claimed in a contract action are direct or consequential is an issue of fact that "must be left for resolution at trial." *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459-60 (S.D.N.Y. 1976).

### C.      HSBC is liable for liquidated loans under the ACE 2005-AG1 PSA.

HSBC argues that Plaintiffs cannot prove that it is liable for failing to enforce the seller's obligation to repurchase in ACE 2005-AG1 because the repurchase price of liquidated mortgage loans is purportedly "zero." Mot. at 36-37. Even ignoring the fact that HSBC makes no effort to identify the specific loans it contends have no repurchase value, this argument is commercially absurd because loans in foreclosure fetch far less than their loan values; and it is contractually absurd because the purpose of repurchase provisions is to "shift risk to the seller," *Wells Fargo v. Bank of Am.*, 2014 U.S. Dist. LEXIS 15000, at *13 (S.D.N.Y. Feb. 6, 2014), *vacated and remanded on other grounds*, 627 F. App'x 27 (2d Cir. 2015), and this purpose would be negated if liquidation extinguished any obligation for the balance.[32] It also is contrary to positions that HSBC has taken in litigation against DBSP when other similar PSA language was at issue. Resp. 56.1 ¶ 109.

Judge Castel has rejected the same argument, concluding that the language in PSAs setting the repurchase price to zero was for internal trust accounting only, and did not, and was not intended to, absolve the warrantor from paying the balance of the repurchase price after

---

lost income due to mispricing of health insurance policies were consequential damages); *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1281, 1285 (2d Cir. 1994) (bench trial; cargo hold inspection company liable for losses from inability to sell); *N. Indus. Holdings, LLC v. E. Env'tal. Grp. Inc.*, 2016 WL 8541049, at *2, 7 (N.D.N.Y. Feb. 23, 2016) (inquest; increased "costs of asbestos abatement" incurred by retaining third party were not sufficiently related to negligent asbestos inspection to warrant recovery); *FDIC v. Drysdale*, 2013 WL 5965723, at *2, 4 (E.D.N.Y. Nov. 7, 2013) (inquest; borrower default was a reasonably foreseeable consequence of the closing agent's malpractice).

[32] *Reichert v. N. MacFarland Builders Inc.*, 85 A.D.2d 767, 768 (3d Dep't 1981) (rejecting an absurd interpretation as "obviously unacceptable"); *In re NXXI Inc.*, 216 F. Supp. 3d 381, 389-90 (S.D.N.Y. 2016) ("where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner").

foreclosure. *See MARM 2006-OA2 v. UBS Real Estate*, 2015 U.S. Dist. LEXIS 24988, at *34-41 (S.D.N.Y. Jan. 9, 2015).[33] The PSA definitions in ACE 2005-AG1 are some of the same terms that were before Judge Castel. *Compare id.* at *36-37, *with* Resp. 56.1 ¶¶108-109. Judge Castel held that these definitions contradicted the argument, asserted by HSBC here, that liquidation would extinguish any remaining repurchase obligation. *MARM*, 2015 U.S. Dist. LEXIS 24988 at *38 ("Thus, if a loan were eventually to be liquidated subsequent to purchase, that Liquidated Loan would not automatically render the Purchase Price as zero."). The definitions on which HSBC relies are "not part of the PSAs' remedial scheme" and "do not alter the remedies available under section 2.03 of the PSAs." *Id.* at *39. The First Department has cautioned a sole-remedy provision should not be read to deprive the trust of a remedy for liquidated loans that cannot be repurchased because such an interpretation would leave plaintiffs without a remedy, and "would create a perverse incentive . . . to fill the trust with junk mortgages that . . . could be released, charged off, or liquidated before a repurchase claim is made." *Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 133 A.D.3d 96, 106 (1st Dep't 2015), *aff'd as modified*, 30 N.Y.3d 572 (2017). Nor has HSBC proffered any evidence that any liquidated loans Plaintiffs contend should have been repurchased otherwise triggered a Liquidation Event as defined in the ACE 2005-AG1 PSA. *See* Resp. 56.1 Resp. ¶ 109. HSBC's unpublished order *BNYM v. WMC Mortgage*, No. 12-cv-7096, ECF 323 (S.D.N.Y. 2015) is a procedurally inapposite motion-in-limine determination and cannot be squared with the better reasoned decision in *MARM 2006-OA2*.

Finally, even if the repurchase price for ACE 2005-AG1 loans were zero after liquidation, that would not extinguish Plaintiffs' right to benefit-of-the-bargain damages for HSBC's breaches

---

[33] Similar to "Stated Principal Balance" here, the definition of 'Principal Balance' in the PSAs before Judge Castel said that "the Principal Balance of any Mortgage Loan that has … become a Liquidated Loan during the related Prepayment Period shall be zero." *MARM*, 2015 U.S. Dist. LEXIS 24988, at *36-37.

of contract, which are measured not by what HSBC did, but by what it should have done.

### D.      HSBC's "ability to pay" argument is unsupported by competent evidence.

HSBC contends Fremont Investment & Loan ("FIL") lacked sufficient funds to satisfy repurchase claims, so Plaintiffs cannot prove damages for FHLT 2006-C. Mot. at 37-38. The argument fails outright because damages are not an essential element of the contract claim. *Kronos, Inc. v AVX Corp.*, 81 N.Y.2d 90, 95-96 (1993). And, because collectability is an affirmative defense, HSBC bears the burden of proving it. *Lindenman v. Kreitzer*, 7 A.D.3d 30, 34–35 (1st Dep't 2004). The discovery orders cited by HSBC, Mot. at 37 n.36, do not address burden of proof, which belongs to HSBC.

HSBC cannot satisfy its burden. Its argument depends on a sole proffered expert witness, Bennett—who offers an inadmissible narrative of hearsay historical facts, effectively making him a mere mouthpiece for HSBC's legal theory. Experts may not provide a factual narrative designed "to tell a story favorable to their client." *In re M/V MSC Flaminia*, 2017 U.S. Dist. LEXIS 119146, at *182-83 (S.D.N.Y. July 28, 2017). Such narratives are improper because they bolster one party's view of the evidence and usurp the "role [of the] factfinder." *Id.*at *165, 169; *see Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 U.S. Dist. LEXIS 24375, at *9 (S.D.N.Y. Apr. 18, 2018) (experts may not "act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story'"). Bennett's recitation of historical facts, which are not based on his first-hand knowledge and do not require industry or technical expertise to understand, should be disregarded.[34] In any event, the "facts" on which

---

[34] Where Plaintiffs rely on experts, they permissibly rely on those witnesses' *opinions* and on facts that form the basis of and lay the foundations for the experts' conclusions. *In re M/V MSC Flaminia*, 2017 U.S. Dist. LEXIS 119146, at *225-26. Experts are entitled to rely on facts and documents, and to explain how those facts and documents are supportive of their opinions. *Scentsational Techs.*, 2018 U.S. Dist. LEXIS 24375, at *9. That is what Plaintiffs' experts do. By contrast, Bennet cobbles facts together into a narrative and characterizes  them "for the purposes of having the fact finder accept that interpretation as fact," which "goes too far." *Id.*

HSBC relies are disputed or false. Bennett and HSBC say: FIL could not pay $129 million in 2010 to satisfy repurchase claims; FIL's parent, FGC, went into Chapter 11 in 2008, and FIL merged into FGC post-bankruptcy; the reorganized entity could not pay; and under FIL's "actual repurchase practices" it could pay only "pennies on the dollar." Mot. at 37-38. That is all wrong or irrelevant.

In March 2008, an FDIC Directive required FGC to divest control of FIL and barred FIL from making capital distributions to FGC. Resp. 56.1 ¶ 118. Bennett is unaware of the Directive ever being terminated. *Id.* In mid-2008, FIL's assets were sold, and FIL—not FGC—retained the cash proceeds; Bennett admits FIL kept $129 million or more. *Id.* ¶ 119. A valuation report on which he relied showed that at year-end 2009, FIL had assets of $426 million, including $331 million+ in cash/cash equivalents, versus $24.7 million in liabilities. *Id.* HSBC's focus on *FGC's* bankruptcy is a red herring because *FIL* was never a debtor in Chapter 11. FIL was not merged into FGC until June 11, 2010, as a result of FGC's reorganization plan. In the Chapter 11, HSBC represented FGC's (but not FIL's) noteholders; on the Creditors Committee, HSBC supported a reorganization plan that used *FIL's* money to pay $280 million in cash to *FGC's* creditors—including $183 million to FGC's noteholders represented by HSBC. Resp. 56.1 ¶ 125. HSBC made no claim in the Chapter 11 for RMBS holders, who got nothing. *Id.*

HSBC relies on Bennett's opinion that FIL wouldn't/couldn't have paid to settle claims of only one trust. Yet Bennett could identify no methodology for this opinion and can't say how one would objectively verify it, Resp. 56.1 ¶ 127, making the basis for HSBC's argument inadmissible *ipse dixit. Caruso v. Bon Secours Charity Health Sys.*, 2016 U.S. Dist. LEXIS 104067, at *15-18 (S.D.N.Y. Aug. 5, 2016); *Bank of N.Y. Mellon v. WMC Mortgage, LLC*, 2015 U.S. Dist. LEXIS 108320, at *23-26 (S.D.N.Y. Aug. 17, 2015). Bennett does not know anything prohibiting FIL

48

from settling one trust's claims before the bankruptcy court order approving FGC's plan. Resp. 56.1 ¶ 127. By July 2008, FIL was no longer FDIC-insured, so the FDIC could not restrict FIL's use of its assets. Resp. 56.1 ¶ 121. Nor can HSBC claim FIL's potential liability for other trusts limited its funds to settle FHLT 2006-C. Bennett disavowed such opinion and doesn't know if HSBC might have been required to request repurchase for only one FIL trust versus others. *Id.* ¶ 128. As for FIL's "actual repurchase practices," Mot. at 38, Bennett averaged three settlements— simple math he admits did not require an expert. Resp. 56.1 ¶ 124. He knows no details underlying the settlements, *id.* ¶ 123, so HSBC cannot prove the results are comparable to, let alone dictate, what FIL would have done for FHLT 2006-C. Even if Bennett is considered, given all these facts contradicting his and HSBC's positions, HSBC is not entitled to summary judgment.

### E. HSBC's mitigation of damages affirmative defense should be dismissed.

HSBC bears the burden of proof on its twenty-seventh affirmative defense (ECF 374 at 45) for failure to mitigate. *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985). HSBC must meet this burden with facts, not "mere speculation or conjecture." *Knight v. U.S. Fire. Ins.*, 804 F.2d 9, 12 (2d Cir. 1986). HSBC's burden includes quantification of the asserted damages that could have been mitigated, *Eskenazi v. Mackoul*, 72 A.D.3d 1012, 1014 (2d Dep't 2010) (dismissing defense), which HSBC cannot provide. *See* Cross Mot. 56.1 ¶ 39. HSBC also fails its burden of identifying the events that triggered the alleged mitigation, nor can it rectify this omission, since HSBC affirmatively denies that it ever repudiated or abandoned its contract, and such repudiation is a *sine qua non* for application of the defense. *Id.* ¶ 40; *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010). And HSBC cannot sustain the defense where, as here, it had the same opportunity (and a far better ability) to prevent damages. *Travelers Indem. Co. v. Maho Mach. Tool Corp.*, 952 F.2d 26, 31 (2d Cir. 1991). A plaintiff "is

'not required to take steps in mitigation that *should have been taken by the breaching defendant*.'" *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2016 U.S. Dist LEXIS 120131, at *65 (S.D.N.Y. Aug. 31, 2016) (quoting *Korea Life Ins. Co. v. Morgan Guar. Tr. Co. of N.Y.*, 2004 U.S. Dist. LEXIS 16436, at *21 (S.D.N.Y. Aug. 20, 2004)) (emphasis added).

HSBC cannot sustain its burden of proof by contending that Plaintiffs could or should have directed it to do its duty. First, HSBC still has to demonstrate facts supporting the quantification, trigger, and repudiation elements of its defense, which it has not done (and cannot do). Second, as the cases note, any duty to mitigate *does not* likely include a duty to direct the Trustee. *Royal Park Invrs. SA/NV*, 2016 U.S. Dist LEXIS 120131, at *65-66. Third, the duty to mitigate does *not* require extraordinary efforts, only reasonable efforts, *U.S. Bank v. Ables & Hall*, 696 F. Supp. 2d at 421 (extraordinary measures not required), and the record evidence establishes that Plaintiffs did the best they could with what they had available. For example, the Plaintiffs submitted their holdings to an attorney to determine whether a group could be formed to direct HSBC. Cross Mot. 56.1 ¶ 41. Finally, HSBC is estopped from making this argument, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), because it has previously obtained litigation rulings in this case by asserting that beneficial holders were invisible to each other. *Royal Park Invrs. SA/NV v. HSBC Bank USA, N.A.*, 2018 U.S. Dist. LEXIS 17623 (S.D.N.Y. Feb. 1, 2018). Without the ability to identify other holders, directing the Trustee is *near impossible.* In short, HSBC's mitigation defense is without legal or factual support, and should be dismissed.

## CONCLUSION

HSBC's motion for summary judgment should be denied and the Court should grant Plaintiffs' cross-motion and strike HSBC's champerty and related standing and collateral estoppel defenses, and its failure to mitigate damages affirmative defense.

Dated: July 13, 2021
　　　　New York, New York

By:　*/s/ Steven S. Fitzgerald*
　　　David H. Wollmuth
　　　Steven S. Fitzgerald
　　　Ryan A. Kane
　　　Sean P. McGonigle
　　　WOLLMUTH MAHER & DEUTSCH LLP
　　　500 Fifth Avenue
　　　New York, New York 10110
　　　Phone: (212) 382-3300


　　　*Attorneys for Plaintiffs*